# THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT COURT

---

## CA. NO. 17-1329

---

### RICHARD KATZ

*Plaintiff/Appellant*

v.

### THE NATIONAL BOARD OF MEDICAL EXAMINERS

### and

### THE FEDERATION OF STATE MEDICAL BOARDS

*Defendants/Appellees*

---

## SUPPLEMENTAL APPENDIX
## VOLUME I OF II

---

Appeal from the February 7, 2017, Order of the Honorable Robert D. Mariani of the United States District Court for the Middle District of Pennsylvania, Case No. 3-15-cv-01187, adopting in part and modifying in part the Report and Recommendation of United States Magistrate Judge Joseph F. Saporito, Jr., dismissing two of Appellant's claims as frivolous, and granting summary judgment in favor of Appellees on all remaining claims.

---

NEIL J. HAMBURG
MICHAEL E. SACKS
ID Nos. 32175 and 39974
HAMBURG & GOLDEN, P.C.
1601 Market Street, Suite 3310
Philadelphia, PA  19103-1443
(215) 255-8590
Counsel for Appellees
National Board of Medical Examiners and
The Federation of State Medical Boards

# TABLE OF CONTENTS

**VOLUME I**                                                              **PAGE**

Docket Entries                                                            S.A. 1
(U.S.D.C. for M.D.Pa., 3:15-cv-01187-RDM)

November 30, 2016, Report and Recommendation of U.S.M.J.                  S.A. 18
Joseph F. Saporito, Jr.

February 7, 2017, Order and Opinion of The Honorable Robert              S.A. 40
D. Mariani, adopting U.S.M.J. Joseph F. Saporito, Jr.'s Report
and Recommendations

April 18, 2017, Order of the Court of Appeals                            S.A. 43

NBME and FSMB's Amended Statement of Undisputed Facts                    S.A. 44

NBME and FSMB's Exhibits to their Amended Motion for
Summary judgment

    Defendants' Exhibit 1, Applicant's Request for Test       S.A. 55
    Accommodations (Step 2 CK)

    Defendants' Exhibit 2, Applicant's Request for Test       S.A. 60
    Accommodations (Step 2 CS)

    Defendants' Exhibit 4, July 7, 2005, letter from M.       S.A. 66
    Fuentes to R. Katz

    Defendants' Exhibit 7, NBME telephone contact memos       S.A. 68
    2005, 2006

    Defendants' Exhibit 10, March 7, 2006, decision forms     S.A. 94
    regarding accommodations requested

    Defendants' Exhibit 11, USMLE announcements re Six        S.A. 97
    Attempt Limit

    Defendants' Exhibit 12, 2013-2014 contacts and emails    S.A. 101

| | |
|---|---|
| Defendants' Exhibit 14, April 2014 emails between R. Katz and NBME | S.A. 105 |
| Defendants' Exhibit 15, June 2015 email from R. Katz to Mr. Rish at Pa. Board of Medicine | S.A. 109 |
| Defendants' Exhibit 16, April 3, 2015, letter from T. Lazo, Counsel for Pa. Board of Medicine, to R. Katz | S.A. 115 |
| Defendants' Exhibit 17, USMLE Candidate Score Inquiry List re R. Katz | S.A. 117 |
| Defendants' Exhibit 18, Plaintiff's (proposed) Second Amended Complaint, with attachments | S.A. 123 |
| Defendants' Exhibit 19, Plaintiff's Amended Complaint | S.A. 165 |
| Defendants' Exhibit 20, Minutes of the May 19, 2015, meeting of the Pennsylvania Medical Board | S.A. 174 |
| Defendants' Exhibit 21, Affidavit of Catherine Farmer, Psy.D. | S.A. 182 |
| Defendants' Exhibit 22, Affidavit of Gerard F. Dillon, Ph.D. | S.A. 196 |
| Defendants' Exhibit 23, Deposition of Richard Katz, February 9, 2016 | S.A. 209 |
| Defendants' Exhibit 24, Records of St. Matthew's School of Medicine (partial) | S.A. 277 |
| Defendants' Exhibit 25, Records of St. Christopher's School of Medicine (partial) | S.A. 282 |
| Defendants' Exhibit 26, Records of the Education Commission for Foreign Medical Graduates (ECFMG) (partial) | S.A. 285 |
| Defendants' Exhibit 27, Second Amended Complaint | S.A. 287 |

# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**Richard Katz**
Plaintiff

                                          Civil Action No. 3:15-cv-01187

         v.

**NATIONAL BOARD OF MEDICAL**
**EXAMINERS**
3750 Market Street
Philadelphia, Pennsylvania 19104,

and

**FEDERATION OF STATE MEDICAL**
**BOARDS**
 400 Fuller Wiser Road, Suite 300 Euless,
Texas 76039-3855

Defendants

---

# I. AMENDED COMPLAINT

COMES NOW the plaintiff, Richard Katz appearing Pro Se for an amended complaint against the defendants above named, states, alleges, and avers as follows:

# II. JURISDICTION & VENUE

1. This Court has subject matter jurisdiction under 28 U.S.C. sections 1331 and 1343.

2. This action is commenced pursuant to 2201 and 2202 and 42 U.S.C., section 1983.

3. Plaintiff seeks declaratory relief pursuant to 28 U.S.C. Section 2201 and 2202.  Plaintiff claims for injunctive relief are authorized by 28 U.S.C. Section 2283 and Rule 65 of the Federal Rules of Civil Procedure.

# III. GENERAL ALLEGATIONS

4. The plaintiff, Richard Katz is a citizen of the State of Pennsylvania, United States of America.

5. Defendants, National Board of Medical Examiners (NBME) and Federation Of State Medical Boards (FSMB) own and sponsor the United States Medical Licensing Examination® ("USMLE"), which is a standardized examination that is used in evaluating applicants for medical licensure in the United States.*

---

*See* NBME and FSMB v. Optima University, LLC Case 1:09-cv-01043-JDB-cgc (¶ 4)  Document 1 Filed  02/23/09

6. The United States Medical Licensing Exam (USMLE) is a standardized examination used to evaluate applicants' competence for purposes of medical licensure in the U.S. and its territories. The USMLE is designed to assess a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care. The USMLE is administered at locations around the world to individuals who are attending, or have attended, medical schools in the United States and abroad. State medical boards rely upon successful completion of the three USMLE component exams, or "Steps," as an important element in the process for licensing physicians.

7. NBME is a private, non-profit organization. Its principal place of business is located in Philadelphia, Pennsylvania. It is registered as a *Professional Society and/or Association* by Guidestar database of Non-profit organizations. http://www.guidestar.org

8. NBME and the FSMB together own and sponsor the United States Medical Licensing Examination ("USMLE"), an examination that is a prerequisite for medical licensing in the United States and its territories. NBME administers the USMLE.

9. FSMB is a private non-profit organization that is incorporated under the laws of Nebraska but located in Euless, Texas. FSMB is registered as a *Research Institute and/or Public Policy Analysis Organization* by Guidestar database. Dr. David Watt former Senior Vice President of Professional Services for FSMB provides an informative PowerPoint presentation on the role of FSMB with respect to the USMLE Organization. This presentation is on file at The University of Texas Health Science Center at San Antonio (please refer to link below). FSMB role in USMLE Organization is as follows:

- Participate in governance (composite committee, step committees)
- Register and verify eligibility of physicians applying to take USMLE Step 3
- Maintain score history for physicians completing the USMLE
  *Transcript annotations (indeterminate, irregular behavior, special testing accommodations)


http://uthscsa.edu/gme/documents/fedstatemedbds.pdf

10. The USMLE Composite Committee, appointed by the FSMB and NBME, establishes policies for the USMLE program. There is a Program Administrator for the USMLE Office of the Secretariat. The Office of the USMLE Secretariat is the central Point of contact for the USMLE program located in Philadelphia, PA and operates on behalf of **NBME** and **FSMB** for the **USMLE Organization**. *One of the primary roles of the Program Administrator is to participate in review of exam candidate policy exception requests; and to prepare responses to these requests* (please refer to Program Administrator job description at: http://nbme.iapplicants.com/ViewJob-684107.html).

11. In 2011 USMLE Organization announced that they will place an exam limit to the number of times examinees can take to pass a USMLE Step Component. *The previous policy allowed the examinee to take the exam as many times as they needed until passing.*

> Defendant posted the following announcement on their website June 12, 2012:
> "http://www.usmle.org/announcements/?ContentId=99
>
> "...the following Examinees who have made six or more attempts to pass a Step or Step component, including incomplete attempts, should be aware that all applications to register for additional attempts will not be processed unless they are submitted on or before December 31, 2012. This limit was first announced in August of 2011"

12. The Announcement refers the reader to the USMLE Bulletin (USMLE Bulletin includes information on all aspects of USMLE, such as eligibility requirements, scheduling test dates, testing, and score reporting) for more information about the Six Attempt Limit Policy and states the following: http://www.usmle.org/bulletin/eligibility/#TimeLimit

> "The USMLE program limits to six the total number of times an examinee can take the same Step or Step Component. An examinee is ineligible to take a Step or Step Component if the examinee has made six or more prior attempts to pass that Step or Step Component, including incomplete attempts. All attempts at a Step or Step Component are counted toward the limit, regardless of when the examinations were taken."

13. If the six attempts have been exceeded and the examinee attempts to register for the Step component the NBME website will inform the examinee that the exam limit has been exhausted and they are no longer eligible to register locking the examinee out from registering for that given Step. *The Bulletin does not discuss exceptions to this rule or matters involving ADA,* **Americans with Disability Act Amendment** *(ADAAA) and* **Rehabilitation Acts policies.**

14. NBME and FSMB are subject to the requirements of Section 309 of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12189, and the implementing regulations, 28 C.F.R. § 36.309.

15. The United States Department of Justice (DOJ) is the federal agency responsible for administering and enforcing Title III of the ADA, 42 U.S.C. §§ 12181-12189. **The DOJ has been investigating plaintiffs' case since November of 2014, and is ongoing** (please refer to court docket document 1-6 filed 06/17/15 Page 4- 7).

16. Pursuant to Title III of the ADA, private entities that administer examinations related to professional licensing must offer the examinations in a place and manner accessible to persons with disabilities. 42 U.S.C. §12189 and 28 C.F.R. § 36.309.

17. Pursuant to 28 C.F.R. § 36.309, private entities that administer such examinations are required to provide reasonable modifications to the examination and appropriate auxiliary aids and services (i.e., testing accommodations) for persons with disabilities. The purpose of testing accommodations is to ensure, in a reasonable manner, that the "examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual or speaking skills (except where those skills are the factors that the examination purports to measure)." 28 C.F.R. § 36.309(b)(1)(i). "Required modifications to an examination may include changes in the length of time permitted for completion of the examination." 28 C.F.R. § 36.309(b)(2).

18. The Attorney General's Office under 42 U.S.C. § 12188(b)(1)(A)(i) conducts investigations of alleged violations of Title III of the ADA, DOJ is currently investigating plaintiffs' case that the NBME had failed to grant him reasonable testing accommodations on the basis of a disability for administrations of the USMLE Exams beginning in 2005. Additionally, the *Six Attempt Limit* has been exhausted by Plaintiff for the USMLE Step I exam. **Plaintiffs' request to modify six attempt policy, is a reasonable accommodation and does not substantially modify the the USMLE's standards.** *See e.g. Doe v. Samuel Merritt University,* **921 F.Supp. 2d. 958 (N.D. Cal. 2013) (Preliminary Injunction granted allowing student with a disability to take a podiatric licensing examination unlimited times as an accommodation to University's policy providing for a three exam limit).**

19. NBME had found that the supporting documentation submitted by plaintiff did not demonstrate that he is currently substantially limited in a major life activity as compared to most people, so as to be disabled within the meaning of the ADA, as amended. *It must be noted that the plaintiff was treated for a seizure disorder, speech disorder and had neurological problems during childhood.*

20. Plaintiff had submitted sufficient documentation to demonstrate that he is a person with a disability within the meaning of the ADA, and that he was entitled to reasonable testing accommodations to take the USMLE.

21. Plaintiff provided additional documentation to the NBME on April 1st 2014 (Please refer to Document 1-2 Filed 06/17/15 Page 1 of 29.) in support of his request for accommodations on the USMLE Step 1 examination documenting accommodations he received in undergraduate school, graduate school, and medical school.

22. The Defendants determination and denial of accommodations is discriminatory, in light of the 2008 ADAAA defendant would not continue their denial. ADAAA purpose is to restore the intent and protections of the Americans with Disabilities Act of 1990. Pursuant to the ADAAA, plaintiff would be entitled to the accommodations of extended time on the USMLE Step 1 Exam.

23. In amending the ADA in 2008, Congress mandated that the Equal Employment Opportunity Commission (EEOC) issue regulations restoring the broad scope of the ADA as Congress originally intended. 42 U.S.C. §12010(b)(6). The promulgated EEOC regulations provide in pertinent part:

"the primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA. Consistent with the Amendments Act's purpose of reinstating a broad scope of protection under the ADA, the definition of disability" in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted..." 29 C.F.R §1630.1(c)(4).

24. The NBME accommodation process should of been simplified as the result of a settlement announced by the U.S. Department Of Justice (DOJ) on February 22, 2011.[1] The case arose under Title III of the ADA and involved the extensive documentation required by the NBME from applicants seeking testing accommodations. Under the terms of the settlement, a Yale Medical School student with dyslexia received the accommodations of **double testing time** and a separate testing area to take the USMLE. (*Please note that beginning November 28th 2014, plaintiffs' case against defendants has been under investigation by DOJ Disability Rights Section based on the above precedent.*)

The defendant is currently required to:

a. Only request documentation about (a) the existence of a physical or mental impairment; (b) whether the applicant's impairment substantially limits one or more major life activities within the meaning of the ADA; and (c) whether and how the impairment limits the applicant's ability to take the USMLE under standard conditions

b. Carefully consider the recommendations of qualified professionals who have personally observed the applicant in a clinical setting and recommended accommodations; an

c. Carefully consider all evidence indicating whether an individual's ability to read is substantially limited within the meaning of the ADA.

25. On July 26, 1990, Congress enacted the Americans with Disabilities Act, 42 U.S.C. section 12101, et seq., establishing the most important civil rights law for persons with disabilities in our country's history. The Congressional statutory findings include:

a. "some 43,000,000 Americans have one of more physical or mental disabilities . . .;

b. "historically, society has tended to isolate and segregate individuals with disabilities and despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

c. "One "purpose of the ADA is to guarantee that those with disabilities are not disadvantaged and to 'place those with disabilities on an equal footing' with others."[2] That purpose often is overlooked in the context of accommodating persons with disabilities in higher education and professional licensing.

---

[1]  The settlement can be found at: <http://www.ada.gov/nbme.htm>.

[2]  *Rothberg v. Law Sch. Admission Council, Inc.*, 300 F.Supp. 2d 1093, 1105 (D. Colo. 2004).

d. "individuals with disabilities continually encounter various forms of discrimination, including the discriminatory effects The Americans with Disabilities Act ("ADA") provides far-reaching protections for people with disabilities. Colleges and universities, as well as professional licensing entities like NBME, covered by Titles II and III of the ADA. . Individuals who are applying for Exam Accommodations to or enrolled in post-secondary educational institutions (schools attended after high school) may encounter ADA issues involving reasonable accommodations, required disclosure of medical information on applications, and suspension or expulsion due to the effects of a disability.

26. One "purpose of the ADA is to guarantee that those with disabilities are not disadvantaged and to 'place those with disabilities on an equal footing' with others."[3] That purpose often is overlooked in the context of accommodating persons with disabilities in higher education and professional licensing. Many private and public colleges, universities, and graduate schools are included in this mandate, as are private professional licensing entities.[4]

27. Nonetheless, these entities do not always grant reasonable modification or accommodation requests, and the implications may be that people with disabilities are denied equal opportunities to pursue degrees in higher education and professionally licensed careers.
    a. "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity . . . to pursue those opportunities for which our free society is justifiably famous . . ."42 U.S.C. section l2101(a).

    b. Private entities, in the context of higher education and when providing licensing, must comply with the general prohibition against discrimination in the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" under Section 12182 of Title III.[5]

## IV. EXHAUSTION OF LEGAL REMEDIES

Plaintiff filed an appeal with defendant on April 1st 2014. In the appeal plaintiff presented the facts related to this complaint. On April 17th 2014 plaintiff was given a response by the defendants stating that the appeal had been denied. On April 20th plaintiff contacted defendants to appeal this denial and to address a *Catch 22* situation, the fact that defendant was requesting a *"formal request"* for exam accommodations on April 8th 2014. It was explained to defendant that a formal request would not be possible to submit as long as plaintiff was locked out from registering for USMLE Step I because of The Six Attempt Limit Rule that was imposed by the defendant. *The notion plaintiff was addressing was you can not submit a formal complaint for an exam that you can not register for, hence a Catch 22 situation.* A form of psychological manipulation and bureaucratic entanglement. **Defendants never responded to plaintiffs' second appeal.**

## V. LEGAL CLAIMS

Plaintiff reallege and incorporated by reference paragraphs 1- 27.
There is clear violation of discrimination pursuant to Title III of the ADA,
The plaintiff has no plain. adequate or complete remedy at law to redress the wrongs described

---

[3] *Rothberg v. Law Sch. Admission Council, Inc.*, 300 F.Supp. 2d 1093, 1105 (D. Colo. 2004).

[4] *Id.*

[5] 42 U.S.C. § 12182(b)(2)(A)(ii); 28 C.F.R. 35.130(b)(7).

herein. Plaintiff has been and will continue to be irreparably injured by the conduct of the
defendants unless this courts grants the declaratory and injunctive relief which plaintiff seeks.

## VI. PRAYER FOR RELIEF

WHEREFORE, the plaintiff respectively prays that this court enter judgment granting
plaintiff:

A declaration that the acts and omissions described herein violated plaintiffs' right under the
Constitution and laws of the United States of America.

A preliminary and permanent injunction ordering defendants to overturn Six Attempt Limit
Rule and allow plaintiff to register for USMLE Step 1, Step 2 (CK and CS) and Step 3 with
accommodations (double exam time) on all USMLE exams under the ADA ADAAA and
Rehabilitation Act programs.

Plaintiff requests that all of his previous attempts on USMLE Step 1, Step 2 CS and CK be
wiped clean from the ECFMG record. These attempts occurred without any form of exam
accommodations, during regular exam conditions, and as a result the playing field was not
leveled based on plaintiffs' disability pursuant to Title III of the ADA.

Compensatory damages in the amount of $70,000 against defendant, jointly and severely

Punitive damages in the amount of $230,000 against Defendants.
$230,000 which, when added to the compensatory damages of $70,000, is the maximum of
$300,000 permitted by the ADA.

A jury Trial on all issues triable by Jury

Plaintiff's Costs for registering for all USMLE Steps without the proper exam accommodations
required for his disability since February 1st 2006 totaling $8,660,00.

Any additional relief this court deems, just, proper, and equitable.

Plaintiff prays that the Court issue an injunction enjoining the defendant from continuing its
discrimination and that the Court award plaintiffs such additional or alternative relief as may be
just, proper, and equitable, including costs.

Respectfully submitted,

Richard Katz
3364 Parker Lane
East Stroudsburg, PA
18301

PRO SE

# EXHIBIT 20

COMMONWEALTH OF PENNSYLVANIA

DEPARTMENT OF STATE

BUREAU OF PROFESSIONAL AND OCCUPATIONAL AFFAIRS

### F I N A L   M I N U T E S

MEETING OF:

## STATE BOARD OF MEDICINE

TIME 9:00 A.M.

BOARD ROOM C

One Penn Center

2601 North Third Street

Harrisburg, Pennsylvania

May 19, 2015

NBME/Katz 0274

2

State Board of Medicine
May 19, 2015

BOARD MEMBERS:

Andrew J. Behnke, M.D., Chair - Absent
Marilyn J. Heine, M.D., Vice-Chair
Ian Harlow, Acting Commissioner, Bureau of Professional and
    Occupational Affairs
Bruce A. Brod, M.D.
Charles A. Castle, M.D.
Department of Health Representative - Absent
Keith E. Loiselle, Public Member
Sukh Dev Sharma, M.D.
Deval R. Paranjpe, M.D.
Allied Health - Vacant
Public Member - Absent

BUREAU PERSONNEL:

Teresa Lazo, Esquire, Board Counsel
Wesley Rish, Esquire, Board Counsel
Peter Speaks, Deputy Secretary for Regulatory Programs
David Green, Esquire, Board Prosecutor
Keith E. Bashore, Esquire, Board Prosecutor
Amanda Wojciechowski, Board Prosecutor
Jason Anderson, Esquire, Board Prosecutor
Anita P. Shekletski, Esquire, Board Prosecution Liaison
Suzanne Zerbe, Board Administrator

ALSO PRESENT:

Andrew W. Worek, Esquire
Angela Boateng, Regulatory Counsel, Pennsylvania Medical
    Society
Angie Armbrust, The Winter Group
Tanya Miller, Pennsylvania Athletic Trainers' Society
Randy Stevens, Pennsylvania Orthotic and Prosthetic Society
Susan DeSantis, Pennsylvania Society for Physician
    Assistants
Mary Marshall, The Hospital and Healthsystem Association of
    Pennsylvania (HAP)
Kendra Snuffer, Ridge Policy Group

1

Diaz Transcription Services - 717-233-6664

NBME/Katz 0275

3

```
1                          * * *
2                 State Board of Medicine
3                      May 19, 2015
4                          * * *
5        The regularly scheduled meeting of the State Board of
6    Medicine was held on May 19, 2015.  Marilyn J. Heine, M.D.,
7    Acting Chair, called the meeting to order at 9:00 a.m.
8    followed by a roll call.
9                          * * *
10   [Members of the staff along with members of the audience
11   were introduced and welcomed by the Board.]
12                         * * *
13   Approval of Minutes
14   DR. HEINE:
15             We will now have a motion to approve the minutes
16             from the last meeting of April 20th, 2015.
17   DR. CASTLE:
18             So moved.
19   DR. SHARMA:
20             Second.
21   DR. HEINE:
22             All those in favor of approving the minutes
23             please say aye.  Any opposed?
24   [The motion carried; Acting Commissioner Ian J. Harlow
25   abstained from voting on the motion.]
```

Diaz Transcription Services - 717-233-6664

NBME/Katz 0276

1   DR. CASTLE:

2        So moved.

3   DR. SHARMA:

4        Second.

5   DR. HEINE:

6        All those in favor say aye.  All those opposed

7        same sign.

8   [The motion carried unanimously.]

9                              ***

10  MR. RISH:

11       Based upon discussions in Executive Session, I

12       would recommend a motion denying the request for

13       waiver of the six attempts at the USMLE Step 1 of

14       Richard Katz, M.D. at this time as premature.

15  DR. CASTLE:

16       So moved.

17  DR. SHARMA:

18       Second.

19  DR. HEINE:

20       All those in favor say aye.  All those opposed

21       same sign.

22  [The motion carried unanimously.]

23                              ***

24  [Dr. Heine expressed her appreciation to the Board for its

25  hard work and also to the public for its interest and

Diaz Transcription Services - 717-233-6664

NBME/Katz 0277

1    attention to the matters which the Board deliberates upon.

2    Dr. Heine noted that the next Board meeting will be held

3    June 23, 2015.]

4                                    * * *

5    Adjournment

6    DR. CASTLE:

7              I move to adjourn.

8    DR. PARANJPE:

9              Second.

10    [The meeting adjourned at 12:32 p.m.]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NBME/Katz 0278

1

2

### CERTIFICATE

   I hereby certify that the foregoing summary minutes of the State Board of Medicine meeting, was reduced to writing by me or under my supervision, and that the minutes accurately summarize the substance of the State Board of Medicine meeting.

_____
Bradley E. Weirich
Minute Clerk

NBME/Katz 0279

```
                    STATE BOARD OF MEDICINE
                       REFERENCE INDEX
                        MAY 19, 2015

TIME        AGENDA:

9:00        Call to Order, followed by roll call

9:01        Introduction of Staff/Members of Audience

9:02        Report of Prosecutorial Division

9:23        Report of Acting Commissioner

9:32        Report of Committees

9:56        Report of Board Counsel

10:06       For the Board's Information

10:06       Executive Session
12:21       Return to Open Session

12:21       Motions

12:32       Adjournment
```

NBME/Katz 0280

# EXHIBIT 21

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|                              |     |                     |
| ---------------------------- | --- | ------------------- |
| RICHARD KATZ                 |  :  | CIVIL ACTION        |
|                              |  :  |                     |
| v.                           |  :  |                     |
|                              |  :  |                     |
| NATIONAL BOARD OF MEDICAL    |  :  | NO. 3:15-cv-1187    |
| EXAMINERS and FEDERATION OF  |  :  |                     |
| STATE MEDICAL BOARDS         |  :  |                     |

### AFFIDAVIT OF CATHERINE FARMER, PSY.D.

Catherine Farmer, having been duly sworn, hereby deposes and states:

1.    Since September 2006, I have been employed by the National Board of Medical
Examiners ("NBME") as Manager/Director of Disability Services and ADA Compliance Officer,
Testing Programs.  As Director, my duties include, among other things, operational
responsibility for the office that receives and processes requests for test
accommodations for the United States Medical Licensing Examination ("USMLE"). I am
responsible for making decisions to approve or deny such requests, and if approved,
the appropriate accommodation(s) to be provided.  A copy of my curriculum vitae is
attached as Exhibit A.

2.    I resigned my position as Case Manager in Disability Services at the NBME in
August 2005 in order to pursue full-time post-doctoral training in clinical psychology at the
University of Rochester School of Medicine and Dentistry. During the period of September
2005-August 2006, I worked as an independent consultant for the NBME, reviewing requests
for accommodations and the supporting documentation submitted by examinees.  At that

time, the NBME's Manager of Disability Services was J. Abram Doane. At the conclusion of my post-doctoral training, I rejoined the NBME as Manager of Disability Services and ADA Compliance Officer in September 2006. The position was retitled to Director in 2011.

**A.      The NBME Receives Hundreds of Requests for Accommodation Every Year, and Typically Grants More often than Denies Those Requests**

3.      Richard Katz, the complainant, made a formal request for testing accommodations on one occasion only, for Step 2 CK and Step 2 CS of the USMLE, in July 2005. Mr. Katz supplied additional information over a period of months, and the NBME completed its evaluation and denied his request for accommodations in March 2006.

4.      As a result of working in the office of Disability Services at the NBME since September 2004 and becoming the Manager of Disability Services in September 2006, I know the procedures followed by the Disability Services office when Mr. Katz made his request, as well as the approximate number of requests for accommodations granted at that time.

5.      In 2005-2006, as now, the Disability Services office of the NBME received hundreds of requests for test accommodations for the USMLE each year. The majority of the requests for accommodation, then and now, were for claimed learning disabilities or ADHD (Attention Deficit Hyperactivity Disorder), and the most common request was (and is) for extra examination time. Richard Katz's 2005 request for accommodations fell into that category.

6.      The NBME's approach to reviewing an examinee's request for accommodations for Step 1, Step 2 CK or Step 2 CS of the USMLE in 2005-2006, which has not changed significantly since that time, can be summarized as follows:

a) The NBME published information and Guidelines to request testing accommodations in the USMLE Bulletin of Information (BOI) and at the USMLE website www.usmle.org.

b) A candidate who believed he or she had a disability that required accommodation on the USMLE would review the published information and submit a Request for Test Accommodations together with supporting documentation in connection with his or her Step exam registration.

c) The NBME Disability Services office would conduct a preliminary audit of the request and supporting documentation submitted by the candidate and advise the candidate of any missing information. The candidate would then have the opportunity to supplement the documentation supporting his or her request for accommodation.

d) The NBME might send the request and supporting documentation to one or more outside consultants for review and recommendation.

e) The Manager/Director of the NBME's Disability Services office would review the written report and recommendation of the outside consultant(s), if applicable, and determine what, if any, accommodation(s) was appropriate for the candidate to access to the examination(s).

f) The NBME Disability Services would notify the candidate of the decision in writing. If accommodations were approved, NBME Disability Services would notify the test vendor of the approved accommodations to be provided for the Step examination.

3

7.     The documentation submitted by examinees in support of a request for accommodations, both in 2005-2006 and now, typically would include reports of clinical assessment, medical records, school records showing the examinee's history of receiving accommodations or symptomology consistent with the reported disability, letters or reports from caregivers, and the examinee's personal statement. The NBME considers all submitted documentation when assessing whether to grant accommodations on the USMLE.

8.     In 2005-2006, as now, no single element of an examinee's documentation would be dispositive. Over all, consistent with the ADA and implementing regulations, the Office of Disability Services would review the documentation to determine whether the information demonstrated that the examinee had a physical or mental impairment that substantially limited one or more major life activities relevant to the examination, compared with most people in the population and what, if any, accommodation(s) were appropriate to ensure access to the examination(s).

9.     In 2005-2006, the NBME granted approximately 75 percent of the requests it received for accommodations on USMLE. Additional time to take the examination has always been, and is, the most common form of accommodation.

10.    In 2005-2006, if the NBME determined that the examinee's supporting documentation did not document the presence of an impairment that substantially limited a major life activity relevant to the examination compared with most people in the population, it would deny the requested accommodation. The same holds true today.

11.    While an individual with a bona fide learning disability or ADHD might be entitled under the ADA to an accommodation such as extra time on the USMLE, an individual who does

4

not have a learning disability or ADHD should not be given additional time on the examination because doing so could give him or her an unfair advantage compared with examinees who are restricted to the standard amount of time. Moreover, the examination itself would become ineffective at identifying individuals who have the requisite level of knowledge and skills to become competent physicians, and those who do not. Those basic principles were as true in 2005-2006 as they are today.

> **B.** **Richard Katz's Request for Accommodation Was Denied for Legitimate Reasons, Namely Because the NBME Concluded that His Documentation Did Not Demonstrate an Impairment that Substantially Limited His Ability to Access the Examination As Compared with Most People.**

12.    As noted, in 2005-2006, before I rejoined the NBME as the full-time Manager of Disability Services at the NBME, I worked as an independent consultant for the NBME performing reviews of examinees' requests for accommodations and the documentation submitted on their behalf. In that capacity, I performed the "outside" review of Richard Katz's request for accommodations and submitted my report and recommendation, dated February 2, 2006, to J. Abram Doane, then the Manager of Disability Services. A copy of my 2006 report is attached as Exhibit B.

13.    I have reviewed my February 2, 2006, review, as well as the supporting documentation submitted by Mr. Katz at that time on which the review was based. If called upon to review the same documentation today I would come to the same conclusion that I did in 2006, namely that the documentation submitted by Mr. Katz did not document the presence of a substantial limitation in a major life activity because of ADHD, depression or anxiety. The detailed reasons for that conclusion are stated in my February 2, 2006, report. A few of the points that supported my conclusion were:

a) Mr. Katz's documentation did not demonstrate any clinical impairment in childhood, and did not include any historical evidence of substantial difficulties secondary to the claimed neurodevelopmental disorder, ADHD, that would rise to the level of a disability;

b) The diagnosis of ADHD appeared to be based largely on self-report and symptom endorsement on ADHD rating scales, but the diagnosis was not supported with evidence of longstanding impairment that could be reliably or specifically tied to ADHD;

c) Testing showed that performance on a range of cognitive and academic achievement tasks were well within average range and did not suggest impairment in reading or learning;

d) Documentation regarding depression and anxiety was inconsistent at best, and no treating professional had assigned any DSM-IV diagnosis of a mood or anxiety disorder before Mr. Katz applied for accommodations on the USMLE.

Over all, the documentation did not support a finding of a substantial limitation in functioning of a major life activity relevant to accessing the USMLE.

14.    I am aware that in this litigation, Mr. Katz has presented some information to the effect that in 2013, during or after a hospitalization, a physician diagnosed him with bipolar disorder, and that the same physician has stated that he believed that the 2005 diagnosis of ADHD was incorrect.

6

15.    This statement by Mr. Katz's treating physician supports my opinion that Mr. Katz's documentation did not demonstrate a significant impairment of a major life activity as a result of ADHD.

**C.    NBME Disability Services Did Not Conduct a Review of Mr. Katz's Potential Entitlement to Accommodations In Or After 2014 Because Mr. Katz Has Not Registered for a Step of the USMLE Or Submitted a Formal, Complete Request for Accommodations in Connection with Such Registration.**

16.    As noted, the NBME Disability Services Office conducts a review of an examinee's request for accommodations when he or she registers and is confirmed eligible for a Step of the USMLE and submits a formal request for accommodations and supporting documentation.    This process ensures a regular protocol that ties the request for accommodations to the demands of the particular examination, that complete documentation is available for review and consideration, and ensures that administrative and expert consultant resources are prioritized to provide a timely review and decision to eligible USMLE examinees.

17.    Mr. Katz has not submitted a formal request for accommodations in connection with a registration since 2005-2006.

18.    I am aware that Mr. Katz argues that he is in a "Catch 22" because he is ineligible to take Step 1 of the USMLE based on the six-attempt limit imposed by the USMLE program, but that is a matter of USMLE policy that is unrelated to the NBME Disability Services office.

19.    It is important to note, however, that even if Mr. Katz were eligible to take Step 1 as a result of an exception requested by a state medical board, and even if it were true that Mr. Katz has now been "correctly" diagnosed with a different condition (bipolar disorder), it does not automatically mean that he would be entitled to any particular accommodations.

7

Rather, Mr. Katz would have to submit supporting documentation to demonstrate that the claimed condition results in impaired functioning that substantially limits a major life activity relevant to the examination, as compared with the general population. That is a judgment that cannot be made without additional documentation.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.  EXECUTED ON THIS 29 DAY OF April, 2016.

Catherine Farmer, Psy.D.

R

# EXHIBIT A

# *Catherine Farmer, PsyD*

Work: 215-590-9700
cfarmer@nbme.org

---

## EDUCATION

| | | | |
|---|---|---|---|
| PsyD | Immaculata University (APA approved)<br>Immaculata, Pennsylvania | Clinical Psychology | 2004 |
| MS | Saint Joseph's University<br>Philadelphia, Pennsylvania | Health Education | 1993 |
| BS | Neumann College<br>Aston, Pennsylvania | Biology | 1985 |

## PROFESSIONAL EXPERIENCE

### *INDEPENDENT CONSULTANT*

9/05 – 8/06    Reviewed requests for test accommodations and supporting documentation of mental disorder/disability. Made recommendations to testing agency regarding appropriate test accommodations based on individual's functional impairment as defined by the Americans with Disabilities Act (ADA).

### *ADMINISTRATIVE/MANAGEMENT*

National Board of Medical Examiners (NBME), Philadelphia, PA

9/06 - present    ***Director, Disability Services***
***ADA Compliance Officer, Testing Programs***
Oversee the Office of Disability Services. Supervise exempt and nonexempt staff. Develop policies, procedures, and best practices to ensure the timely processing of requests for test accommodations. Develop and manage unit budget. Review examinee requests for test accommodations and supporting documentation of disability. Consult with experts in physical and mental impairments. Determine appropriate accommodations based on functional impairments as defined by the ADA. Make decisions and recommendations for approval of accommodations for United States Medical Licensing Examination (USMLE). Communicate with examinees regarding the outcome of their request for accommodations.

8/04 - 8/05    ***Case Manager, Disability Services***
Reviewed requests for test accommodations for the USMLE and supporting documentation of disability. Communicated NBME/USMLE policy and documentation guidelines to examinees, evaluators, and medical school personnel. Prepared custom written correspondence to examinees communicating the status and outcome of their requests for accommodation.

5/01 - 8/04    ***Special Assistant (part-time)***
Assisted with special projects and programs as needed to support the goals and objectives of the Division of Examinee Support Services. Assisted Disability Services staff with review of examinee requests for test accommodations and documentation of disability. Prepared custom written correspondence to examinees communicating the status and outcome of their requests for accommodation.

Catherine Farmer, PsyD
Page 2 of 3

1/95 - 5/01   **Assistant Manager, Test Administration**
Managed daily operation of the test administration unit including supervision of four exempt staff members. Prepared and monitored annual budget. Communicated policies and procedures regarding delivery of the NBME Certification Examination and the USMLE to examinees, medical school officials, hospital staff, medical licensing authorities and the public. Supervised the investigation and resolution of problems and irregularities regarding computer based test delivery of USMLE. Communicated the outcome/resolution of investigations to examinees.

1/93 - 12/94   **Test Center Coordinator**
Assessed compliance with NBME/USMLE test administration procedures at over 200 national test centers. Conducted test center site visits; evaluated test center facilities and staff. Planned, developed and conducted on-site proctor training. Established new test centers, negotiated and monitored vendor service agreements.

## PROJECT MANAGEMENT

8/88 - 1/93   **Project Coordinator**
Coordinated a collaborative research project between the NBME and the National Council of State Boards of Nursing, Inc. (NCSBN) to develop computer simulations for testing competence in nursing practice.

8/86 - 1/93   **Computer Based eXamination (CBX) Analyst**
Assisted with development of NBME computer-based simulations for testing competence in medical practice.

## TEACHING

9/05 - 8/06   **Postdoctoral Fellowship: Primary Care Family Psychology**
University of Rochester, School of Medicine and Dentistry, Rochester, New York
Department of Medicine, Highland Hospital

## CLINICAL PSYCHOLOGY TRAINING

**Postdoctoral Fellowship: Primary Care Family Psychology**
9/05 - 8/06   University of Rochester, School of Medicine and Dentistry, Rochester, New York
Department of Psychiatry, Strong Memorial Hospital

**Predoctoral Internship**
7/03 - 8/04   The Renfrew Center, Philadelphia, Pennsylvania

**Clinical Practica**
9/01- 6/03   Bryn Mawr Rehab Hospital, Malvern, Pennsylvania
                    Psychology Department
                    Pain Management Program

5/01 - 8/01   Children's Crisis Treatment Center, Philadelphia, Pennsylvania
                    Psychological Assessment

Catherine Farmer, PsyD
Page 3 of 3

### *CLINICAL NURSING EXPERIENCE*

1991 - 95    Bayada Nurses, Media, Pennsylvania
2001 - 02    ***Licensed Practical Nurse (LPN) (temporary part-time):*** Home Care Nursing

6/88 - 10/91    Western Medical Services, Media, Pennsylvania
             ***LPN (temporary part-time):*** Home Care Nursing

1977 - 86    Mercy Catholic Medical Center, Darby, Pennsylvania (Mercy Fitzgerald Hospital)
             ***LPN:*** Cardiac Step-Down/Telemetry Unit, Surgical Intensive Care/Coronary Care Unit,
             Operating Room, Medical Intensive Care Unit, General Medical Unit

1975 - 77    St. Francis Country House (Skilled Nursing Facility), Darby, Pennsylvania
             ***LPN:*** Charge nurse

### PROFESSIONAL MEMBERSHIPS

American Psychological Association (APA)

# EXHIBIT B

# FILED UNDER SEAL
## (SAME AS EXHIBIT 8)

# EXHIBIT 22

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD KATZ | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | |
| NATIONAL BOARD OF MEDICAL | : | NO. 3:15-cv-1187 |
| EXAMINERS and FEDERATION OF | : | |
| STATE MEDICAL BOARDS | : | |
| | : | |

**AFFIDAVIT OF GERARD F. DILLON, PH.D.**

Gerard F. Dillon, having been duly sworn, hereby deposes and states:

1.      My name is Gerard F. Dillon, and I am the Vice President for Licensure Programs at the National Board of Medical Examiners (NBME). I have worked at the NBME in various capacities since 1974. My curriculum vitae is attached. My background within psychology is psychometrics, which relates to the theory and technique of psychological measurement that focuses on the measurement of knowledge and skills.

2.      I am providing this affidavit to share my knowledge about the United States Medical Licensing Examination ("USMLE") and the adoption, in 2011, by its Composite Committee, of a six-attempt limit on taking any Step or Step Component of the USMLE. The USMLE Composite Committee establishes policy for the USMLE Program and is composed of representatives of the Federation of State Medical Boards (FSMB), the National Board of Medical Examiners (NBME), the Educational Commission for Foreign Medical Graduates (ECFMG), and the American public. This affidavit is based on my personal knowledge gained from my role of providing information and support and participating as a staff person in the Composite Committee's meetings.

3.      The USMLE is a three-step examination, assessing a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that are important in health and the treatment of diseases, and that constitute the basis of safe and effective patient care. The USMLE is used by medical boards to evaluate applicants' minimum competence for purposes of medical licensure in the United States and its territories. Step 1 of the USMLE assesses whether the examinee understands and can apply important concepts of the core sciences basic to the practice of medicine, with special emphasis on principles and mechanisms underlying health, disease, and modes of therapy. Step 1 ensures mastery of not only the sciences that provide a foundation for the safe and competent practice of medicine in the present, but also the scientific principles required for maintenance of competence through lifelong learning.

4.     Step 2 of the USMLE assesses whether the examinee can apply medical knowledge, skills, and understanding of clinical science essential for the provision of patient care under supervision, emphasizing health promotion and disease prevention.  Step 2 is comprised of two parts: Step 2 CK (Clinical Knowledge) is constructed according to an integrated content outline that organizes clinical science material along two dimensions: physician task and disease category.  Step 2 CS (Clinical Skills) is a clinical skills exam that uses standardized patients (actors in the role of patients) to test whether the examinee has the ability to gather information from patients, perform physical examinations, and communicate his or her findings to patients and colleagues.

5.     Step 3 of the USMLE assesses whether the examinee can apply medical knowledge and understanding of biomedical and clinical science essential for the unsupervised practice of medicine, with emphasis on patient management in ambulatory settings.  It is the final examination in the USMLE sequence leading to a license to practice medicine without supervision.

6.     The examination material for all three steps of the USMLE is prepared by examination committees broadly representing the medical profession.  The committees are comprised of recognized experts in their fields, including both academic and non-academic practitioners, as well as members of state medical licensing boards, which rely upon successful completion of the three USMLE steps as an important element in the process for licensing physicians.

7.     Most medical schools in the United States and many located elsewhere require medical students to take USMLE Step 1 after completing the first two years of medical school, which is comprised of the core sciences that form the basis of medical practice.

8.     I am aware that Richard Katz has alleged that before the adoption of the six-attempt limit in 2011, it had been the policy of the USMLE to allow examinees take a Step "as many times as they needed in order to pass."  That is a technically correct but misleading statement.  The point was never to allow, and certainly not to encourage, an examinee with multiple failures on a Step or Step Component of the USMLE to continue taking the examination until he or she passed.  The point was to place the responsibility for imposing attempt limits on state medical boards, rather than on the USMLE itself.

9.     Before the adoption of the six-attempt limit by the USMLE through its Composite Committee, each individual state medical board decided for that state whether to impose an attempt limit on taking the USMLE, and if so, what the maximum number would be.  The USMLE made recommendations to state medical boards about imposing attempt limits, including the recommendation – in place for nearly 20 years leading up to the adoption of the six-attempt limit – that state medical boards impose a limit of six attempts to pass any Step or Step Component unless the examinee demonstrated that he or she had obtained additional educational experience acceptable to the licensing authority.

S.A.  198

10.     In 2010-2011, when the Composite Committee considered adoption of a limit on the number of attempts to pass any Step or Step component of the USMLE, 41 out of 50 states (78%) imposed such limits. The vast majority imposed a limit of three or four attempts per Step. Pennsylvania was in the minority of states that imposed no attempt limit at all.

11.     The primary impetus for the USMLE's consideration of a six-attempt limit was a security issue involving the computerized Steps of the USMLE, in which the concern was that examinees who took a Step multiple times might be contributing to the "leak" of examination questions.

12.     A second significant motivation was the concern within the Composite Committee that among the very small percentage of examinees who repeatedly failed a Step of the USMLE, some might eventually pass not because of skill or knowledge, but by chance. The concern among the Committee was that an unqualified examinee might eventually pass by chance alone if given enough opportunities.

13.     Throughout all the discussions of the Composite Committee that led to the adoption of the six-attempt limit, none of the participants expressed the concern that imposing a limit on the number of attempts might disproportionately impact individuals with disabilities, or that the limit itself might be discriminatory against individuals with disabilities.

14.     In my opinion, based upon my participation in the discussions, the Composite Committee believed that the process at the NBME for evaluating and accommodating disabilities of USMLE examinees was sufficient and placed all examinees on the same footing, and that no additional measures were required specifically for disabled individuals in regard to the six-attempt limit.

15.     In other words, those examinees who requested and received accommodations for their USMLE testing could utilize those accommodations during each attempt to pass a Step of the USMLE, whether the individual needed one attempt or six. Conversely, if an examinee who had been granted and utilized his or her accommodations was not held to the six-attempt limit like his or her non-disabled peers, it would create an unfair advantage for the disabled individual that is contrary to the intent of the disabilities laws.

16.     The exception that the Composite Committee discussed, and adopted, was one that allows a state medical board to request an exception to the six-attempt limit for any specific examinee without regard to disability. In that way, just as before the adoption of the six-attempt limit, each state medical board could determine whether or not to impose attempt limits, and if so, the number of attempts permitted, so too, after the adoption of the six attempt limit, if a state medical board believed that an examinee should be given an additional attempt, the control would be with the state board who issues the license to practice medicine.

17.     Since the adoption by the USMLE of the six-attempt limit, I am not aware of any evidence that leads me to believe that individuals with disabilities have been disproportionately impacted by the six-attempt limit, and I believe that if the six attempt limit were to be waived

3

or eliminated only for people with disabilities, it would create an unfair advantage for those individuals and would undermine the integrity of the examination.

18.    Finally, I can attest without any equivocation that neither the USMLE Composite Committee nor the NBME had any intention to impact – positively or negatively – any category or group of examinees, including disabled individuals, when it considered and adopted the six-attempt limit. Rather, the USMLE Composite Committee adopted the six-attempt limit strictly for the reasons explained above.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF

AMERICA THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON THIS 2 DAY OF

Mn l , 2016.

GERARD F. DILLON, PH.D.

4

# EXHIBIT A

# CURRICULUM VITAE

February 2016

## Gerard F. Dillon, Ph.D.

**Business Address**

National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104

Telephone:    (215) 590-9743
FAX:             (215) 590-9470
E-mail:gdillon@mail.nbme.org

**Education**

Ph.D., Educational Psychology, Temple University, 1992
M.Ed., Educational Psychology, Temple University, 1980
B.A., Psychology, LaSalle College, 1973

**Employment History**

Vice President, Licensure Programs, 2013 to present
National Board of Medical Examiners (NBME)

Responsible for coordination of activities related to licensure examinations, including those in support of USMLE. Responsibilities include implementation and coordination of policies, development of an appropriate program design, composition and activities of test committees, development of a research agenda, and liaison with external groups.

Vice President United States Medical Licensing Examination (USMLE) 2008 to 2013
Associate Vice President, USMLE, 2001 to 2007
Director, USMLE Step 3, NBME, 1997 to 2001
Senior Psychometrician, NBME, 1980 to 2001
Psychometric Associate, NBME, 1976 to 1980
Psychometric Technician, NBME, 1974 to 1976
Adjunct Faculty, Psychological Studies in Education, Temple University, 1995 to 1997

**Professional Organizations**

Membership in:    American Educational Research Association, (AERA)
National Council on Measurement in Education (NCME)
Administrators in Medicine (AIM)
International Association of Medical Regulatory Authorities
(IAMRA)

Selected Presentations and Publications

Dillon, G.F., Henzel, T.R. and LaDuca, A. (1989). *The Use of Relative-Absolute Compromise Techniques in the Standard Setting Process.* Paper presented at the Annual Meeting of the National Council on Measurement in Education, April, San Francisco.

Dillon, G.F., Postell, L.E. and Henzel, T.R. (1990). *Using Scrambled Test Forms to Discourage Cheating Behavior - Practical Implications for Test Equating.* Paper presented at the Annual Meeting of the American Educational Research Association, April, Boston.

Dillon, G.F. (1990). *The Relationship of Item Position and Angoff-Based Standard Setting Judgments.* Paper presented at the Annual Meeting of the American Educational Research Association, April, Boston.

Dillon, G.F., Nungester, R.J. and LaDuca, A. (1990). *The Relationship of Test Item Content and Format to Angoff Based Standard Setting Judgments - Alerting Judges to Potential Problems.* Paper presented at the Annual Meeting of the National Council on Measurement in Education, April, Boston.

Swanson, D.B., Dillon, G.F. and Postell, L.E. (1990). Setting Content-Based Standards for National Board Exams: Initial Research for the Comprehensive Part I Examination. *Academic Medicine September Supplement 1990: Proceedings of the Twenty-Ninth Annual Research in Medical Education Conference*, 65(9), S17-S18.

Dillon, G.F. and Ross, L.P.(1991). *The Effect of Targeting Test Questions at the Minimum Pass Point: Practical Considerations and Implications.* Paper presented at the Annual Meeting of the American Educational Research Association, April, Chicago.

Dillon, G.F., Swanson, D.B., Kelley, P.R., Nungester, R.J. and Powell, R.D.(1991). *Retention of Basic Science Information by Fourth-Year Medical Students.* Paper presented at the Annual Meeting of the American Educational Research Association, April, Chicago.

Clyman S.G., Julian E.R., Orr N.A., Dillon G.F., Cotton K.E.(1991). Continued research on computer-based testing. In Clayton PD (ed): *Proceedings of the Fifteenth Annual Symposium on Computer Applications in Medical Care.* New York, McGraw-Hill, Inc., pp 742-746.

Dillon, G.F. and Clyman, S.G. (1992). The computerization of Clinical Science Exams and Its Effect on Performance of Third-Year Medical Students. *Academic Medicine September Supplement 1992: Proceedings of the Thirty-First Annual Research in Medical Education Conference*, 67(10), S76.

Dillon, G.F., Henzel, T.R., Klass, D.J., LaDuca, A., and Peskin, E.(1993). *Presenting*

*Test Items Clustered Around Patient Cases - Psychometric Concerns and Practical Implications for a Medical Licensure Program.* Paper presented at the Annual Meeting of the American Education Research Association, April, Atlanta.

Dillon, G.F., Swanson, D.B., Nungester, R.J., Peskin, E., and Ross, L.P.(1993). *A System for Training Standard Setting Judges Using Repeated Exercises, Questionnaires, and Unique Data Formats.* Paper presented at the Annual Meeting of the American Educational Research Association, April, Atlanta.

Dillon, G.F.(1994). Setting Standards on Written Examinations. In Mancall, EL, Bashook, PG, and Dockery,JL (eds.): *Establishing Standards for Board Certification.* Evanston, American Board of Medical Specialties, pp. 41-45.

Dillon GF, Henzel TR, LaDuca A, Walsh, WP(1995). *The Influence of Type of Residency Training and Gender on an Examination for Medical Licensure.* Paper presented at the Annual Meeting of the American Educational Research Association, April, San Francisco.

Dillon, GF, Henzel TR, and Walsh WP(1996). *The impact of item set configuration on examinee response patterns.* A paper presented at the Annual Meeting of the American Educational Research Association, April, New York.

Dillon, GF(1996). The Expectations of Standard Setting Judges. *CLEAR Exam Review,* 7(2), 22-26.

Leone-Perkins ML, Dillon GF, Walsh, WP(1996). Examinee perceptions of the usefulness of performance feedback on an examination for medical licensure. Proceedings of the Thirty-fifth Annual Conference of Research in Medical Education. *Academic Medicine,* 1996, 71(10), S88-S90.

Swanson DB, Case SM, Luecht, RM, and Dillon, GF(1996). *Retention of basic science information by 4th-year medical students.* Proceedings of the Thirty-fifth Annual Conference of Research in Medical Education. *Academic Medicine,* 1996, 71(10), S80-S82.

Dillon GF, Marcus LA, and Walsh WP(1997). *Preparing to repeat the USMLE Step 3 examination: The usefulness of test performance feedback.* Proceedings of the Thirty-sixth Annual Conference of Research in Medical Education. *Academic Medicine,* 1997, 72(10), S94-S96.

Dillon GF, Henzel TR, and Walsh WP(1997). The Impact of postgraduate training on an examination for medical licensure. In Scherpbier, AJJA, van der Vleuten CPM, Rethans JJ, van der Steeg AFW, eds.: *Advances in Medical*

*Education*, Kluwer Academic Publishers, 146-148.

Dillon, GF(1998). Testing and Measurement Issues: The Role of Survey Data in a Testing Program. *CLEAR Exam Review*, 9(1), 20-22.

Dillon GF and Walsh WP(1998). *Standard setting judges' perceptions on the use of performance data to guide their decisions.* A paper presented at the Annual Meeting of the National Council on Measurement in Education, April, San Diego.

Dillon GF, Case SM, Melnick DE, Nungester RJ, and Swanson DB(1998). Setting standards on the United States Medical Licensing Examination. *Proceedings of the Eighth International Ottawa Conference.* Philadelphia, PA: National Board of Medical Examiners; *CD-ROM.*

Dillon GF, and Henzel TR(1999). *The relationship between amount of postgraduate training and performance on a physician licensing examination.* A paper presented at the Annual Meeting of the American Education Research Association, April, Montreal.

Dillon GF and Walsh WP (2000). Using performance data to set standards: Practical impact and the perception of judges. *CLEAR Exam Review,* 11(1), 15-18.

Johnson D, Dillon GF, and Henzel TR (2000). The Post Licensure Assessment System. *The Journal of Medical Licensure and Discipline*, 86(3), 116-122.

Dillon GF (2000). *Technological Innovations and Issues in Testing.* Presentation at the Annual Conference of the Council on Licensure, Enforcement, and Regulation (CLEAR), September, Miami.

Dillon GF, Clyman SG, Clauser BE, Margolis MJ. The introduction of computer-based case simulations into the United States Medical Licensing Examination. *Academic Medicine.* 2002;77:S94-96.

Melnick DE, Dillon GF, Swanson DB. Medical licensing examinations in the United States. *Journal of Dental Education.* 2002;66:595-599; discussion 610-611.

Sawhill AJ, Dillon GF, Ripkey DR, Hawkins RE, Swanson DB. The impact of postgraduate training and timing on USMLE Step 3 performance. *Academic Medicine.* 2003;78(10 Suppl):S10-12

Cuddy MM, Dillon GF, Clauser BE, Holtzman KZ, Margolis MJ, McEllhenney SM, Swanson DB (2004). Assessing the validity of the USMLE Step 2 clinical knowledge examination through an evaluation of its clinical relevance. *Academic Medicine*, 79(10 Suppl):S43-45.

De Champlain AF, Winward M, Dillon GF, De Champlain JE (2004). Modeling passing rates on a computer-based medical licensing examination: an application of survival data analysis, *Educational Measurement: Issues and Practice* 23(3): 15-22.

Dillon GF, Clauser BE, Hawkins RE, Swanson DB (2004). Building a validity argument for a medical licensing examination. Paper presented at the Eleventh International Ottawa Conference on Medical Education and Assessment, July, Barcelona, Spain.

Dillon GF, Boulet JR, Hawkins RE, Swanson DB. Simulations in the United States Medical Licensing Examination (USMLE). *Quality & Safety in Health Care.* 2004;13 Suppl 1:i41-i45.

Swygert KA, Muller ES, Clauser BE, Dillon GF, Swanson DB (2004). The impact of timing changes on examinee pacing on the USMLE Step 2 exam. *Academic Medicine*, 79(10 Suppl):S52-54.

Swanson DB, Lazarus CJ, Dillon GF, Melnick DE (2005). Coverage of the Behavioral and Social Sciences on the United States Medical Licensing Examination (USMLE). *Annals of Behavioral Science and Medical Education,* 11(1): 30-36.

Dillon GF, Scoles PV. An Examination of Clinical Skills in the United States Medical Licensing Examination (USMLE). *ACGME Bulletin.* December, 2005:16.

Harik P, Clauser BE, Grabovsky I, Margolis MJ, Dillon GF, Boulet JR. Relationships among subcomponents of the USMLE Step 2 Clinical Skills examination, the Step 1, and the Step 2 Clinical Knowledge examinations. *Academic Medicine*, 81(10 Suppl): S21-S24.

Cuddy MM, Swanson DB, Dillon GF, Holtman MC, Clauser BE (2006). A multilevel analysis of the relationships between selected examinee characteristics and United States Medical Licensing Examination Step 2 Clinical Knowledge performance: Revisiting old findings and asking new questions. *Academic Medicine*, 81(10 Suppl): S103-S107.

DeChamplain A, Sample L, Dillon GF, Boulet JR (2006). Modeling longitudinal performance on the United States Medical Licensing Examination and the impact of sociodemographic covariates: an application of survival data analysis. *Academic Medicine*, 81(10 Suppl): S108-S111.

Dillon GF, Hallock JA, Melnick DE, Scoles PV, Thompson J (2006). Introduction of an assessment of clinical skills into a medical licensing examination. International Association of Medical Regulatory Associations, 7th Conference on Medical Regulation, November, Wellington, New Zealand.

Dillon GF, Clauser BE, Hawkins RE, Swanson DB (2006). Validity and the Medical Licensing Examination. International Association of Medical Regulatory Associations, 7th Conference on Medical Regulation, November, Wellington, New Zealand.

Ramineni C, Harik P, Margolis MJ, Clauser BE, Swanson DB, Dillon GF. Sequence effects in the United States Medical Licensing Examination (USMLE) Step 2 Clinical Skills (CS) Examination. *Academic Medicine.* 2007;82(10 Suppl):S101-S104

Dillon GF, Melnick DE. The Value and Price of Performance Assessment. International Conference on Medical Regulation; October 2008; Cape Town, South Africa.

Berg K, Winward M, Clauser BE, Veloski JA, Berg D, Dillon GF, Veloski JJ . The relationship between performance on a medical school's clinical skills assessment and USMLE Step 2 CS. *Academic Medicine.* 2008;83(10 Suppl):S37-S40.

Gilliland WR, La Rochelle J, Hawkins RE, Dillon GF, Mechaber AJ, Dyrbye L, Papp KK, Durning SJ. Changes in clinical skills education resulting from the introduction of the USMLE step 2 clinical skills (CS) examination. *Medical Teacher.* 2008;30:325-7.

Boulet JR, Smee SM, Dillon GF, Gimpel JR. The use of standardized patient assessments for certification and licensure decisions. *Simulation in Healthcare: Journal of the Society for Simulation in Healthcare.* 2009;4:35-42

Dillon GF, Clauser BE. Computer-delivered patient simulations in the United States Medical Licensing Examination (USMLE). *Simulation in Healthcare: journal of the Society for Simulation in Healthcare.* 2009;4:30-34

Clauser BE, Mee JM, Baldwin SG, Margolis MJ, Dillon GF. Judges' use of examinee performance data in an Angoff standard-setting exercise for a medical licensing examination: an experimental study. *Journal of Educational Measurement.* 2009;46:390-407.

Margolis MJ, Clauser BE, Winward M, Dillon GF. Validity evidence for USMLE examination cut scores: results of a large-scale survey. *Academic Medicine.* 2010;85(Suppl 10):S93-S97.

Morrison C, Ross LP, Fogle T, Butler A, Miller JG, Dillon GF. Relationship between performance on the NBME Comprehensive Basic Sciences Self-Assessment and USMLE Step 1 for U.S. and Canadian medical school students. *Academic Medicine.* 2010;85(Suppl 10):S98-S101.

Feinberg, R. A., Swygert, K. A., Haist, S. A., Dillon, G. F., & Murray, C. T. (2012). The impact of postgraduate training on USMLE® Step 3® and its Computer-based Case Simulation component. *Journal of General Internal Medicine, 27*(1), 65-70, DOI: 10.1007/s11606-011-1835-1.

Dillon GF, Katsufrakis PJ, Melnick DE. Medical Regulation and Licensure – Keys to Valid Assessment. Annual Meeting of the International Association of Medical Regulatory Authorities; October 2012; Ottawa, Canada.

Dillon GF, Swanson DB, McClintock JC, Gravlee GP. The relationship between the American Board of Anesthesiology Part I Certification Examination and the United States Medical Licensing Examination. *Journal of Graduate Medical Education*: June 2013, 5 (2), 276-283.

Haist SA, Katsufrakis PJ, & Dillon GF. The Evolution of the United States Medical Licensing Examination (USMLE): Enhancing Assessment of Practice-Related Competencies. *Journal of the American Medical Association. 2013;* Dec 4; 310(21):2245-6.

Dillon GF, Johnson DA. Implementing strategic changes to the USMLE. *Journal of Medical Regulation.* 2014;100(3):19-23.

Holtzman KZ, Swanson DB, Ouyang W, Dillon GF, Boulet JR. International variation in performance by clinical discipline and task on the United States Medical Licensing Examination Step 2 Clinical Knowledge component. *Academic Medicine.* 2014;89:1558-1562.

Raymond MR, Mee J, Haist SA, Young A, Dillon GF, Katsufrakis PJ, McEllhenney SM, Johnson DA. Expectations for physician licensure: a national survey of practice. *Journal of Medical Regulation.* 2014;100(1):15-23.

# EXHIBIT 23

1        IN THE UNITED STATES DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

2                    -   -   -

   RICHARD KATZ,        : NO. 3:15-cv-1187
3          Plaintiff,    :

                         :
4          V.            :

                         :
5    NATIONAL BOARD OF   :
     MEDICAL EXAMINERS and:
6    FEDERATION OF STATE :
     MEDICAL BOARDS,     :
7          Defendants.   :

8                    -   -   -

9            February 9, 2016

10                   -   -   -

11            Oral deposition of RICHARD

12   KATZ, M.D., M.H.A., held at Holiday Inn &

13   Suites, 1863 West Main Street,

14   Stroudsburg, Pennsylvania 18360,

15   commencing at 9:08 a.m., on the above

16   date, before Margaret Peoples, a

17   Registered Professional Reporter and

18   Notary Public in and for the States of

19   Pennsylvania, New York and Connecticut.

20

                     -   -   -

21

22          GOLKOW TECHNOLOGIES, INC.
       877.370.3377 ph | 917.591.5672 fax
23            deps@golkow.com

24

Page 2

1  A P P E A R A N C E S :
2  HAMBURG & GOLDEN, P.C.
   BY: MICHAEL E. SACKS, ESQUIRE
3  1601 Market Street
   Suite 3310
4  Philadelphia, Pennsylvania 19103
   (215) 255-8590
5  sacksme@hamburg-golden.com
   Counsel for the Defendants
6
7         - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1         - - -
2         I N D E X
3  WITNESS              PAGE NO.
4  RICHARD KATZ, M.D., M.H.A.
5  By Mr. Sacks          5
6
7
8         - - -
9       E X H I B I T S
10 NO.    DESCRIPTION   PAGE NO.
11 19*  Curriculum Vitae    252
12
13
   *(Retained by Attorney Sacks)
14
15
16         - - -
17
18
19
20
21
22
23
24

Page 4

1
   DEPOSITION SUPPORT INDEX
2
3  Direction to Witness Not To Answer
4  Page  Line  Page  Line
   None
5
6
7
8
   Request For Production of Documents
9  Page  Line  Page  Line
   53    22
10 54    21
   102   24
11 154   24
12
13
   Stipulations
14 Page  Line  Page  Line
   None
15
16
17
   Questions Marked
18 Page  Line  Page  Line
   None
19
20
21
22
23
24

Page 5

1         - - -
2       RICHARD KATZ, M.D., M.H.A.
3  after having been duly sworn,
4  was examined and testified as
5  follows:
6         - - -
7       EXAMINATION
8         - - -
9  BY MR. SACKS:
10     Q.  Mr. Katz, my name is Michael
11 Sacks.  We have spoken on the phone
12 several times actually over the last
13 several months, but this is the first
14 time we're meeting today; correct?
15     A.  Yes.  Correct.
16     Q.  So, let me just go through a
17 few things that I say generally at the
18 outset of any deposition.
19         First of all, there's a
20 court reporter here today, Margaret, who
21 is going to be taking down verbatim all
22 of the questions and all of the answers.
23 Do you understand?
24     A.  Yes.

Page 6

1    Q.  So, you have to answer
2  questions orally rather than just a nod
3  of the head or a shake of the shoulders
4  or whatever, just so that the court
5  reporter can get a clear answer.  Is that
6  fair?
7    A.  Yes.
8    Q.  If you need a break at any
9  point, just say so.
10    A.  Okay.
11    Q.  This is not an endurance
12  test.  If you need to go to the bathroom
13  or just take a walk or whatever it is,
14  just let me know and we'll stop and you
15  can take a break.
16    A.  Okay.
17    Q.  And similarly, I may take a
18  break.
19    A.  Okay.
20    Q.  I'm notorious for needing
21  bathroom breaks.
22        Have you ever had your
23  deposition taken before?
24    A.  Never.

Page 7

1    Q.  Have you ever given
2  testimony under oath in any kind of
3  proceeding?
4    A.  Never.
5    Q.  Are you on any medications
6  today?
7    A.  I am.
8    Q.  Are you on any medications
9  that would interfere with your ability to
10  understand my questions and respond
11  truthfully to my questions?
12    A.  I don't see a problem, but
13  I'm on psychotropic medications.  There
14  are certain symptoms, like dry mouth and
15  things like that, that can possibly
16  interfere and I may need water at times.
17        But in terms of
18  understanding the question, I think I'm
19  coherent, but I don't know what residual
20  effects those medications could have.
21    Q.  What are the medications
22  that you're on?
23    A.  I'm on lithium, Seroquel,
24  duloxetine.  Those are the psychotropics,

Page 8

1  the main psychotropics.  I'm also on
2  asthma medications and other things that
3  won't affect this testimony.
4    Q.  Okay.  So, lithium is a
5  medication for bipolar --
6    A.  Yes.
7    Q.  -- disorder?
8    A.  It's a mood stabilizer.
9    Q.  One more of the rules I
10  forgot to mention is, let me finish my
11  question before you start to --
12    A.  Absolutely.
13    Q.  -- answer just so the court
14  reporter can take down my question before
15  your answer.  Okay.  It's artificial
16  because in common conversations, we speak
17  over one another.
18    A.  I'm just --
19    Q.  But for the court reporter's
20  sake.
21        So Seroquel, what was that
22  one, what is that for?
23    A.  That's antipsychotic.
24    Q.  What was the third one?

Page 9

1    A.  Duloxetine or Cymbalta.
2    Q.  Tolox --
3    A.  Duloxetine.
4    Q.  Duloxetine
5    A.  That's the generic name.
6    Q.  Also the --
7    A.  Cymbalta.
8    Q.  What is that one?
9    A.  That's an antidepressant.
10    Q.  And how long have you been
11  on each of these medications?
12    A.  Since March of 2013.
13    Q.  All three?
14    A.  Correct.
15    Q.  And would you say that your
16  medications are stabilized in terms of
17  the level of each one?
18    A.  Yes.
19    Q.  Do you know the milligrams,
20  the dosage of each one?
21    A.  Yes.
22    Q.  What are they, for lithium?
23    A.  Lithium is 300 milligrams.
24    Q.  Once a day?

Richard Katz, M.D., M.H.A.

Page 10

1    A.    Twice a day.
2    Q.    What about Seroquel?
3    A.    400 milligrams at night.
4    Q.    And how about duloxetine?
5    A.    60 milligrams once a day.
6    Q.    Do the medications slow down
7  your thinking at all?
8    A.    At times, yeah.
9    Q.    And can you tell when that
10 is happening?
11    A.    Yeah.  I mean, I think I
12 kind of cycle sometimes.  Sometimes like
13 I come in and out, but it's hard to say
14 if it's the mental illness or the
15 medication.
16    Q.    And does that happen on a
17 daily basis?
18    A.    I would -- yes.  Yeah.
19    Q.    And you said it's hard to
20 distinguish whether that's from the
21 medication or the illness itself?
22    A.    Depression slows you down.
23 Yeah.
24    Q.    So in your view, is it

Page 11

1  primarily the depression that slows down
2  your thinking or the depression or the
3  medications for depression, or some
4  combination of the medications if it's
5  the medications?
6    A.    I would say it's the -- it's
7  probably the mental illness that slows me
8  down because it's like a -- just a
9  generally slowing when you have
10 depression, it's like everything slows
11 down, you know.
12    Q.    And have you experimented,
13 and I don't mean yourself, but with your
14 doctors in terms of dosages of medication
15 to gain a greater control over the
16 depression?
17    A.    I think this is the
18 baseline.  I think this is the best I'm
19 going to get.  I have improved
20 considerably.
21    Q.    So, the best that you can
22 get even with medication, you still have
23 a slowness of your thinking?
24    A.    That's a very difficult

Page 12

1  question to answer.  There is a certain
2  amount of psychomotor retardation that
3  accompanies depression and that's just a
4  side effect of depression.  Everybody
5  that has depression has a general slowing
6  down.
7    Q.    And when you say
8  "psychomotor," do you include in that the
9  process of thinking?
10    A.    Oh, yeah.  Yeah.  Yes.
11    Q.    Let me ask some questions
12 about your background.  You have a bit of
13 a New York accent.
14    A.    Correct.
15    Q.    Were you born in New York
16 City?
17    A.    I was.  Queens, New York.
18    Q.    How long did you live there?
19 I mean, until when did you change your
20 address on a permanent basis?
21    A.    I changed my address on a
22 permanent -- I was there throughout
23 college.  When I left medical school is
24 when I left New York.  So that was around

Page 13

1  2000.
2    Q.    Do you have any siblings?
3    A.    I do.
4    Q.    Who is that?
5    A.    I have an older brother.
6    Q.    Where is he?
7    A.    He is New Jersey.
8    Q.    Does he suffer from mental
9  illness?
10    A.    He does.
11    Q.    Of what kind?
12    A.    He has depression.
13    Q.    Is he treated for that?
14    A.    Yes.
15    Q.    Has he ever been diagnosed
16 with a bipolar disease, bipolar disorder?
17    A.    Not formally.
18    Q.    Do you believe he has
19 bipolar disorder?
20    A.    I think he has a mood
21 disorder.
22    Q.    Does your brother work?
23    A.    He does.
24    Q.    What does he do for a

Richard Katz, M.D., M.H.A.

Page 14

1  living?
2      A.   He works for Airborne
3  Express.
4           DHL. I'm sorry, DHL.
5      Q.   So you grew up in Queens?
6      A.   I did.
7      Q.   And did you attend public
8  school?
9      A.   I did.
10     Q.   I saw a reference to what
11  looked like a Catholic school.
12     A.   Yes.
13     Q.   At some point, did you
14  attend Catholic school?
15     A.   For two years, for 7th and
16  8th grade.
17     Q.   And what was the name of
18  your elementary school?
19     A.   PS 90 Horace Mann.
20     Q.   In Queens?
21     A.   Yes. Richmond Hill.
22     Q.   And after PS 90, did you
23  then attend Catholic school?
24     A.   Yes.

Page 15

1      Q.   What was the name of that
2  school?
3      A.   Holy Child Jesus.
4      Q.   Why did you switch to
5  Catholic school?
6      A.   Convenience. It was across
7  the street from my house and no buses
8  involved to go to the junior high school
9  that everybody else was going to.
10     Q.   Did you eventually go to the
11  junior high school?
12     A.   No.
13     Q.   So 7th and 8th grades. Was
14  the junior high school similarly 7th and
15  8th grades?
16     A.   Yes.
17     Q.   During the time that you
18  were in elementary school at PS 90, did
19  you ever have special classes, special
20  accommodations for --
21     A.   Yes.
22     Q.   -- any kind of academic
23  difficulty?
24     A.   Yes.

Page 16

1      Q.   What was that?
2      A.   Well, I had a speech
3  impediment, a speak problem. I also had
4  a seizure disorder. They would pull me
5  out of class to help me with the -- there
6  were certain consonants I had trouble
7  with.
8           Like if I were to say -- I'm
9  trying to think of -- like if I went to
10  say shovel, I would slur and say
11  "slhovel" [ph].
12          If I were to say -- if
13  somebody's name was Charlie, I would say
14  kah [enunciating/ph] Charlie. If I were
15  to say the word tree, I would slur and
16  say kah [enunciating/ph] tree.
17          So there was like this
18  slurring on the left side.
19          I also would have seizures
20  on that side. So there was some inherent
21  thing that was probably wired into me
22  genetically. I don't know where it came
23  from, but I would have seizures.
24     Q.   So, to your knowledge, did

Page 17

1  the speaking disorder interfere with your
2  academic abilities?
3      A.   I believe it hurt the
4  communication process of conveyance,
5  conveying your point to the instructor.
6  Kids would laugh. You know, it was --
7           I remember one time I had a
8  seizure in the middle of fourth grade and
9  they thought I was like the class clown.
10  And I heard everybody, because I would
11  still be coherent when I was having the
12  seizure, everybody was laughing. So
13  there was a certain amount of
14  embarrassment to all of that.
15     Q.   What I'm getting at is your
16  ability to process information, to
17  understand material that was being
18  taught, the ability to do written work.
19  Did --
20     A.   I struggled. I had a very
21  porous memory. I was very creative, but
22  I struggled with the academics.
23     Q.   My question was, did you
24  ever have any kind of accommodation for

S.A. 214

Richard Katz, M.D., M.H.A.

Page 18

1 that?
2     A.   Besides the speech,
3 intervention to help me with that
4 problem, I don't recall any further
5 intervention.
6     Q.   Did any psychologist ever do
7 any testing during elementary school and
8 arrive at some kind of diagnosis about
9 your academic or cognitive abilities?
10     A.   Besides the national tests
11 that were administered from the school, I
12 don't believe there was any other
13 intervention other than New York
14 Hospital, the New York Hospital which is
15 now Rockefeller, who did a series of
16 testing for the seizure disorder to see
17 if there was any residual deficits
18 because of that.
19         But those records are not
20 found other than the one file, the one
21 record that I submitted to the Court.
22     Q.   So if I understand your
23 answer, other than standardized testing
24 that everybody had and other than being

Page 19

1 tested at the hospital for the seizure
2 disorder, you are not aware of any
3 testing done by any psychologist
4 specifically regarding your intellectual
5 capabilities?
6     A.   I don't recall ever having
7 testing for cognitive.  It could have
8 been done, but I don't have recollection
9 of it.
10     Q.   And when you were at PS 90,
11 you weren't in quote/unquote special
12 education classes?
13     A.   On the contrary because of
14 my artistic capabilities, I was in gifted
15 classes.
16     Q.   What does that entail being
17 in gifted classes?
18     A.   I believe there was more
19 creative expression.  I was allowed to be
20 more apt with building that right side of
21 my brain kind of thing.  You know, the
22 right brain/left brain.  I think that it
23 was more kind of a nurturing environment
24 where you're surrounded by more

Page 20

1 stimulating classmates.
2     Q.   So was it actually a
3 separate classroom?
4     A.   It was -- each class was
5 broken up into -- like you had thee 6
6 grade classes, let's say.  One was gifted
7 and two -- one was like medium
8 functioning and one was lowering
9 functioning.  That was my take on it.
10     Q.   So they actually separated
11 kids that way?
12     A.   Back then, yes, I think they
13 probably did.
14     Q.   Did you have any difficulty
15 keeping up with the work --
16     A.   I did.
17     Q.   -- of the gifted class?
18     A.   I did.  And I had a certain
19 nervousness that I would never -- I
20 wouldn't, like from 4th grade to 5th
21 grade to 6th grade that I wouldn't be
22 able to continue with my classmates that
23 I made friends with that I wouldn't keep
24 up with the requirements.

Page 21

1     Q.   But you did keep up with the
2 requirements?
3     A.   They passed you through.
4 You know how the public school system is,
5 they kind of pass you through.
6     Q.   And it's my understanding
7 from materials that you have provided to
8 the Court or to the National Board at
9 some point that you've tried to locate
10 records from the elementary school and
11 you were not successful.
12     A.   That's correct.
13     Q.   The next school you went to
14 was Holy Child Jesus --
15     A.   Correct.
16     Q.   -- for 7th and 8th grade.
17     A.   Yes.
18     Q.   And the same questions,
19 were you separated out into gifted --
20     A.   No.
21     Q.   -- or not gifted?  Again,
22 I'm going to remind you to let me finish
23 my question.
24     A.   I'm sorry.

Richard Katz, M.D., M.H.A.

Page 22

1  Q. That's all right. The
2 answer was "no?"
3  A. No.
4  Q. And were you able to keep up
5 with your peers at Holy Child Jesus?
6  A. In certain classes I
7 struggled.
8  Q. Were there any interventions
9 to accommodate you?
10  A. From whom are you referring?
11  Q. From school.
12  A. Not really.
13  Q. From anybody else?
14  A. Like my parents?
15  Q. Yes.
16  A. They were preoccupied with
17 their own issues and problems and I
18 didn't really get the support I probably
19 needed.
20  Q. Did you continue receiving
21 speech therapy at Holy Child Jesus?
22  A. No. It was corrected by the
23 time I left PS 90. The speech therapist
24 would hold a mirror in front of me and

Page 23

1 see that I was actually slurring and she
2 kind of corrected it that way. And by
3 the time I left there, I was talking
4 normally.
5  Q. And did the seizure disorder
6 eventually resolve itself?
7  A. It did.
8  Q. Did it resolve itself
9 through medication or --
10  A. Yes. I was on
11 phenobarbital.
12  Q. Did you have to continue on
13 phenobarbital forever or did that stop?
14  A. I think right around the
15 time I was in Holy Child, it kind of
16 fizzled out. The doctors thought let's
17 see how he does off of it.
18  Q. And the seizure disorder did
19 not return?
20  A. Subsided.
21  Q. Where did you go after 8th
22 grade?
23  A. The High School of Art and
24 Design in Manhattan.

Page 24

1  Q. And obviously that was an
2 art-focused high school?
3  A. Correct.
4  Q. And did you have any special
5 accommodations in terms of your
6 academic --
7  A. The special --
8  Q. -- classes there?
9  A. I'm sorry I interrupted.
10  The special accommodation
11 was that if you were going to have a
12 vocation in the art world, in the art
13 field as an illustrator, as a commercial
14 artist, they allowed you to drop math and
15 science in the 10th grade. That was the
16 accommodation.
17  Q. But that was the same for
18 everybody, wasn't it?
19  A. If you wanted to drop it,
20 yeah. But if you wanted to pursue the
21 academic course and you're an
22 academician, then it was available to
23 you.
24  Q. So, again, though, that was

Page 25

1 the same for all students, not just you,
2 that if one wanted to pursue math and
3 science, one could. But if one wanted --
4  A. Right. It was the nature of
5 the high school.
6  Q. Let me finish the
7 question --
8  A. I'm sorry.
9  Q. -- again for the court
10 reporter's sake.
11  So based on the nature of
12 the high school, one could either
13 continue with academic courses like math
14 and science or one could drop them and
15 just pursue art?
16  A. Correct.
17  Q. And did you drop those math
18 and science courses and just pursue art?
19  A. I did.
20  Q. So, you didn't take math or
21 science after what grade?
22  A. 10th grade.
23  Q. After 10th grade?
24  A. Yeah.

Page 26

1  Q.  In 9th and 10th grade, how
2  was your performance in math and science?
3  A.  I struggled.
4  Q.  Were you in a standard
5  curriculum --
6  A.  Standard.
7  Q.  -- or advanced curriculum?
8  A.  Standard.
9  Q.  Or a substandard curriculum?
10  A.  Standard.
11  Q.  And in math and science in
12  9th grade, do you recall what your grades
13  were?
14  A.  Borderline. 65, 70s. I
15  think I actually failed and had to go to
16  summer school one semester.
17  Q.  We're talking about 9th
18  grade now.
19  A.  Yeah. I think it was the
20  second sequential math 2 I failed and I
21  had to go to summer school.
22  Q.  And how about in science
23  courses in 9th grade?
24  A.  75s.

Page 27

1  Q.  What was the course, do you
2  remember? Was it like biology?
3  A.  Yeah, biology.
4  Q.  And did you only get number
5  grades rather than letter grades?
6  A.  Yeah. It was just numbers.
7  Q.  So, again, in biology you
8  were in the 75 range?
9  A.  Yes.
10  Q.  Is that approximate?
11  A.  Yes.
12  Q.  And in math, in 9th grade,
13  in the second semester you think you
14  failed it?
15  A.  I did. I don't think. I
16  did fail.
17  Q.  And then you took summer
18  school --
19  A.  I did.
20  Q.  -- and repeat the course?
21  A.  I did.
22  Q.  And then how did you do?
23  A.  I did okay. I did well.
24  Q.  Meaning?

Page 28

1  A.  I don't think I excelled,
2  but I got through.
3  Q.  You don't remember whether
4  it was a 70 or a 60 or an 80?
5  A.  It could have been a 75
6  to -- maybe 75.
7  Q.  And what about the non, what
8  I'll call, quantitative courses, like
9  English, reading, foreign language if
10  there was a foreign language, those types
11  of courses. How did you do in those
12  courses in 9th grade?
13  A.  I remember English I had
14  trouble reading. I wasn't a fast reader.
15  My reading comprehension probably wasn't
16  where it was supposed to be at that
17  level.
18  Q.  Were there any interventions
19  or accommodations for that?
20  A.  From whom are you referring?
21  Q.  From the school.
22  A.  I don't recall a school
23  psychologist being very prevalent in the
24  High School of Art and Design. I'm not

Page 29

1  sure they had such services.
2  Q.  But you passed, is that
3  fair?
4  A.  I passed English. Yes.
5  Q.  Let's try 10th grade. In
6  10th grade how did you do in English
7  courses, language courses?
8  A.  I think about the same. You
9  want a number grade?
10  Q.  If you remember.
11  A.  I'm thinking probably around
12  75.
13  Q.  And how about math?
14  A.  Probably around 70.
15  Q.  Did you fail math in 10th
16  grade?
17  A.  I don't believe so because I
18  think I dropped it in 10th grade, at the
19  end of 10th grade. Up until the end of
20  10th grade, I was doing okay.
21  Q.  And would that be like
22  algebra, geometry?
23  A.  Yes. They called it
24  sequential.

Richard Katz, M.D., M.H.A.

Page 30

1    Q.    But you didn't get into
2  trigonometry --
3    A.    No.
4    Q.    -- calculus?
5    A.    No.
6    Q.    Am I correct that later in
7  your career you had to take trigonometry
8  and calculus?
9    A.    Correct.
10    Q.    We'll come back to that.
11       What science course did you
12  take in 10th grade?
13    A.    I think it was just biology.
14  I think there was some general chemistry,
15  too.
16    Q.    And how did you do in
17  science?
18    A.    75.
19    Q.    And that was a standard
20  curriculum?
21    A.    It was.
22    Q.    You said you stopped taking
23  science and math after 10th grade?
24    A.    Yes.

Page 31

1    Q.    Is it correct that you did
2  not take science or math again until
3  after you completed college?
4    A.    That's correct.
5    Q.    By the way, is the High
6  School of Art and Design still there?
7    A.    Currently a Whole Foods, I
8  believe, making big luxury condos.
9    Q.    In gathering your records to
10  submit to the National Board of Medical
11  Examiners, did you try to get records
12  from the High School of Art and Design?
13    A.    Yeah.  I actually went there
14  before they closed.
15    Q.    Okay.  And did you find any
16  records?
17    A.    Not many, no.
18    Q.    The records that you did
19  find, did you submit them?
20    A.    I submitted everything that
21  I had.
22    Q.    Every single piece of paper?
23    A.    Absolutely.
24    Q.    And that was submitted to

Page 32

1  the National Board?
2    A.    Correct.
3       MR. SACKS:  Off the record.
4       -  -  -
5       (Whereupon, a discussion
6       was held off the record.)
7       -  -  -
8  BY MR. SACKS:
9    Q.    So at the High School of Art
10  and Design, if I understand correctly,
11  there were no accommodations for you as
12  we think of accommodations today for
13  disability?
14    A.    Accommodations, there were
15  none because there was essentially an art
16  curriculum which I kind of really
17  excelled at and I was able to do away
18  with the academics, which I never really
19  the proper application because it wasn't
20  instilled in me to have that because I
21  struggled.  So one tends to relinquish
22  what it doesn't excel at.  And I excelled
23  at art.  I was gifted.
24    Q.    So, fair to say, you always

Page 33

1  struggled with math and science?
2    A.    I struggled academically my
3  whole life.
4    Q.    Have you ever served in the
5  military?
6    A.    Never.
7    Q.    Have you ever been arrested?
8    A.    Never.
9    Q.    Have you ever been involved
10  in a lawsuit other than this lawsuit?
11    A.    Never.
12    Q.    Have you ever filed any
13  claims or charges like discrimination
14  charges at any other time other than
15  this --
16    A.    Never.
17    Q.    -- case?
18    A.    Never.
19    Q.    Has anyone ever sued you?
20    A.    Never.
21    Q.    Has anyone ever asked for a
22  restraining order or protection from
23  abuse --
24    A.    Never.

Richard Katz, M.D., M.H.A.

Page 34

1  Q.  -- order against you?
2  A.  Never.
3  Q.  So is this case the first
4  case in which you have ever been involved
5  in the court system in any way?
6  A.  Yes.  And as a pro se
7  representative of my own neophyte
8  attorney skills.
9  Q.  Who do you live with now?
10  A.  I live with my wife and my
11  mother.
12  Q.  And when did you get
13  married?
14  A.  In 2008, August.
15  Q.  What is your wife's name?
16  A.  Lorena.  L-O-R-E-N-A.
17  Q.  Does she go by Katz?
18  A.  Afanador Katz.
19  Q.  Fantaor?
20  A.  A-F-A-N-A-D-O-R.
21  Q.  And you also live with your
22  mother?
23  A.  Correct.
24  Q.  What is your mother's name?

Page 35

1  A.  Kathleen Katz.
2  Q.  With a C or K?
3  A.  With a K.
4  Q.  Does your mother work?
5  A.  She's retired.
6  Q.  What did she do --
7  A.  On Social Security.
8  Q.  What did she do before?
9  A.  She worked for a company
10  that provided the laundry machines for
11  laundromats.  She was like the
12  salesperson, like a gal Friday kind of,
13  like a secretary.
14  Q.  What was the name of that?
15  A.  Laundry Center.  That was
16  located in Woodside, Queens.  I think
17  it's still there actually.
18  Q.  And how about your wife,
19  Lorena, does she work?
20  A.  She does.
21  Q.  What does she do?
22  A.  She works part-time at the
23  children's learning center at the local
24  community college, Northampton.

Page 36

1  Q.  So Northampton Community
2  College?
3  A.  Correct.
4  Q.  Is that essentially a
5  daycare center --
6  A.  For --
7  Q.  -- for people who work --
8  A.  Or students who have babies.
9  Q.  And what is her position
10  there?
11  A.  She works with the infants.
12  She's an infant teacher.
13  Q.  Do you have any children?
14  A.  No.  We -- my wife had a
15  miscarriage when I got out of the
16  hospital, psychiatric unit.  I don't know
17  if it was the stress or she lost the
18  baby.
19  Q.  No children?
20  A.  No.
21  Q.  Have you lived with your
22  mother throughout the time you have been
23  married?
24  A.  No.  No.

Page 37

1  Q.  Okay.
2  A.  We moved here in 2011.
3  Q.  "Here" being Stroudsburg?
4  A.  Yes.
5  Q.  Where did you live before
6  that?
7  A.  Before that we were living
8  in New Mexico, Roswell.
9  Q.  Okay.  So was your mother
10  already in Stroudsburg?
11  A.  Oh, yeah.  Many years.  This
12  is where they settled.
13  Q.  They?
14  A.  My family.
15  Q.  Is your father living?
16  A.  He's deceased.
17  Q.  So did your mother and
18  father move to Stroudsburg?
19  A.  Yes.
20  Q.  Just out of curiosity, what
21  took them to Stroudsburg?
22  A.  My father was born and
23  raised in the lower east side of New York
24  and I think he got tired of

Page 38

1 overpopulation. He wanted some space
2 around him, is what he used to say.
3    Q.   So they just picked
4 Stroudsburg, PA?
5    A.   It was within their
6 affordability, taxes and just kind of
7 made sense. And he would commute to
8 Manhattan every day into the garment
9 center where he worked.
10    Q.   You said you moved to
11 Stroudsburg in 2011?
12    A.   Yes.
13    Q.   And before that, you lived
14 in Roswell, New Mexico?
15    A.   Yeah.
16    Q.   How long did you live in
17 Roswell, New Mexico?
18    A.   I want to say about a year.
19    Q.   And you were married at that
20 time?
21    A.   Yes.
22    Q.   Why don't you give me a
23 chronology of where you have lived since
24 college or since medical school.

Page 39

1    A.   Since medical school. Okay.
2 While I was in -- I lived in New York
3 City. That's where I grew up. From
4 medical school, I went to Belize in
5 Central America.
6    Q.   From medical school?
7    A.   I'm sorry. Before medical
8 school, I went to Belize in Central
9 America.
10    Q.   What year was that?
11    A.   That was around -- I want to
12 say 1999, 2000. I have to check the
13 transcript for sure, but I think it was
14 around that time. I finished medical
15 school in 2004. So it was a four-year
16 program.
17    Q.   I wanted to ask about that
18 and we'll spend a little time with this.
19 But you went to medical school in Belize.
20 And the name of that school?
21    A.   St. Matthew's.
22    Q.   It's just called St.
23 Matthew's?
24    A.   School of Medicine, I

Page 40

1 believe.
2    Q.   Do you know the address?
3    A.   I think they're somewhere in
4 Florida, the main office. But they are
5 now in -- what is that island? Kurks
6 [sic] and Caicos, or something. Turks
7 and Caicos. They're in the Caribbean.
8    Q.   So the school is no longer
9 in Belize?
10    A.   They moved. There was some
11 discrepancy with the government there.
12 I'm not sure exactly what happened.
13    Q.   How many years did you
14 actually spend in Belize attending
15 school?
16    A.   I want to say -- I would
17 come home for breaks. So I don't know
18 how to -- I guess the semesters were like
19 12, 14 weeks long. So I guess two years,
20 if you want to say two years.
21    Q.   Do you know what, I'm going
22 to go back. Let's take this more in
23 chronological order.
24        We went through high school.

Page 41

1 After high school, am I correct you
2 attended Parsons School of Design?
3    A.   (Gesturing.)
4    Q.   And what years was that?
5    A.   That was 1988 until '92.
6    Q.   At Parsons, did you have a
7 major?
8    A.   Illustration.
9    Q.   Did you graduate in four
10 years?
11    A.   I did.
12    Q.   BFA?
13    A.   Correct.
14    Q.   At Parsons, did you take
15 academic, what I'll call academic courses
16 in addition to art courses?
17    A.   Yeah, but they were watered
18 down, you know, like philosophy 101 and
19 English. And there really was no
20 science. I think I took wildlife of
21 North America something, that constituted
22 a science class.
23    Q.   And what was your grade
24 point at Parsons when you graduated?

Richard Katz, M.D., M.H.A.

Page 42

1     A.   You want academics or you
2 want everything?
3     Q.   Everything. Your grade
4 point average.
5     A.   Very high honors. I
6 excelled.
7     Q.   At Parsons, when you took
8 academic as opposed to art courses, did
9 you have any kind of accommodations for a
10 disability?
11     A.   I don't recall needing them.
12 I don't recall that the requirements for
13 the course work was that grueling or
14 taxing.
15       There was like no time
16 accommodations for testing. It was more
17 papers, writing papers. And I would
18 spend a lot of time doing that,
19 preparing, you know, papers and stuff
20 like that. That was taxing. But there
21 was no need in terms of the way the
22 courses were set up and the fact that
23 they were so watered down.
24     Q.   So you didn't ask for any

Page 43

1 accommodations?
2     A.   I don't believe they were
3 required based on the curriculum.
4     Q.   They were not required for
5 you, you mean?
6     A.   Yeah, based --
7     Q.   You didn't need any
8 accommodations?
9     A.   At that point in time
10 because it was an art program, and I was
11 able to do my art and not -- just do what
12 I always did and what I was gifted at,
13 then I did not require.
14     Q.   So you didn't require -- for
15 what you were doing, you didn't require
16 any accommodations?
17     A.   It was an art college.
18     Q.   And you didn't ask for any?
19     A.   I kind of object to the form
20 of the question.
21     Q.   All right. Well let me try
22 again. And that's fine.
23       Is it correct that during
24 college you did not feel the need to ask

Page 44

1 for any academic accommodations?
2     A.   There was no need to request
3 the accommodation because it was all
4 painting, illustration concepts, classes,
5 very few academics.
6     Q.   But in terms of the few
7 academic courses that there were,
8 focusing on those, you did not feel the
9 need to request accommodations?
10     A.   I don't believe that
11 accommodations were required because of
12 the way the course was structured and the
13 fact that it was watered down.
14     Q.   So again, I interpret that
15 as you did not feel the need to ask for
16 any accommodations because of the way the
17 courses were.
18     A.   If you want to say that
19 because of the curriculum of an art
20 program where you are not faced with such
21 complicated academics and it's more about
22 the world of art and design, then I
23 didn't request accommodations because no
24 grueling tests were given to us. It was

Page 45

1 more create the paper and submit the term
2 paper and things of that nature.
3       And for that I wouldn't need
4 accommodations because I was home
5 spending hours and hours and hours doing
6 at my pace and that was -- that's,
7 basically, all I can say to that.
8     Q.   Did none of the academic
9 courses have exams?
10     A.   Very few. Very few. I do
11 believe that the wildlife of North
12 America had an exam. I didn't fair too
13 well on that.
14     Q.   Do you remember what you got
15 in that course?
16     A.   I think I just passed,
17 probably like a C or something like that.
18     Q.   So after Parsons, did you go
19 right on -- in 1992 after you graduated,
20 did you go right into some sort of a
21 post-baccalaureate program?
22     A.   While I was at Parsons, I
23 worked in the emergency department of
24 Elmhurst Hospital.

S.A. 221

Richard Katz, M.D., M.H.A.

Page 46

1    Q.   Elmer Hurst?
2    A.   Elmhurst.  It's part of the
3  Health and Hospitals Corporation.
4        And I worked in the
5  emergency room as a part-time clerk
6  registering patients, doing blood work,
7  doing some coding.
8        And my parents had already
9  moved up here.  So I was kind left on my
10  own to kind of fend for myself.  So that
11  was a very fortuitous job.  It had
12  benefits as a part-timer and it paid
13  pretty well.
14        But that's where I
15  discovered medicine.  I kind of modeled
16  myself after some of the doctors there.
17  And I liked the fast-pace environment of
18  the ER.  And it wasn't until like 1994 or
19  so that I began taking pre-med classes.
20    Q.   Okay.  You said that you
21  graduated Parsons in 1992.
22    A.   Yes.
23    Q.   So, did you continue working
24  at Elmhurst after 1992?

Page 47

1    A.   Yes.
2    Q.   And did you become a
3  full-time employee?
4    A.   No.  What I did was, I tried
5  to utilize my art degree and I was -- I
6  kept Elmhurst on the weekends.  And I was
7  working for a company called Andover Togs
8  on 34th Street.  Subsequently though --
9    Q.   Hold on one second.
10        What is name of that?
11  Andover --
12    A.   Togs.
13    Q.   T-O --
14    A.   G-S.
15    Q.   And what was that?
16    A.   That's a children's wear
17  manufacturer.  So I would do the graphics
18  for the -- you know, the artwork for the
19  the -- (gesturing._
20    Q.   Did you have a major -- you
21  said you were an illustration major?
22    A.   Yes.
23    Q.   Did you have -- what was
24  your career goal while you were attending

Page 48

1  Parsons?
2    A.   Freelance illustrator doing
3  magazines' articles illustrations for,
4  you know, The New Yorker.  That was my
5  goal, to be became an illustrator.
6    Q.   Did you ever try to pursue
7  that?
8    A.   I did.  I have some
9  published work.
10    Q.   Did you try to pursue that
11  as a career?
12    A.   The life of a freelancer
13  made me a little nervous.
14    Q.   Because it's not secure?
15    A.   Yeah.
16    Q.   So after you graduated from
17  Parsons in 1992, you continued to work
18  part-time at Elmhurst Hospital?
19    A.   Yes.
20    Q.   And you also got a job at
21  Andover Togs --
22    A.   Yes.
23    Q.   -- in Manhattan?
24    A.   Yes.

Page 49

1    Q.   Was that a full-time job?
2    A.   It was.
3    Q.   How long did you work there?
4    A.   They fired me.
5    Q.   Why was that?
6    A.   I don't know.  I don't think
7  I was cut out for that kind of teddy bear
8  kind of art.  You know, they were selling
9  to Walmart and that just wasn't me.  I
10  was more a photo realist at the time
11  where I could paint portraits and stuff like
12  that.  So I wasn't the right fit for them
13  really.  They needed more of a
14  cartoonist.
15    Q.   How long did you work there?
16    A.   I want to say a year.
17    Q.   Did you have any
18  disagreements that led to your firing or
19  was it about not the right fit as an
20  illustrator?
21    A.   Just wasn't the type of
22  artwork that I was geared to and it kind
23  of showed.  It wasn't a very congenial
24  environment.

Page 50

1    Q.    After you left Andover Togs,
2  did you continue to pursue artwork?
3    A.    I then decided to start
4  pre-med.
5    Q.    So the answer is, "no?"
6    A.    No. That's correct.
7    Q.    Did you continue to do
8  freelance artwork?
9    A.    I did not.
10    Q.    Today, do you do any
11  freelance artwork?
12    A.    Today, I'm lucky that I can
13  get out of bed and drag a comb across my
14  hair. Today, I lost my soul, is the way
15  it feels like. That's the way it feels
16  to me.
17    Q.    Do you do art for fun?
18    A.    I used to. I doodled this
19  morning while I waited for you. But
20  other than that, not as much as I would
21  like to. I just don't have the energy or
22  the -- I don't know. It's hard to
23  explain. It's sort of taxing to have
24  that talent and not use, it hurts, too.

Page 51

1    Q.    During that year that you
2  worked at Andover Togs, where did you
3  live?
4    A.    I lived in New York.
5    Q.    By yourself or --
6    A.    Yeah. Yes.
7    Q.    And when you started -- you
8  said that after the one year, you started
9  taking pre-med courses?
10    A.    When I was fired from
11  Andover Togs.
12    Q.    How did you start that
13  process?
14    A.    How did I start it?
15    Q.    Let's take it this way.
16  What was the first school you went to?
17    A.    Queens College.
18    Q.    And Queens College is part
19  of the City university system?
20    A.    Correct.
21    Q.    Were you living in Queens?
22    A.    Yes.
23    Q.    And did you go full-time to
24  Queens College?

Page 52

1    A.    I was still working at the
2  hospital and I was taking full-time
3  classes, I believe. Yes.
4    Q.    How long did you go to
5  Queens College?
6    A.    Just, I want to say two
7  semesters.
8    Q.    Is Queens College located
9  exactly where it was when you attended?
10    A.    Yeah.
11    Q.    And what courses did you
12  take at Queens College?
13        Let's try to take it
14  chronologically if we can.
15    A.    It's like an introduction to
16  chemistry, an introduction to math,
17  algebra, basic algebra and bio.
18    Q.    So, first semester, three
19  courses?
20    A.    I think so.
21    Q.    And how did you do?
22    A.    Not well.
23    Q.    Could you be more specific?
24    A.    I wound up, I think,

Page 53

1  withdrawing from most of them, I think.
2    Q.    So there were three courses
3  in the first semester that you mentioned.
4        And is it your testimony
5  that you withdrew from all of them or --
6    A.    I think I kept the math
7  class and I think I finished out okay, I
8  think with a B or something.
9        The other two classes, I
10  think I withdrew if I remember correctly.
11    Q.    And how about the following
12  semester, what did you do?
13    A.    I think I did -- I think --
14  I would have to check my transcripts. I
15  believe I may have kept the C that I got
16  in bio and I went on to bio 2.
17        I don't know if they gave
18  you the option of registering for bio 2
19  without bio 1. I don't really recall.
20    Q.    Do you have transcripts?
21    A.    Yes.
22    Q.    All right. I'm going to
23  request -- if I didn't request that
24  originally, I request that.

S.A. 223

Richard Katz, M.D., M.H.A.

Page 54

1    A.  Okay.
2    Q.  So, I will follow up with a
3  letter to you with --
4    A.  Transcripts.
5    Q.  -- requesting.  So if we
6  come up with three or four things today
7  that I'm requesting, I'm going to follow
8  up in a letter to you.
9    A.  I don't have transcript from
10  Queens College, though.
11    Q.  Okay.  Because when you were
12  describing what you did, intro chem,
13  algebra, bio and then what the grades
14  were, then you said, "well, I would have
15  to check my transcripts."  So that's why
16  I'm asking.  Do you have them?
17    A.  No.  Queens College, I have
18  no transcripts.  I transferred to the
19  State University at Old Westbury.  For
20  there, I have transcripts.
21    Q.  Okay.  So I'm going to
22  request copies of any transcripts you
23  have for any school that you ever
24  attended.

Page 55

1    A.  If it's in my possession,
2  I'll send them to you.  Your client
3  should have the NBME, that should be on
4  file for medical school.
5    Q.  Well, my understanding is
6  that the -- whatever your application
7  process would be with the ECFMG, which is
8  a different organization.
9       Do you have any objection --
10  if I were to -- I could do that by either
11  an informal request, because the
12  organizations work together, or I could
13  do that by subpoena.  And so, I would --
14  like we did a couple of weeks ago, I
15  would send you a copy of a proposed
16  subpoena.
17       Would you object to my
18  getting your file from ECFMG?
19    A.  I have to think about that.
20  I don't know what is in that file.
21    Q.  I don't either.  That's why
22  I'm asking.  Okay.
23    A.  I think I probably would
24  object.  I'm not sure how it's relevant.

Page 56

1  I don't see relevance.  I mean, it's a
2  file I don't even have.
3    Q.  Well, just so we're clear,
4  anything that I would get by subpoena,
5  obviously you would get as well.
6    A.  Right.  I don't know.  To
7  me, I don't think that there's anything
8  at the end of that.  There won't be any
9  enlightening information to help
10  discovery.
11    Q.  Well, we obviously disagree
12  about what is relevant and what is not
13  and we've had that disagreement already
14  and we're waiting for the Judge's ruling
15  on those things.  So we don't have to,
16  you know, try to thrash that out here.
17       But I will tell you that if
18  you think that you had transcripts and
19  you supplied to them ECFMG as part of
20  your registration process, then I'm going
21  to request those either informally to you
22  or and by subpoena to the ECFMG.
23       Let me ask you this:  Do you
24  have a complete copy of what you

Page 57

1  submitted to the ECFMG from the first
2  time that you applied to take the USMLE?
3    A.  No.
4    Q.  You didn't save what you
5  submitted?
6    A.  I don't recall what I
7  submitted.
8    Q.  And --
9    A.  This is 10 years ago.
10    Q.  But in your files at home,
11  you don't have a copy -- I'm asking
12  whether you have a copy of what you
13  submitted, the entire application if you
14  want to call it that, to the ECFMG?
15    A.  I moved several times.  A
16  lot of things I can't even locate
17  anymore.
18    Q.  Okay.  Fair enough.
19       So we were trying to take
20  this chronologically.  You went to Queens
21  College for two semesters.  You described
22  your first semester.
23       How about the second
24  semester?

Page 58

1    A.   Second semester -- okay.
2  This is what I think happened.  First
3  semester I dropped bio and the pre-chem.
4  Second semester, I just registered for
5  bio 2, I think, at night.  And I think I
6  got a C.
7         And I think I took the
8  second part of the algebra, mathematics
9  to start building my mathematical
10  abilities a little bit better.  I took a
11  second part of the algebra.  And I think
12  I got a C on that, too.
13         From there, I went to Old
14  Westbury.
15    Q.   So, you finished Parsons.
16  You worked for a year or so at Andover
17  Togs.  Then he went to Queens College for
18  a year.  Then you went to Old Westbury.
19    A.   Yes.
20    Q.   Have I missed anything in
21  there?
22    A.   I don't think so.
23    Q.   How long did you go to Old
24  Westbury?

Page 59

1    A.   '94 to '98 I want to say.
2    Q.   And is Old Westbury in Long
3  Island?
4    A.   Yes.
5    Q.   Were you living in Queens?
6    A.   Yes.  It was only like a
7  half hour, 35-minute drive on the
8  Northern State.
9    Q.   And were you in a degree
10  program at Old Westbury?
11    A.   I was not.  I was just
12  matriculating for pre-med courses.
13    Q.   Were you attending Old
14  Westbury full-time?
15    A.   I want to say, yes, while I
16  was working the weekends at the hospital.
17    Q.   To the extent that you can,
18  I'm going to ask you to go through
19  semester by semester what you took and
20  how you did in each course to the extent
21  that you can remember.
22    A.   Okay.
23    Q.   Okay?
24    A.   What's your question?

Page 60

1    Q.   So, first semester at Old
2  Westbury, what did you take?
3    A.   I remember taking chemistry
4  I.
5    Q.   And --
6    A.   And the lab.  I took bio.  I
7  think that's it.
8    Q.   No math course?
9    A.   No, not yet.
10    Q.   And you weren't taking
11  courses that you didn't need to take for
12  pre-med, like English?
13    A.   No, no, no.
14    Q.   Philosophy?
15    A.   No.
16    Q.   So how did you do in chem 1
17  and the lab first semester?
18    A.   Not bad.  I think I got like
19  an A in the lab, I think a B minus in the
20  course, but I worked so hard.
21    Q.   How did you do in biology?
22    A.   I think I got a B plus, I
23  want to say.
24    Q.   Now, those courses, were you

Page 61

1  taking those courses along with
2  undergraduates?
3    A.   Yes.
4    Q.   So it wasn't graduate
5  school.  This was undergraduate school,
6  but you weren't there to get a degree?
7    A.   Right.  I should preface,
8  though, I was like a post-bacc, but there
9  was a problem when I was taking exams.
10  And I remember talking to the professor
11  about it, that I was having this anxiety
12  problem when I was sitting for her exams,
13  that I was like losing my information in
14  my mind.
15         I did well in the lab
16  because that was just reports and it was
17  hands-on.  But I remember talking to Dr.
18  Garrity and I told her, I don't know
19  what's wrong, that I had to see -- you
20  know, see what's going on with me, I get
21  very nervous during the testing, that I
22  don't know if I need to see a clinician
23  about it.
24         But I was very nervous when

S.A. 225

Page 62

1  I sat for the chemistry exams and I would
2  forget information.
3       Q.   Now, did you at that time
4  see any psychologist or psychiatrist
5  about that issue?
6       A.   I remember not really
7  knowing why this was happening.  And I
8  don't know if I had enough insight to go
9  and seek a clinician at that point.
10      Q.   At some point, at Old
11 Westbury, you went to the office for --
12      A.   Disability.
13      Q.   -- disability services?
14      A.   Yes.
15           Yeah.  That's when I came to
16 the conclusion after speaking to a
17 caregiver about my symptoms and they
18 thought that I had anxiety disorder for
19 testing.
20      Q.   And was that Mr. Lupardo?
21      A.   Right.
22      Q.   He was the clinician you're
23 referring to?
24      A.   No.  He was in charge of the

Page 63

1  student for special services.  He has a
2  master's.  And he, at the time, was the
3  director of the student for special
4  services.
5       Q.   The disability services --
6       A.   Correct.
7       Q.   -- is the equivalent of
8  that?
9       A.   Yes.
10      Q.   So in that first semester,
11 you had some issues during test taking
12 and you spoke to your professor about it,
13 but that wasn't when you first went to
14 talk --
15      A.   I remember she said --
16      Q.   -- to Mr. Lupardo --
17      A.   I'm sorry, I interrupted
18 you.
19           I remember Dr. Garrity
20 telling me that I have to do something.
21 I remember that she was bothered by the
22 fact that I was performing pretty well in
23 lab and the professor in the lab thought
24 I was pretty good, but I wasn't showing

Page 64

1  that in her classes.  So I think she
2  thought it was some reflexion on her and
3  her teaching as to why isn't he doing
4  well in my class kind of thing.
5       Q.   Do you remember when it was
6  that you first went to that Office for
7  Students with Disabilities, when was the
8  first time you went there?
9       A.   I believe it was right
10 around that time.
11      Q.   So first year out of four
12 years?
13      A.   The first year I think I --
14 you know what it was, it was after I
15 finished chem 2 and I realized there's a
16 problem here because I got a C, I think.
17           And after that, then I spoke
18 to the instructor again, Dr. Garrity and
19 I continued to take it not really
20 understanding what was wrong.  And it
21 wasn't until I completed that, I got a C,
22 I was disappointed because you need a B
23 or better for medical school, that I went
24 and talked to someone when organic 1

Page 65

1  started.
2       Q.   Okay.
3       A.   I believe it was during
4  organic chemistry I went to see Mr.
5  Lupardo.  I didn't even know that office
6  existed until then.  I didn't know there
7  was any help.
8       Q.   So --
9       A.   So there was a doctor -- I
10 forget his name.  He was a West Indian
11 professor.  And he said go see the
12 testing center, you obviously have a
13 problem.
14      Q.   Second semester at Old
15 Westbury, you took chem 2 and what else?
16      A.   Chem 2 and bio 2.
17      Q.   And chem 2 you said you got
18 a C?
19      A.   I think so.  Yeah.  She knew
20 I needed a B or better for medical
21 school.  And I was striving for that and
22 I was working very hard, but I thought
23 that because I was doing so well in the
24 lab that that could bring me up.  But

S.A. 226

Page 66

1  they were two separate grades, really.
2      Q.   How did you do in bio?
3      A.   I think I did well because I
4  was primed from Queens College, I had
5  already taken it. So I left the grade in
6  Queens College because I wanted to see if
7  I could get a better grade and I did.
8      Q.   What did you get?
9      A.   I think I got a B plus.
10     Q.   So, you had started this
11  discussion saying you went to Old
12  Westbury 1994 to 1998.
13         So did you just describe the
14  1994/1995 academic year?
15     A.   That sounds correct.
16     Q.   So, second year, which would
17  be 1995/1996, what did you take third
18  semester?
19     A.   Now --
20     Q.   Or did you continue with
21  the --
22     A.   I'm not certain of these
23  dates. I'm doing the best I can here
24  with you.

Page 67

1         It would have been organic
2  1. And I don't remember -- I think I
3  took physics with it.
4      Q.   How did you do in
5  organic/chem 1?
6      A.   I'm trying to remember. I
7  think I got a C.
8      Q.   And how about physics?
9      A.   I think I got a B.
10     Q.   And was it during that
11  semester that you went to the student
12  disability office?
13     A.   I think after that C I was
14  kind of devastated because I was really
15  working very hard. And I went to see Mr.
16  Lupardo after I had finished organic 1.
17  And I told Mr. Lupardo that was going
18  on -- I get very flustered during the
19  tests, that I'm not thinking properly, I
20  forget all the information, I don't know
21  what's going on.
22         He suggested I see a doctor,
23  describe my symptoms and then get back to
24  him, which I did.

Page 68

1      Q.   Did he send you to a
2  particular doctor?
3      A.   No. I think I saw a doctor
4  in Queens, but I don't remember who I saw
5  for that.
6         That doctor, I believe he
7  wrote a letter based on a pretty thorough
8  evaluation and he stated that I had test
9  anxiety.
10     Q.   And do you remember the name
11  of the doctor?
12     A.   I don't remember. I don't
13  know who that was.
14     Q.   Do you remember what kind of
15  doctor it was?
16     A.   I believe it was a general
17  family doc, family physician.
18     Q.   Like an M.D.?
19     A.   Yeah.
20     Q.   Was it your long-standing
21  family physician or --
22     A.   I didn't really have a
23  long-standing family physician back then.
24     Q.   And based on that letter

Page 69

1  that you brought to doctor -- Mr.
2  Lupardo's office, did you receive
3  accommodations?
4      A.   I explained to him the
5  symptoms. He took a thorough intake, I
6  believe. And he kept the record, the
7  file of the doctor's recommendations and
8  created a file for me. And then,
9  basically, I was permitted to have
10  accommodations based on the first couple
11  of semesters of struggling.
12     Q.   Okay. And what were the
13  accommodations that you got?
14     A.   Double time on the exam and
15  a private room in the testing center.
16     Q.   And that was based on test
17  anxiety?
18     A.   That was the diagnosis.
19  Yes.
20     Q.   Did you continue -- you just
21  described your third semester.
22         Did you keep going
23  semester after semester to Old Westbury?
24     A.   Yes.

Richard Katz, M.D., M.H.A.

Page 70

1    Q.  And did you -- is Old
2  Westbury the only -- leaving aside Queens
3  College or Queens College and Old
4  Westbury together, is that the sum total
5  of your post-baccalaureate education?
6    A.  That's kind of a compound
7  question. I object to the way you're
8  stating that.
9    Q.  Let me try again. You've
10  described going to Queens College and
11  then Old Westbury.
12        Did you go to any other
13  schools or colleges or universities for
14  pre-med courses?
15    A.  One summer semester, summer
16  session at Nassau Community College where
17  I attempted to do physics over the
18  summer, but it was too fast paced. So I
19  wound up withdrawing. But I did continue
20  with pre-calculus.
21    Q.  At?
22    A.  At Nassau. And I don't
23  remember which summer that was, but it
24  was probably after -- probably after chem

Page 71

1  2, I want to say, that I began trying to
2  do physics over the summer.
3    Q.  Was that in between Queens
4  College and Old Westbury?
5    A.  No. I was already at Old
6  Westbury.
7    Q.  And that was Nassau
8  Community College?
9    A.  Yes.
10    Q.  And you took physics and you
11  withdrew?
12    A.  Yeah. I just didn't -- I
13  wasn't grasping it. It was too fast of a
14  pace where I was at. At the time period,
15  there was this other problem I was
16  contending with that I didn't even know
17  exactly what that was, which turned out
18  to be the anxiety test. This is prior to
19  that.
20    Q.  Okay.
21    A.  So physics I withdrew. And
22  then I took pre-calc that summer and I
23  got a C. And I struggled with that, too.
24        Exams were very difficult

Page 72

1  for me because especially coming from
2  Parsons, new school where everything was
3  papers, that's why I kind of -- I think I
4  did better in the laboratories because
5  you took the data home and you wrote your
6  report and I wasn't pressured.
7    Q.  Okay. So let's go back to
8  your time at Old Westbury, fourth
9  semester.
10    A.  Okay.
11    Q.  In the fourth semester, you
12  already had accommodations in place; is
13  that right?
14    A.  Yes.
15    Q.  And did those accommodations
16  continue throughout the time you were at
17  Old Westbury?
18    A.  I believe so. Yes. As soon
19  as the doctor identified an anxiety
20  disorder, then it kicked in.
21    Q.  And the anxiety disorder
22  that that doctor found was test anxiety?
23    A.  Yes.
24    Q.  What did you take in the

Page 73

1  fourth semester?
2    A.  I believe it was organic 2
3  and physics 2.
4    Q.  And how did you do in those
5  two courses?
6    A.  Markedly better.
7    Q.  How did you do in those two
8  courses?
9    A.  B plus in organic. An A in
10  the lab. I want to say a B in physics
11  and an A in the lab.
12    Q.  An A in the lab?
13    A.  I think so. Yeah.
14    Q.  And you said your
15  accommodations continued. Did that mean
16  you had double time on testing?
17    A.  Yeah, and a separate private
18  room to take my exam.
19    Q.  How about now we're into
20  your third year at Old Westbury. So it
21  would be the fifth --
22    A.  That was it.
23    Q.  I'm assuming --
24    A.  That was it, I believe.

S.A. 228

Richard Katz, M.D., M.H.A.

1 After organic, I completed my
2 prerequisites. Prerequisites were done.
3    Q.   That was the end of your
4 time --
5    A.   I believe. Yeah.
6    Q.   -- at Old Westbury?
7    A.   Oh, there was -- I remember
8 that I had to take something with getting
9 an extra class in because I had to be at
10 a certain amount of credits for some
11 reason. I think it was because of the
12 financial aid or something.
13       So, the chemistry professor
14 for organic allowed me to do a paper or
15 something for like a credit course or
16 something like that. I think I got a C
17 plus in that.
18    Q.   So earlier I asked you when
19 you attended Old Westbury. You told me
20 1994 to 1998. So, you went through four
21 semesters starting in 1994. How did we
22 get all the way to 1998?
23    A.   1994 is when I believe I
24 began Old Westbury. One whole year there

1 for inorganic and organic. One -- oh,
2 unless I did physics by itself, which I
3 may have done.
4       I may have done -- I grouped
5 physics with organic with you here. I
6 think I may have done physics alone for
7 the year in question.
8    Q.   Okay. And then similarly
9 organic by itself?
10    A.   I believe so. Yes.
11       And I'm just going off my
12 memory. That's what I remember.
13    Q.   And during the time that you
14 were at Old Westbury and you were taking,
15 for example, just one course, organic or
16 just physics, were you working?
17    A.   Yes.
18    Q.   And that was on the
19 weekends?
20    A.   Yes.
21       Two 12-hour shifts,
22 Saturday, Sunday.
23    Q.   How were you supporting
24 yourself? Was it through your work at

1 the hospital?
2    A.   Correct.
3    Q.   And did you also have
4 financial aid at Old Westbury?
5    A.   I believe so. Yes.
6    Q.   And was that grants or loans
7 or what?
8    A.   I believe it was loans.
9    Q.   Have you ever paid back
10 loans or have you rolled loans over
11 into -- so that they're all one big loan
12 now?
13    A.   How is that relevant to what
14 we're discussing?
15    Q.   I think your livelihood,
16 which I'm going to ask you about, is
17 relevant. So I'm going to ask you about
18 that. And it doesn't mean that it gets
19 admitted at trial, but it's part of a
20 picture.
21    A.   I struggled financially.
22 And I'm still struggling. And I am in a
23 lot of debt because of my education.
24 Nobody handed me anything. Right from

1 Parsons, I was on my own. And I got a
2 small institutional scholarship because
3 of my artistic abilities, not because of
4 my academics.
5    Q.   At Parsons, you mean?
6    A.   Partial. But other than
7 that, I have been on my own. I didn't
8 get much support.
9    Q.   And do you still have
10 loans --
11    A.   Of course I do.
12    Q.   -- back to Parsons?
13    A.   Of course I do.
14    Q.   Okay.
15    A.   Your clients, unfortunately,
16 created a big problem when they denied me
17 the ability to move forward by denying
18 the request for accommodations.
19    Q.   So, is it correct, then,
20 that you have loans going back to Parsons
21 and Old Westbury and medical school?
22    A.   Yes.
23    Q.   And what is the total
24 amount, if I may ask that?

Richard Katz, M.D., M.H.A.

Page 78

1    A.    I would have to check, but
2  it's in the hundreds of thousands.
3    Q.    Have you ever declared
4  bankruptcy?
5    A.    2005, I believe.
6    Q.    And did you have a lawyer
7  represent you in that or did you do it
8  yourself?
9    A.    I don't recall his name, but
10  it was a lawyer.
11    Q.    Where was that filed?
12    A.    In New York.
13    Q.    And as a result of that
14  bankruptcy, was there a requirement that
15  you pay back money over time?
16    A.    To whom?
17    Q.    I don't know who the debtors
18  were in that bankruptcy, but I'm asking.
19    A.    Are you asking me if I'm
20  still liable for my student education
21  debts?
22    Q.    No, that's not what I'm
23  asking. Let me take it step by step.
24        You filed for personal

Page 79

1  bankruptcy in New York in 2005. And you
2  had a lawyer.
3    A.    Mm-hmm. Yes.
4    Q.    Do you remember what court
5  it was?
6    A.    I want to say Brooklyn. And
7  that was -- because I thinking the lawyer
8  was located in Brooklyn.
9    Q.    And you don't remember the
10  name of the lawyer?
11    A.    I don't. Not offhand, no.
12    Q.    And at the end of that case,
13  was there a decree by the court that
14  ended the case?
15    A.    I don't understand the
16  question.
17    Q.    How did that bankruptcy end?
18  Did you have debts that were discharged?
19    A.    I believe it was the
20  unsecured credit card possibly, but
21  student loans are not dischargeable.
22    Q.    So you had unsecured credit
23  card debt?
24    A.    Probably. The student loan

Page 80

1  situation destroyed me because I think my
2  credit score was actually pretty good
3  back then.
4    Q.    What was the amount of
5  unsecured credit card debt?
6    A.    I don't think it was very
7  much. Maybe 16, 17,000. Something like
8  that.
9    Q.    And do you recall if there
10  were any other debts other than credit
11  card debts that were discharged?
12    A.    I don't recall.
13    Q.    But as you said, your
14  student loans stayed with you?
15    A.    Correct.
16    Q.    And was that the only time
17  that you've been through the bankruptcy
18  proceeding?
19    A.    Yes. Yes. I was definitely
20  having some economic problems.
21    Q.    Do you work now?
22    A.    No.
23    Q.    When was the last time you
24  had a job?

Page 81

1    A.    Probably, a real job, I
2  would say 2008.
3        MR. SACKS:  You know what,
4    let's take five minutes.
5        - - -
6        (Whereupon, a brief recess
7    was taken.)
8        - - -
9  BY MR. SACKS:
10    Q.    How do you support yourself
11  today?
12    A.    The good graces of my
13  mother.
14    Q.    So your mom receives Social
15  Security. You and your wife live with
16  your mom.
17    A.    Until this all gets squared
18  away and I know what is going on here.
19  This is -- 2011 we moved here with the
20  expectation she wanted to down-size, go
21  into kind of like a senior living
22  quarters.
23        And, you know, her hope was
24  that my wife and I would be able to take

Richard Katz, M.D., M.H.A.

Page 82

1 over the house and she could down-size
2 and not have this albatross around her
3 neck, but she's been trying to hold on to
4 it because of us.
5         So, basically, you know, I
6 would be in the street if it wasn't for
7 her. I don't know where we would be.
8 She had pity on us.
9    Q.   Do you receive any kind of
10 public benefits?
11    A.   We get SNAP program for
12 food, but that's it. And that's as far
13 as it goes, I believe.
14    Q.   So you and your wife get
15 food stamps, essentially?
16    A.   Yeah. Yeah.
17    Q.   Have you ever tried to get
18 disability, Social Security Disability?
19    A.   I haven't. I haven't. I
20 don't know what is entailed in that.
21    Q.   I was just asking if you
22 did. I'm not advocating. I don't know
23 either.
24    A.   I don't know anything about

Page 83

1 it.
2    Q.   So I had asked you about
3 your last job. And you know what, last
4 evening you supplied us with some
5 documents. And one of those is your
6 resume.
7    A.   Yes.
8    Q.   Is this your resume that you
9 sent to us yesterday, sent in response to
10 the request for documents?
11    A.   That's correct.
12         Yes.
13    Q.   So according to your resume,
14 you worked at Elmhurst Hospital 1991 to
15 '98 and then also in a different job from
16 1998 to 2000.
17    A.   A different job?
18    Q.   A different position?
19    A.   Oh, at Elmhurst. Yes.
20 That's correct.
21    Q.   So, the position that you
22 held from 1998 to 2000, the second
23 position, what was that job? What was it
24 called?

Page 84

1    A.   It was in the department of
2 behavioral health. I was responsible for
3 helping with the nurse educators to train
4 the various staff members, to create what
5 they called a therapeutic milieu for the
6 patient population, trying to come up
7 with protocols for group therapy and
8 things of this nature. And also some
9 troubleshooting where there may be
10 problems on the unit to try to kind of
11 correct those problems from a -- what is
12 the word they use? The people that kind
13 of troubleshoot problems in the hospital.
14 There's a word for it.
15    Q.   Consultant?
16    A.   Not really a consultant.
17 Like maybe risk management type thing.
18    Q.   Okay. So was your position
19 administrative?
20    A.   It was --
21    Q.   Clerical?
22    A.   -- under nursing.
23    Q.   You were not a nurse, were
24 you?

Page 85

1    A.   No, but they trained us.
2 There was a special program that the
3 nursing department trained us for.
4    Q.   And you were not providing
5 clinical care to patients, were you?
6    A.   In a sense, we were helping
7 the office staff on many levels. The
8 position called for a bachelor's degree.
9 And we were like a supplemental ancillary
10 help to the nursing staff.
11         So if -- where the risk
12 management stuff came in was with the --
13 when a patient had like a decompensation,
14 if they had an outburst on the unit, you
15 know, kind of talk them down and things
16 like that.
17    Q.   You would be involved in
18 that process?
19    A.   There was a team. And I
20 would be -- one of my unit's
21 representative member for that team of
22 responding to those types of
23 interventions in a very therapeutic
24 manner.

Richard Katz, M.D., M.H.A.

Page 86

1    Q.   So looking at your resume --
2  so that position ends in the year 2000.
3    A.   Something like that. Yeah.
4  1999, 2000. It was right before I went
5  to medical school. So I went to medical
6  school around 2000.
7    Q.   So the medical school in
8  Belize that you mentioned earlier, St.
9  Matthew's, is not identified on your
10  resume.
11    A.   Oh.
12    Q.   Is that -- where does that
13  fit in?
14    A.   That fits in 2000 to 2002.
15  I didn't graduate from St. Matthew's.
16    Q.   We'll come back to that in a
17  minute. Let's follow through on the
18  jobs --
19    A.   Sure.
20    Q.   -- chronology of the jobs.
21  So you had these two positions at
22  Elmhurst Hospital.
23    A.   That was pre-medical school.
24    Q.   Pre-medical school. And

Page 87

1  then you attended medical school. And
2  then there's a position at Nathan Kline
3  Institute for Psychiatric Research.
4    A.   Right.
5    Q.   And that's --
6    A.   In Orangeburg.
7    Q.   Orangeburg, New York.
8  September 2005 to September 2007. So two
9  years.
10    A.   Mm-hmm.
11    Q.   And what was your position
12  there?
13    A.   Research oriented,
14  psychiatric research. I was studying
15  aging in the laboratory there.
16    Q.   Were you paid?
17    A.   And I was involved --
18    Q.   Was that a paid position?
19    A.   That was a paid position.
20  Yes.
21    Q.   And were you a researcher?
22  What was your title?
23    A.   I think they called it
24  fellow in aging. That dealt a lot with

Page 88

1  the IRB and conducting studies on aging.
2    Q.   Was there a primary
3  researcher that you worked under?
4    A.   There were a couple.
5    Q.   Do you remember who they
6  were?
7    A.   One was John Fox.
8    Q.   Was he a psychiatrist?
9    A.   A Ph.D. And he's the main
10  one I took direction from.
11    Q.   And it was his lab, his
12  research?
13    A.   Yeah. Mm-hmm.
14    Q.   Why did you leave that
15  position in 2007?
16    A.   It was a two-year kind of
17  like a fellowship program. So it's kind
18  of like after two years, it was over.
19    Q.   And was that a full-time
20  position?
21    A.   It was.
22    Q.   Do you recall what your
23  salary was or what your earnings were?
24    A.   At that time, I think it was

Page 89

1  between 40 and 46,000.
2    Q.   When that position ended,
3  did you try to locate any other positions
4  in the same institution?
5    A.   Chasing research jobs. I
6  had a couple of associates that I had,
7  business associates, and that's where the
8  other came in at the Alamance Regional.
9    Q.   I want to -- you have to
10  explain that a little bit better to me,
11  the chasing research jobs.
12    A.   Yeah. In other words, I
13  didn't have a secure position to go into
14  next. So there were a couple of projects
15  that I kind of was told about and that I
16  pursued. And that was one of them, in
17  Alamance.
18    Q.   Mentioned business
19  associates. What does that mean?
20    A.   People that I knew in the
21  field of research.
22    Q.   People that you worked with?
23    A.   Yes.
24    Q.   You mean, just people who

Richard Katz, M.D., M.H.A.

**Page 90**

1 you worked with and they recommended,
2 trying to get --
3    A.   Yeah.  It was kind of like
4 utilizing your network of people and --
5    Q.   According to your resume,
6 you finished the job at Nathan Kline
7 Institute September 2007.  And you
8 started the next job at Alamance Regional
9 Medical Center in September 2007.  So it
10 was kind of one job to the next?
11    A.   Yeah.  Yeah.  That's true.
12    Q.   And that job was in North
13 Carolina?
14    A.   Right.
15    Q.   And you did that job from
16 September 2007 to July 2008, about nine
17 months --
18    A.   Mm-hmm.
19    Q.   -- ten months; is that
20 right?
21    A.   Mm-hmm.
22    Q.   That's a "yes?"
23    A.   Yes.  I'm sorry.
24    Q.   What was your position

**Page 91**

1 there?  Was it again research fellow?
2    A.   No.  It wasn't.  It was more
3 like a project, kind of like consultant.
4 It was help setting up the laboratory for
5 neuropsych, electrophysiology laboratory.
6    Q.   So you helped set up an
7 electrophysiology lab?
8    A.   Yes.  Among other things
9 that are listed there.
10    Q.   Why did you leave that
11 position after approximately ten months?
12    A.   It was just a temporary kind
13 of a thing.  It's like a project.
14    Q.   So the reason you left that
15 position was because it was a temporary
16 position and it ended?
17    A.   Yes.
18    Q.   Who did you work under
19 there?
20    A.   David Durham.
21    Q.   Was he a Ph.D.?
22    A.   M.D.
23    Q.   Do you still have any
24 contact with David Durham?

**Page 92**

1    A.   Not too much anymore.  No.
2    Q.   How about with John Fox?
3    A.   Not too much.  Not since
4 that period of time.
5    Q.   Now, after July of 2008, you
6 don't list any further jobs on your
7 resume.  Was that job at Alamance your
8 last job?
9    A.   Pretty much the last time I
10 worked.  Yes.
11    Q.   When you say "pretty
12 much" --
13    A.   Well, there's been some
14 small projects that I didn't list on the
15 CV that I didn't it was pertinent.
16    Q.   What sorts of projects?
17    A.   Like the one that brought me
18 to New Mexico.
19    Q.   What was that?
20    A.   That was, basically, kind of
21 doing -- utilizing the MHA degree and
22 kind of overseeing kind of office staff.
23 But it wasn't -- that, too, was
24 temporary, six months.

**Page 93**

1    Q.   So you got a temp job.  Was
2 it referred to a temporary job or was --
3    A.   Yeah, it was temporary.
4    Q.   Let me make sure I finish my
5 question.  Okay?
6        So after the Alamance job
7 ended, the next job that you had was in
8 New Mexico?
9    A.   Correct.  But that was just
10 a short project.
11    Q.   Who were you working for
12 there?
13    A.   It was a company called
14 NMPS, New Mexico Psychiatric Services.
15    Q.   Was that part of the New
16 Mexico government?
17    A.   No.
18    Q.   So it was a private company?
19    A.   Yeah, yeah.  Private.
20    Q.   Private provider?
21    A.   Yes.
22    Q.   Was it a hospital-based
23 provider?
24    A.   Hospital based, yes.

Richard Katz, M.D., M.H.A.

Page 94

1    Q.    Who was your actual
2  employer?
3    A.    It was a guy by the name of
4  Mirin. Mirin is the last name.
5    Q.    You don't remember a first
6  name?
7    A.    No. Just Mirin.
8    Q.    Spelled how?
9    A.    M-I-R-I-N.
10    Q.    A Ph.D. or --
11    A.    I think an M.D.
12    Q.    And was it his company?
13    A.    Yes.
14    Q.    He owned or ran --
15    A.    I guess, yeah. I didn't
16  know very much. I just was kind of
17  temping there.
18    Q.    And when you say you were
19  temping there, did you apply for the job
20  when you were living in North Carolina?
21    A.    Yes.
22    Q.    And so you were looking
23  nationally for jobs?
24    A.    Yes.

Page 95

1    Q.    And was --
2    A.    This was another one of
3  those networking things, you know,
4  somebody who knew someone.
5    Q.    And did you move to New
6  Mexico knowing that it was just a
7  temporary project?
8    A.    Yeah. And I had thought
9  that maybe there was potential in New
10  Mexico, if I was able to get the boards
11  done, maybe do residency there. Then
12  maybe it offered some opportunity because
13  I knew there was a big physician shortage
14  there.
15    Q.    How long did that project
16  last?
17    A.    Six months.
18    Q.    And was it in Roswell?
19    A.    Mm-hmm. Yes. Sorry.
20    Q.    Isn't Roswell where the --
21    A.    Yes. That's correct. And
22  it's a strange place. The street lights
23  have alien heads.
24    Q.    Have alien heads?

Page 96

1    A.    Yeah.
2    Q.    Oh, that's funny. So they
3  capitalize on their fame.
4    A.    That's about all they
5  capitalize on.
6    Q.    After that temporary project
7  ended at New Mexico Psych Services --
8    A.    Came here.
9    Q.    You returned to
10  Pennsylvania?
11    A.    Yes.
12    Q.    Earlier you told me that you
13  moved back to Stroudsburg in 2011.
14    A.    Mm-hmm.
15    Q.    So between 2008 and 2011,
16  what were you doing?
17    A.    Between 2008 and 2011, I had
18  been staying -- my wife and I were
19  staying in Ohio for a little while. My
20  wife got a job in the Cleveland Clinic as
21  an instructor for the child care center
22  there.
23    Q.    Did you have any connection
24  or did she --

Page 97

1    A.    I had a connection in Ohio.
2  And for a short period of time, we
3  remained there.
4    Q.    2008 to 2011?
5    A.    Before -- actually, that was
6  before New Mexico. That was before New
7  Mexico.
8    Q.    Living in Ohio?
9    A.    Yeah. Yeah.
10    Q.    So --
11    A.    And I wasn't working at that
12  time. I had gone to Ohio. I had a
13  business associate who stated that there
14  was a position available there in the
15  Veterans Affairs in the medical records
16  department. And that position never came
17  to fruition. I had interviewed for it
18  and, basically, it just never happened.
19  I didn't get it.
20    Q.    So let me make sure I have
21  the chronology right.
22        You were in North Carolina
23  September 22, 2007 to July 2008. And
24  after July of 2008, you moved to Ohio.

Richard Katz, M.D., M.H.A.

Page 98

1    A.   After North Carolina.
2  That's correct.  I had interviewed for
3  that job while we were in North Carolina,
4  the job I just told you about.
5    Q.   And this was at a VA
6  hospital?
7    A.   Yes.
8    Q.   And where in Ohio was that?
9    A.   In the Cleveland area.
10   Q.   So you had interviewed for a
11 job while you were still in North
12 Carolina, you thought you would get it,
13 you moved to Cleveland, and then you --
14   A.   My wife got a job pretty
15 quickly.  She was holding the fort while
16 I was trying to study for boards.
17   Q.   When you refer to the
18 boards, you are talking about the USMLE?
19   A.   Correct.
20   Q.   How long did you stay in
21 Ohio?
22   A.   Up until going to New
23 Mexico, which was right around 2010, I
24 want to say.

Page 99

1    Q.   So you did not get any
2  employment --
3    A.   No.
4    Q.   -- while in Ohio?
5    A.   No.
6    Q.   And then moved to -- why did
7  you move to New Mexico?
8    A.   For that temporary position.
9    Q.   So your wife left her job in
10 Ohio because you got a job, a temp job?
11   A.   She wasn't that happy there,
12 I guess.  That was one of the reasons,
13 too.  And she wanted to move on to other
14 venues.
15   Q.   Where did you meet her?
16   A.   We worked together in
17 Elmhurst Hospital as clerks.
18   Q.   So she's a New Yorker, too?
19   A.   She is.  Yeah.
20   Q.   So you lived in New Mexico
21 for about -- from what years was that,
22 2009 or '10?
23   A.   '10, to around 2011.
24 November is when we moved here.  And we

Page 100

1  moved back because my dad passed,
2  unexpectedly passed.
3    And in theory, we were going
4  to try to help my mother out, but she's
5  turning out to kind of help us out.  Took
6  kind of pity on our situation.
7    Q.   So no employments from the
8  time you left New Mexico.  Have you tried
9  to get employment --
10   A.   Oh, yeah.
11   Q.   -- in the Stroudsburg area?
12   A.   Stroudsburg, the new
13 hospital is being built here for St.
14 Luke's.
15     Yeah.  And Sanofi is a big
16 one that I have been trying to get into,
17 but apparently you have to know people.
18   Q.   What is Sanofi?
19   A.   That's the big
20 pharmaceutical vaccination company that's
21 actually right here in Swiftwater, right
22 up 611.  I applied to numerous positions.
23 Nobody calls you back.
24   Q.   Do you keep a record of --

Page 101

1    A.   Sure.
2    Q.   -- the positions you've
3  applied for?
4    A.   Yeah.
5    Q.   That was one of the things I
6  asked for.
7    A.   Yes.  I didn't see the
8  relevance.  I wanted to understand where
9  you're coming from.
10   Q.   Well, I will try to explain
11 it in a sentence or two what I think the
12 relevance of that is.
13     And that is that you are
14 asking for damages to compensate you for
15 the loss of a career.
16   A.   Yes.
17   Q.   And that has to be compared
18 against something else.
19   A.   Okay.
20   Q.   And a person who brings a
21 lawsuit and claims a loss of earnings --
22   A.   When you say "something
23 else," what do you mean?
24   Q.   That has to be compared to

Richard Katz, M.D., M.H.A.

| Page 102 |
| --- |

1 what you might otherwise be earning.
2        If you could earn $100,000 a
3 year as an artist, for example. If one
4 could, if you could, and then you were --
5 but you didn't do that.
6    A.   Right.
7    Q.   And you were claiming that
8 you lost the opportunity to earn money as
9 a doctor, then the money that you could
10 have been earning as an artist comes into
11 play as to what they call mitigation.
12    A.   Okay. I didn't understand
13 where you were coming from.
14    Q.   That's fine. I'm
15 explaining. So that's why I'm asking you
16 about your efforts to mitigate your
17 losses.
18    A.   Okay.
19    Q.   And that's why I have asked
20 about employment.
21    A.   Okay.
22    Q.   So --
23    A.   I have a record.
24    Q.   So I'm going to ask, then,

| Page 103 |
| --- |

1 that you provide those documents that
2 we've requested.
3    A.   I'll send it as a PDF.
4    Q.   And that, just so we're
5 clear.
6    A.   Some things that you ask for
7 I didn't send because I didn't understand
8 the relevance or the application where
9 you were coming from.
10    Q.   Just so we're clear, what
11 I'm asking for is since you've returned
12 to Pennsylvania --
13    A.   Sure.
14    Q.   -- all the jobs that you
15 have applied for.
16    A.   Now, I do -- in going
17 through the archives, I have most of the
18 jobs, but there are countless amounts of
19 jobs that you just do electronically
20 online.
21        Typically, you get a
22 response back in your e-mail box, like on
23 a certification, that you applied for
24 such and such a position. So I can give

| Page 104 |
| --- |

1 you all that.
2    Q.   Great.
3        And do you have that
4 material even going further back than
5 Stroudsburg? For example, in New Mexico?
6    A.   Probably not.
7    Q.   So I'm going to ask for
8 whatever you do have that you provide.
9    A.   There was an interview that
10 I didn't get when I was in New Mexico, in
11 the Phoenix area, in the southwest. But
12 I have may have the e-mails for that.
13    Q.   What types of positions have
14 you been applying for in Pennsylvania?
15    A.   Entry level manager, even
16 below. You know, anything in the
17 healthcare-related field, in an
18 administrative capacity, in a research
19 development capacity.
20    Q.   And in since you have moved
21 back here in 2011, have you had any
22 interviews?
23    A.   No. None.
24    Q.   Not a single interview?

| Page 105 |
| --- |

1    A.   Not a single stitch of
2 interview.
3    Q.   And typically, when you
4 apply, do you send a cover letter?
5    A.   Yes.
6    Q.   And you've retained all that
7 information or whatever you have, you
8 will be able to provide to us?
9    A.   I can give you the -- I can
10 give you the job sites that I use. And
11 there's some -- all the jobs that I've
12 applied to there. And I can give you the
13 confirmation e-mail that I applied to the
14 job.
15    Q.   And what I was just asking
16 about for cover letters is, typically is
17 there something else other than an online
18 application and a receipt that they print
19 out that you --
20    A.   You know what, I have a
21 generic cover letter and I just change
22 the managers and the business names. And
23 that generic one gets doctored to meet
24 the needs of that position that I'm

Richard Katz, M.D., M.H.A.

Page 106

1 applying to.
2     Q. So in your electronic
3 archives that you do have, do you save
4 those cover letters?
5     A. I don't know if I always
6 keep them.
7     Q. Okay. Fair enough.
8     Obviously, we're just asking
9 for what you do have.
10     A. I'll give you what I have.
11     So, this was the job search
12 history you need?
13     Q. Right.
14     A. Okay.
15     Q. Going back to your education
16 for a minute --
17     A. Sure.
18     Q. In the time that you were at
19 Parsons, did you ever have any
20 disciplinary issues?
21     A. I don't understand the
22 question.
23     Q. At colleges and
24 universities, typically there is a

Page 107

1 disciplinary system that can charge a
2 student with, you know, you violated our
3 disciplinary code by doing X, Y, Z. And
4 then they can have a hearing.
5     A. No, nothing like that.
6     Q. That's my question. Were
7 you ever charged with any kind of
8 violation of a disciplinary --
9     A. Never.
10     Q. -- nature?
11     A. I'm a good guy. I never
12 really had any violations in my life.
13     Q. Did you -- at Parsons, did
14 you get any awards?
15     A. The scholarship for artistic
16 merit, partial scholarship to go to the
17 university. And special distinction at
18 graduation for my artistic abilities.
19     Q. And I may have asked this,
20 what was your graduating GPA at Parsons?
21     A. At Parsons, I guess around a
22 3.64.
23     Q. How about at Old Westbury?
24     A. I want to say like a B

Page 108

1 average, probably around a 3.3 or so.
2     Q. And at Old Westbury, did you
3 have any disciplinary issues?
4     A. Never.
5     Q. And did you get any awards
6 there?
7     A. I believe that I may have
8 made the honor roll, the dean's list. I
9 guess in college they call it the dean's
10 list, after my anxiety disorder was
11 accommodated for.
12     Q. Now, during the time that
13 you were at Parsons, did you ever have
14 any kind of mental health treatment?
15     A. Depression.
16     Q. Before you ever went to
17 Parsons, did you ever have any mental
18 health treatment?
19     A. Before Parsons? Just
20 neurological, just for the seizure
21 disorder.
22     Q. So, when you were at
23 Parsons, you were treated for depression?
24     A. Correct.

Page 109

1     Q. Was that through the school
2 or was that separate from the school?
3     A. Separate.
4     Q. Who did you go to?
5     A. I remember it was a
6 counseling service in Forest Hills,
7 Queens, but I don't remember the name.
8     Q. Do you remember the
9 counselor or psychiatrist or psychologist
10 that you saw?
11     A. I don't remember.
12     Q. Do you remember how many
13 times you went there?
14     A. I went weekly probably for
15 several months, but I don't remember
16 where -- I remember it was in Forest
17 Hills, Queens, but I don't remember the
18 name or who was treating me. I just
19 remember it was a woman.
20     Q. You can't remember the name
21 of the facility?
22     A. No.
23     Q. Or the doctor?
24     A. No.

S.A. 237

Richard Katz, M.D., M.H.A.

| Page 110 | Page 112 |
|---|---|

**Page 110**

1  It's a long time ago.
2  Q.  Did you get any medication
3 at that time for depression?
4  A.  At that time, I don't
5 remember -- I don't remember. I don't
6 think so. I think it was just talking.
7 It was like sessions, like therapy.
8  Q.  And was that the first time
9 in your life --
10  A.  Yes.
11  Q.  -- that you saw a counselor
12 for depression?
13  A.  Yes.
14  Q.  And leaving aside the
15 neurological issue about seizures, that
16 was the first time that you anywhere at
17 any time that you had seen a mental
18 health provider?
19  A.  I think that's fair to say.
20  Q.  And what led you to get that
21 counseling?
22  A.  A break up with a girlfriend
23 at the time.
24  Q.  And is that the

**Page 112**

1 moved up here and left me in New York to
2 fend for myself.
3  Q.  Did your brother still live
4 in New York?
5  A.  No. He moved up here with
6 them.
7  Q.  When was the next time in
8 your life that you had any kind of mental
9 health treatment or that you consulted
10 with a psychologist, psychiatrist,
11 counselor of any kind?
12  A.  What year are we talking?
13 Where are we now?
14  Q.  You told me that you
15 finished -- after Parsons.
16  A.  After Parsons, I was in Old
17 Westbury, Queens College, Old Westbury.
18 I had met Grisel around -- after that
19 breakup. I believe that the main issues
20 that I was experiencing around that time
21 was board related, was the next time that
22 I consulted mental health professionals,
23 that I was having trouble with anxiety
24 again and tests. And it was right around

**Page 111**

1 fiancée that --
2  A.  No, no. It's before her,
3 predated her.
4  Q.  The fiancée's name was what?
5  A.  Grisel.
6  Q.  Grisel. And this is before
7 Grisel?
8  A.  Right.
9  Q.  Would you characterize that
10 as a situational relating to a breakup?
11  A.  Situational and probably
12 other things. I was dealing with a lot.
13  My parents had moved away,
14 you know, I was still kind of a kid,
15 20-years old I guess. I was dealing with
16 a lot, a lot of being on my own for the
17 first time. 19 years old, 20 years old.
18 The breakup was a component of it, but
19 there were other factors. There were
20 other factors.
21  Q.  Do you remember any of
22 those?
23  A.  Just I remember -- I felt
24 somewhat like abandonment that my parents

**Page 113**

1 that time that I began, you know, doing
2 some research on what was wrong with me.
3  Q.  Before we get to that, after
4 Parsons you went to Queens College then
5 you went to Old Westbury and you already
6 described that while you were at Old
7 Westbury, you went to a doctor --
8  A.  Yes.
9  Q.  -- and were diagnosed with
10 test anxiety.
11  A.  That's correct.
12  Q.  Was there any kind of like
13 mental health treatment or therapy
14 associated with that?
15  A.  In terms of -- can you be
16 more specific? I don't know what you are
17 looking for.
18  Q.  Did you get any kind of
19 medication from that doctor related to
20 your diagnosed test anxiety?
21  A.  No.
22  Q.  Did you participate in any
23 kind of counseling around it?
24  A.  Counseling around?

Richard Katz, M.D., M.H.A.

Page 114

1    Q.   Around the test anxiety that
2  that doctor diagnosed.
3    A.   Just prior to that time when
4  I had the breakup and my parents had
5  moved away, that was all culminated
6  around that time when I was seeing a
7  therapist.
8    Q.   Okay.  I want to try to make
9  sure I understand the chronology.  So you
10 described a few months, is what you said,
11 that you saw a counselor --
12   A.   Several months.
13   Q.   -- for a few months, several
14 months while you were in Parsons.
15   A.   While I was in Parsons.
16 That's right.
17   Q.   So now we're a couple of
18 years later after Parsons when you were
19 going to Old Westbury --
20   A.   Yes.
21   Q.   -- and you had already --
22 you were in, at least, your second year
23 at Old Westbury --
24   A.   Right.

Page 115

1    Q.   -- that you went to see a
2  doctor about and learned that you were
3  diagnosed then with test anxiety.
4    A.   Right.  And then the
5  discussion I remember at that time was,
6  do you want to start taking an
7  anxiolytic, take a pill for anxiety, but
8  I didn't want to take any pills.  So I
9  just did the best I could with the
10 disability and work extra hard and with
11 the accommodation I was able to do okay.
12   Q.   Okay.
13   A.   I actually did better with
14 the accommodation.
15   Q.   And was there any counseling
16 or therapy at that time?
17   A.   Just with the testing center
18 at the college, but that was it.  It was
19 like groups and stuff.
20   Q.   And what were those groups
21 like?  Did they address like study
22 skills, that sort of thing?
23   A.   I think stress management
24 and stuff like that, but I don't really

Page 116

1  remember them too well.
2    Q.   After you were diagnosed
3  with test anxiety and then you went to --
4  you had some group involvement at Old
5  Westbury through the disability office
6  there, when was the next time that you
7  sought a mental health provider?
8    A.   Okay.  So, you're talking
9  about -- what year are you asking me for?
10   Q.   I don't know.  That's what
11 I'm asking you.
12   A.   Where are we in time?
13 Because we're all over the place
14 chronologically.  Was year are you asking
15 about?
16   Q.   We took --
17   A.   Or what period of time?
18   Q.   Well, I'm trying to
19 establish a chronology.  And so far, we
20 have that you saw someone while at
21 Parsons for a few months.
22   A.   Several months.
23   Q.   Several months.  And then
24 when you were at Old Westbury, you saw a

Page 117

1  family doctor who diagnosed you with test
2  anxiety, but there was no real counseling
3  with that doctor or any other mental
4  health provider, but you attended some
5  group sessions through the office of
6  disabilities.
7    A.   Right.
8    Q.   So chronologically, what is
9  the next point in time?
10   A.   So at that year, we're about
11 19 -- this is prior to going to medical
12 school in 2000.  So we're about in the
13 '90s, late '90s now.  Is that correct?
14       So the next time I would
15 have seen someone to figure out what was
16 going on was probably around 2003.
17   Q.   Okay.
18   A.   And that's when I consulted
19 St. John's psychological services.
20   Q.   So between --
21   A.   Late '90s to early 2000s.
22   Q.   And during that time, you
23 weren't seeing any mental health
24 providers?

S.A. 239

Richard Katz, M.D., M.H.A.

Page 118

1    A.    One doctor by the name of
2  Ubaldo Ieli because I was having problems
3  with depression.
4    Q.    Do you remember when that
5  was?
6    A.    That was probably right
7  around 2000.
8    Q.    And is he in New York?
9    A.    He is.
10    Q.    And did you see him only one
11  time?
12    A.    I saw him twice, I believe.
13  He was reluctant to start me on Prozac
14  medication. He said let's see how you do
15  with cognitive behavior type stuff and
16  coping on your own and if down the pike,
17  if you want to come back to me. I think
18  there was a problem with insurance and I
19  don't think I was able to afford him.
20    So for a period of time, I
21  wasn't able to seek getting help because
22  I had no health insurance. Because the
23  job at Elmhurst was over and that was the
24  only insurance that I had. So I remember

Page 119

1  there was a finance problem.
2    Q.    And that was early 2000s?
3    A.    That's probably 2000.
4  Ubaldo Ieli, the doctor in Manhattan,
5  then the issues with the boards kicked in
6  around 2003.
7    Q.    Let me just make sure I
8  understand your medical school situation.
9    First of all, when did you
10  first take the GMAT?
11    A.    I never took the GMAT.
12    Q.    You never took the GMAT.
13    A.    No. That's for graduate
14  school.
15    Q.    I'm sorry, the MCAT. I'm
16  sorry, I misspoke.
17    Did you take the medical
18  admissions test?
19    A.    Yeah. Yeah, I did. I did.
20  I didn't fair very well.
21    Q.    How many times did you take
22  that?
23    A.    I think twice.
24    Q.    When you took the MCAT, did

Page 120

1  you apply for accommodations on that
2  test?
3    A.    I didn't really know about
4  accommodations back then.
5    Q.    Okay. You had been
6  receiving accommodations at Old Westbury;
7  correct?
8    A.    Correct, but I didn't know
9  what was entailed. I didn't even know
10  really what was wrong with me other than
11  I used to freak out and have anxiety
12  attacks during exams. But I didn't have
13  the intrapersonal insight to understand
14  all of this at that point when I applied,
15  when I was applying.
16    This is pretty early in the
17  game, you know, applying for medical
18  schools. So, during the period, I didn't
19  make that jump from, here I am, in
20  college, getting these accommodations and
21  now I have this MCAT exam that I just
22  didn't know about it. I didn't know how
23  to go about it. I didn't have anybody
24  properly guiding me and saying, okay, you

Page 121

1  got this disorder, you're going to need
2  these accommodations in order to do well.
3    Q.    How about Mr. --
4    A.    I just worked hard.
5    Q.    How about Mr. Lupardo?
6    A.    Mr. Lupardo did what he
7  could to help my anxiety during the exams
8  for the school. But this is a different
9  animal, the MCAT. That was a big
10  standardized test. I don't think there
11  was much support in that realm.
12    Q.    And my question was, did Mr.
13  Lupardo give you any kind of counseling
14  about taking the MCAT?
15    A.    I remember that there was an
16  advisor for this purpose.
17    Q.    At Old Westbury?
18    A.    Yes. And I dealt with that
19  advisor who was one of the professors for
20  organic chemistry, who had a lot of
21  training with student services. And he
22  is the person that I -- he was kind of
23  like -- what do you call these people?
24  Like an advisor or guidance person for

Page 122

1 the MCAT exam. And he was the person
2 that I would go and -- that was his role.
3          Mr. Lupardo, I think, was
4 dealing more with the daily functioning
5 of the disabilities of the community of
6 the university. But this individual was
7 in the science department and that was
8 his role to deal with that kind of stuff.
9          And I did discuss some of
10 this with him, but I don't remember the
11 exact advice that he gave me.
12     Q.   What was his name?
13     A.   Hoyt. H-O-Y-T.
14     Q.   First name?
15     A.   Robert. I think that was
16 his name.
17     Q.   So, you said you didn't fair
18 very well on the MCAT. Do you remember
19 your scores?
20     A.   Like it was out of 30,
21 right? Out of 30, I think I got a 16 or
22 something.
23          I remember you needed like
24 8s across the board to get into a good

Page 123

1 medical school with an unconventional
2 background. You needed like a 24 or
3 better.
4          And not surprisingly, I
5 didn't have any accommodation for that
6 and I probably needed it. That was the
7 key.
8          I remember reading the
9 passages and my reading comprehension
10 wasn't fast enough for the test.
11     Q.   So, did you apply to
12 multiple med schools?
13     A.   Multiple med schools?
14     Q.   Did you apply to more than
15 one medical school?
16     A.   In the US?
17     Q.   Wherever.
18     A.   Yeah, sure I did.
19     Q.   Did you apply to schools in
20 the United States?
21     A.   Sure I did.
22     Q.   And did you get into any of
23 them?
24     A.   Well, my MCAT score wasn't

Page 124

1 going to get me there, so I applied any
2 way to a couple of the schools that I
3 thought would be the right schools to
4 apply to. But based on their record, you
5 needed to really have a certain score on
6 the MCAT. And I didn't. That's what led
7 me to foreign programs.
8     Q.   So you applied to some
9 schools in the United States but didn't
10 get in?
11     A.   That's correct.
12     Q.   And did you apply to more
13 than one medical school -- foreign
14 medical school?
15     A.   Yes.
16     Q.   And did you get in to more
17 than one?
18     A.   Yes.
19     Q.   And where else did you get
20 other than St. Matthew's?
21     A.   Ross. St. Matthew's and
22 then I applied to -- I think I applied to
23 St. George, but they didn't take me. And
24 then I applied to St. Christopher's from

Page 125

1 St. Matthew's.
2     Q.   That's what I wanted to
3 figure out because I didn't understand
4 that sequence. So, hang on one second.
5          You were accepted at Ross
6 but didn't go?
7     A.   No. I did go for one
8 semester. That's when I had the problem
9 with Dr. Leli. That's when I came back.
10     Q.   At Ross?
11     A.   Yes. I did go, but I
12 didn't -- I stood, but I was basically
13 sick. I got sick.
14     Q.   Let's start that again
15 because I don't understand that.
16     A.   Okay.
17     Q.   So you started at Ross.
18     A.   I started at Ross for one
19 semester. This was around 2000.
20     Q.   Ross is in the Caribbean?
21     A.   Dominica, West Indies. The
22 habitat there was too harsh for me. I
23 became anemic, physically sick and I got
24 depressed.

Richard Katz, M.D., M.H.A.

Page 126

1    Q.  So you did complete a
2 semester at Ross?
3    A.  I stuck it out, but I didn't
4 pass. When I came back, that's when I
5 saw Leli. I was also treated with Prozac
6 by the doctor there at Ross, on the
7 island of Dominica. They had a campus
8 doctor, a psychiatrist. I don't remember
9 his name.
10    Q.  So if we go back to our
11 discussion a few minutes ago about
12 chronology of mental health treatment --
13    A.  Oh, yeah, he's in there.
14 He's in there, right around Leli, which
15 was around, what, 2000.
16    Q.  Okay. So --
17    A.  I remember he was an Indian
18 doctor. He was there to treat the
19 students for mental health problems or
20 whatever.
21    Q.  Do you remember his name?
22    A.  I don't remember his name.
23    Q.  And he prescribed you
24 Prozac?

Page 127

1    A.  He did.
2    Q.  And did the Prozac help?
3    A.  You know, looking back now,
4 I think it made me kind of manicky. But
5 I didn't know, I didn't see that then.
6    Q.  So you came back to
7 New York --
8    A.  Saw Leli.
9    Q.  -- after the one semester at
10 Ross in which you stuck it out, but you
11 didn't pass; is that right?
12    A.  Right.
13    Q.  And saw Leli. And what were
14 you doing then?
15       Were you then thinking about
16 where you would go next to medical
17 school?
18    A.  No. I already figured that
19 out from a couple of people at Ross that
20 were transferring over because they found
21 out about this school in St. Matthew's,
22 that it's created by physicians and it
23 was a smaller kind of a dynamic and a
24 more hospitable island and there was more

Page 128

1 overlap with the professors because it
2 was a smaller school and that it would
3 probably be better off than a big
4 commercial production thing at Ross,
5 where you were kind of in this big
6 amphitheater, you didn't really know the
7 instructor.
8       So it helped to have overlap
9 in case you had questions. You could sit
10 and meet with the professors and get your
11 questions answered and stuff like that.
12    Q.  So what year did you start
13 at Ross? Was that 2000?
14    A.  I think it was the winter
15 semester. So I think it just became
16 2000.
17    Q.  You mean, that was your
18 first semester in medical --
19    A.  Yes.
20    Q.  -- school? You were halfway
21 through a typical academic year?
22    A.  Yeah. They would start at
23 strange times. They would have the first
24 class during summertime, like September,

Page 129

1 August/September. And then there would
2 be another starting class in the
3 wintertime. I started the wintertime,
4 like around December.
5    Q.  Okay. And then you decided
6 to go to St. Matthew's?
7    A.  Because there was -- it had
8 some good reviews in terms of the passing
9 grades for the boards and stuff like
10 that.
11    Q.  So you went to St. Matthew's
12 when?
13    A.  That was --
14    Q.  Did you start again in a
15 sense?
16    A.  I started over. Yeah.
17    Q.  And how long did you stay at
18 St. Matthew's?
19    A.  Up until clinical
20 clerkships. So I did the basic sciences
21 at St. Matthew's.
22    Q.  Two years?
23    A.  Yeah.
24    Q.  And did you then transfer?

Richard Katz, M.D., M.H.A.

Page 130

1    A.   To St. Christopher's from
2  St. Matthew's after the clinical, after
3  the basic science.
4    Q.   I'm asking you.
5    A.   Yes.
6    Q.   That's the answer?
7    A.   That's the answer.  Yes.
8    Q.   So after two years, you
9  transferred to St. Christopher's.
10    A.   2002.
11    Q.   Where is St. Christopher's?
12    A.   Senegal.  But they have
13  offices here, I think.
14    Q.   Where did you go?
15    A.   I was just in clinical
16  clerkship.  So you're in the hospital.
17  You're not in the university anymore.
18         So, in other words, this is
19  what happened.  Because St. Matthew's did
20  not have clinical clerkships in the
21  northeast in the New York area, I found a
22  school that had some clerkships in the
23  New York area.  And that was St.
24  Christopher's.  And that was the

Page 131

1  motivation for...
2         Now, St. Christopher's
3  provided at Flushing Hospital pediatrics
4  and obstetrics rotations.  Each one of
5  those was six weeks each.
6         After that, I contacted the
7  Veterans Affairs and I got into Northport
8  VA Hospital and I did all of my
9  clerkships, other than pediatrics and
10  obstetrics, at Northport VA with Stony
11  Brook students, but I was still
12  matriculating out of St. Christopher's.
13    Q.   Did you arrange all that for
14  yourself?
15    A.   I did.
16    Q.   Where was the -- where is
17  St. Christopher's administratively, their
18  office?
19    A.   There may be -- I haven't
20  checked in a few years, but -- I think
21  they have an office somewhere in the
22  United States, but their main campus is
23  in Senegal.
24    Q.   You don't know where their

Page 132

1  main office is in the US?
2    A.   I don't know now.
3    Q.   Where was it then?
4    A.   It used to be, I think, in
5  Scotch Plains, New Jersey.  But they
6  administratively have another office now,
7  I think, in the United States.  It may be
8  Florida.  I'm not certain about that.
9    Q.   So was anybody at St.
10  Christopher's keeping track of you and
11  your progress --
12    A.   Absolutely.
13    Q.   -- as a med student?
14    A.   Absolutely.
15    Q.   Did you ever meet with
16  people?
17    A.   At St. Christopher's?
18    Q.   Yes.
19    A.   What do you mean "meet with
20  people?"  For what reason?
21    Q.   Well, you described that
22  they have an office in the US somewhere,
23  that their main campus is in Senegal, and
24  that you were doing clerkships in

Page 133

1  New York.
2    A.   Right.
3    Q.   So I'm trying to figure out
4  how -- what did St. Christopher's do for
5  you?  How did they oversee your
6  education?
7    A.   Because I would have to
8  get -- each preceptor was responsible for
9  me at the VA Hospital.  And they were
10  Stony Brook professors.  So they would
11  have to submit an evaluation to the main
12  office and submit --
13    Q.   Okay.  That's my.
14    A.   To rate me.  They rated me.
15  So each preceptor was responsible for me
16  because I worked underneath them at the
17  VA.  And then they would rate me and send
18  that information to medical college.
19    Q.   Got it.
20         So all clerkships other
21  than --
22    A.   Flushing Hospital OB/GYN.
23  And I was actually with the Einstein --
24    Q.   And pediatrics did you say?

S.A. 243

Richard Katz, M.D., M.H.A.

Page 134

1    A.   Yeah. I was with the
2 Einstein medical students for pediatrics
3 at Flushing Hospital.
4    Q.   Were those two both at
5 Flushing Hospital?
6    A.   Yes, because there's no
7 pediatric veterans.
8    Q.   That makes sense.
9    A.   Although they could be
10 pregnant veterans.
11    Q.   And you said that all the
12 rest of your clerkships were at the VA?
13    A.   In Northport.
14    Q.   Where is Northport?
15    A.   In Long Island.
16    Q.   Long Island?
17    A.   Yeah. Yes.
18    Q.   And the preceptors were
19 Stony Brook faculty did you say?
20    A.   Yes, most of them.
21    Q.   And they reported your
22 progress to St. Christopher's?
23    A.   Correct.
24    Q.   So, St. Christopher's would

Page 135

1 have records of you as a student for
2 those two years --
3    A.   Correct.
4    Q.   -- wherever St.
5 Christopher's presently resides?
6    A.   Correct.
7    Q.   So you would pay tuition to
8 St. Christopher's so you could go out and
9 do your clerkships. Is that how it
10 works?
11    A.   I don't understand the
12 correlation you're making.
13    Q.   So, when you went to St.
14 Matthew's in Belize, you would pay
15 tuition and attend classes?
16    A.   Yes. Yeah.
17    Q.   And then after your first
18 two years, you were out doing clerkships?
19    A.   That's correct.
20    Q.   And so, you would pay
21 tuition to St. Christopher's while you
22 did your clerkships and they would --
23    A.   Well, they were trying to
24 establish a site at the VA. And I think

Page 136

1 I was the first student.
2    Q.   Were there also classes at
3 St. Christopher's or that St.
4 Christopher's provided?
5    A.   For clinical clerkships?
6    Q.   Yes.
7    A.   No. I was just under the
8 auspices of the preceptor. But I did
9 attend classes at Stony Brook for various
10 instructional courses, but it wasn't
11 being matriculated, it was just for my
12 own development.
13    Q.   Okay.
14    A.   So I would drive to Stony
15 Brook campus and the same courses that
16 those students were receiving, I would
17 sit in and also be attending.
18    Q.   So going back to your
19 medical school time at St. Matthew's in
20 Belize, in the basic science courses,
21 those are lectures?
22    A.   Yes.
23    Q.   And did they have exams,
24 exam components?

Page 137

1    A.   Yes.
2    Q.   And were there also lab
3 courses?
4    A.   Yes.
5    Q.   And did you request
6 accommodations of double time at St.
7 Matthew's?
8    A.   Well, this is kind of -- it
9 was kind of an informal arrangement. If
10 I was taking an anatomy exam, I would
11 sit, take the exam. And if I needed as
12 much time as I wanted to take the test, I
13 think that it was sort of informal to
14 allow me to sit longer with no formal
15 accommodation. Like there was a
16 professor there, a Ph.D. who was like the
17 student services type person. But I do
18 not believe there was any formal
19 arrangements set up for a disability for
20 anyone there. So it was informal.
21    Q.   Did you investigate whether
22 there was --
23    A.   I did. And I would meet
24 with the counselor, the individual I'm

S.A. 244

Richard Katz, M.D., M.H.A.

Page 138

1 taking about.
2     Q.   Let me finish my question.
3     A.   Sorry.
4     Q.   Did you investigate whether
5 they had an office for students with
6 disabilities that could grant
7 accommodations if the student presented
8 documentation?
9     A.   I did.
10     Q.   And what did you learn?
11     A.   I learned that I have to go
12 and meet with this counselor every week
13 and he would help me with my study
14 skills.
15     Q.   And is it your testimony
16 that there was no such thing as formal
17 accommodations at St. Matthew's?
18     A.   I didn't see it done. And
19 this individual was really all they had
20 for that purpose. And I met with him on
21 a weekly basis.
22     Q.   For two years?
23     A.   No, not so much the first
24 semester, but the second semester I did.

Page 139

1     Q.   And --
2     A.   I don't think I was in such
3 a bad position because I had -- even
4 though I got sick at Ross, I still stood
5 and I tried to learn something. So I
6 kind of was primed for when I went to St.
7 Matthew's because I repeated all that
8 course work again. So it wasn't until
9 the second semester when I started having
10 some problems there.
11     Q.   And what kind of problems
12 did you have?
13     A.   Problems focusing,
14 concentrating, getting organized, study
15 skills, time management. You know,
16 depression, because I was away from home,
17 away from family, away from loved ones.
18         You know, I think that
19 environment is kind of isolative and that
20 took its toll on me. You know, being in
21 a foreign place took a toll on e. You
22 know, a lot of things affect you when
23 you're in that kind of situation.
24     Q.   Did you request from that

Page 140

1 person at St. Matthew's the ability to
2 have extra time on exams?
3     A.   Yes.
4     Q.   And was it so informal that
5 you could just take extra time whenever
6 you needed it?
7     A.   No. I think the point I'm
8 trying to make is that if you went to see
9 this individual who was taking the role
10 of the student advisor/counselor that he
11 knew who the people were that were having
12 difficulties and he tried to accommodate
13 them.
14     Q.   Okay.
15     A.   That's the feeling that, at
16 least, I got. I don't know about anybody
17 else, but that's -- this is what I
18 believe to be so.
19     Q.   Take a look in the book at
20 Exhibit 1, please.
21     A.   Okay.
22     Q.   Am I correct that Exhibit
23 1 -- first of all, the handwriting is
24 your handwriting?

Page 141

1     A.   That's correct.
2     Q.   And this is your request for
3 accommodations on Step 2 CK; is that
4 right?
5     A.   Step 1 and Step 2 CK is what
6 is written on top here.
7     Q.   So take a look, the middle
8 of that page, it says "please type or
9 print." Do you see?
10     A.   Yes. So I checked Step 2
11 CK.
12     Q.   So it's accommodations are
13 requested for the following step
14 examinations. And you checked Step 2 CK.
15     A.   That's correct.
16     Q.   So this is your application
17 for accommodations in Step 2 CK.
18     A.   Correct.
19     Q.   And if you look at the third
20 page, toward the bottom, it asks about
21 college. If you've had -- well, let's
22 see.
23         Section D, I'm sorry. Let's
24 look on the third page about a quarter of

Richard Katz, M.D., M.H.A.

Page 142

1 the way down. Section D, accommodation
2 history. Do you see that?
3     A.   Yes. Yes.
4     Q.   And it says "standardized
5 examinations MCAT." And you checked
6 "no."
7          Am I correct that means you
8 did not have accommodations on the MCAT?
9     A.   That's correct. I didn't
10 receive accommodations.
11     Q.   And then the next section
12 says "medical school." And you checked
13 "no." Is that correct?
14     A.   Formal accommodations?
15 Depends what you want to call
16 accommodation.
17     Q.   Well, I'm --
18     A.   Formally, yeah, it would be
19 no, but there were.
20     Q.   So what you said to the NBME
21 in the form was you didn't get
22 accommodations in medical school; right?
23     A.   It depends what you want to
24 call accommodation. Informal

Page 143

1 accommodation, yes. Formal
2 accommodation, no.
3     Q.   That's not what you said on
4 the form; right? The form --
5     A.   The form doesn't say any
6 other type of accommodation. It just
7 says accommodation received, but I didn't
8 include that because it wasn't anything
9 that was formally done or with paperwork
10 that I could submit to them.
11     Q.   And then, for where it says
12 college, you checked "yes." Is that a
13 reference to Old Westbury?
14     A.   It is.
15     Q.   And then there's a reference
16 for secondary or elementary school. You
17 referred to your time when you were taken
18 out of class for speech therapy.
19     A.   That's right.
20     Q.   And if you look at the next,
21 number 2, Exhibit 2, this is -- am I
22 correct this is your request for
23 accommodations on Step 2 clinical skills,
24 CS; is that right?

Page 144

1     A.   That's correct.
2     Q.   And you provided the same
3 information there; is that right?
4     A.   I don't know what you mean
5 by "the same information."
6     Q.   If you look at page 4 under
7 accommodation history, you checked "no"
8 with respect to the MCAT.
9     A.   That's correct.
10     Q.   You checked "no" with
11 respect to medical school; right? Same
12 as the last one we just looked at.
13     A.   Right, because informal and
14 not formal.
15     Q.   And you checked "yes" for
16 college and that refers to Old Westbury?
17     A.   That's correct.
18     Q.   And then the last one,
19 secondary or elementary school, you said
20 the same think about the speech --
21     A.   And that's correct, too.
22     Q.   And that's your signature on
23 both of those?
24     A.   Correct.

Page 145

1     Q.   Now, did you ever submit any
2 other requests for accommodations other
3 than these two forms to the US -- to the
4 NBME?
5     A.   During which period of time?
6     Q.   Any period.
7          Well, let's put it this way.
8 In the 2005/2006 period, did you submit
9 any other requests for accommodations
10 other than we just looked at on these two
11 exhibits?
12     A.   I'm not aware of anything --
13 I mean, in terms of the paperwork they
14 required for me to fill out?
15     Q.   Yes.
16     A.   I think this was the only
17 form they had at the time.
18     Q.   And do you agree with me
19 that you did not request accommodations
20 on Step 1?
21     A.   Yeah. But if you read -- if
22 you read what is written in those files,
23 it makes reference to Step 1. But the
24 actual application for Step 1 was not

Page 146

1 applied to. It was CK and CS only for
2 Step 2.
3      Q.   If you look at Exhibit 1,
4 the form allows you to request
5 accommodations for Step 1 and for Step 2
6 CK and for -- isn't that correct?  You
7 could check Step 1?
8      A.   Yeah, but I didn't register
9 for Step 1 at the time.
10      Q.   So am I correct that you
11 never formally requested accommodations
12 on Step 1?
13      A.   For which year?
14      Q.   Ever.
15      A.   Using this form?
16      Q.   Yes.
17      A.   Or any other
18 recommendations?
19      Q.   I'm not talking about 2013,
20 '14, '15. I'm not talking about that
21 right now.
22      A.   You are talking about Step
23 1.
24      Q.   I'm talking about 2000 --

Page 147

1 from any time from 2002 or 3 when you
2 first took Step 1 -- let me back up.
3          When was the first time you
4 took Step 1?
5      A.   Probably right around 2002,
6 2003 I think.
7      Q.   From that time through say
8 2013, did you ever submit a request for
9 accommodations on Step 1?
10      A.   2014 I did.
11      Q.   I wasn't talking about 2014.
12 I said from 2002 through 2013, did you
13 ever request --
14      A.   Why should I have requested
15 when they denied me these two times? I
16 gave them everything I had to prove a
17 diagnosis. And we didn't know the
18 diagnosis until 2013. So what --
19      Q.   Am I correct that you never
20 submitted a form requesting
21 accommodations on Step 1; is that
22 correct?
23      A.   I never used this form that
24 you have in Exhibit 1 that is used to

Page 148

1 designate the exams that you're applying
2 for accommodations for, for Step 1.
3      Q.   Okay.
4      A.   But I did ask for
5 accommodations in 2014 upon my appeal.
6          MR. SACKS:  Let's take five
7 minutes.
8            - - -
9          (Whereupon, a brief recess
10 was taken.)
11            - - -
12 BY MR. SACKS:
13      Q.   So, from the time that you
14 started your clinical clerkships, was
15 there -- did any of those involve
16 examination?  Where they courses in the
17 sense that there might be an exam at the
18 end?
19      A.   The preceptor gave an exam.
20      Q.   At each course?
21      A.   Not all courses.
22      Q.   Some of the clerkships --
23      A.   Yeah.
24      Q.   -- had exams?

Page 149

1      A.   And they were mostly oral,
2 mostly oral.
3      Q.   And did you ever need or
4 request accommodations for that?
5      A.   It wasn't a time type of
6 setup. It was an oral questioning or
7 display of patients' skills.  It was more
8 practical kind of hands on thing.
9      Q.   How did you do in your
10 clerkships?  Were there any clerkships
11 that you had to repeat?
12      A.   No.
13      Q.   So you passed them all on
14 the first go-around?
15      A.   Yes.
16      Q.   Was that sort of a standard
17 curriculum of med school clerkships?
18      A.   Yes.
19      Q.   And did you receive grades
20 or --
21      A.   They rated you, like I told
22 you earlier.
23      Q.   What was the rating scale?
24      A.   I think it was like one to

Page 150

1  nine; one being the worse and nine being
2  the best, or something like that.
3      Q.   And did you -- do you recall
4  what your ratings were in the various
5  clerkships?
6      A.   It probably varied.
7      Q.   But you never had to repeat
8  any?
9      A.   No.
10     Q.   During the time that you
11 were in clerkships, did you have any
12 mental health treatment during that time?
13     A.   During clerkships. I don't
14 recall.
15         I recall 2000 -- around
16 2002, 2003 that I did seek counseling.
17     Q.   And from whom?
18     A.   In New York City. And I
19 don't remember the name of the
20 individual. It was a sliding fee scale
21 kind of a thing where you got therapy and
22 it was adjusted to your income kind of
23 thing and I remember it was very
24 affordable.

Page 151

1      Q.   And was this when you were
2  in New York because you were doing your
3  clerkships?
4      A.   Right. And I would go see
5  this counselor in New York City. And it
6  was a gentleman, younger gentleman. And
7  I don't remember the name and I don't
8  remember the place, but he provided
9  counseling. And he was the one who
10 recommended that I get tested for a
11 learning disability or cognitive problem
12 that may be related to my mental illness.
13     Q.   And what led to thinking
14 that there might be a problem that
15 required some sort of testing?
16     A.   I was not able to keep up
17 with the format of the USMLE.
18     Q.   So --
19     A.   It was too rapid, too much
20 reading in too much short amount of block
21 time that they gave you. I wasn't
22 finishing.
23     Q.   So you took the -- are you
24 taking about Step 1?

Page 152

1      A.   Correct.
2      Q.   And you took Step 1 for the
3  first time after you completed your first
4  two years at St. Christopher's. And you
5  moved to New York to go to -- I'm sorry
6  let me start that again.
7          You completed your first two
8  years of medical school at St. Matthew's
9  in Belize. And then you came to the US
10 as a matriculated student at St.
11 Christopher's to do your clerkships --
12     A.   Right.
13     Q.   -- in New York; is that
14 right?
15     A.   Right.
16     Q.   And when did you first -- in
17 that sequence of time, in that period of
18 time, when did you first take the USMLE?
19     A.   I think it was around 2002
20 or 2003. You have the dates here
21 somewhere. You have the listing.
22     Q.   So after completing the two
23 years at St. Christopher's, you were
24 then --

Page 153

1      A.   No. I think -- I think the
2  first time I took Step 1, I probably had
3  just finished St. Matthew's. I was
4  probably a student at St. Matthew's.
5      Q.   Excuse me. I misspoke and
6  said St. Christopher's when I meant St.
7  Matthew's.
8      A.   You know, all saints.
9      Q.   So while you were still at
10 St. Matthew's is when you first took --
11     A.   I believe that's correct, to
12 the best of my recollection.
13     Q.   And how many times did you
14 take Step 1 before you thought there
15 might be a problem?
16     A.   I knew immediately there was
17 a problem, probably within the first two
18 attempts -- first attempt.
19         I mean, to identify these
20 intrapersonal issues in yourself, it not
21 always easy. It's easier when somebody
22 is looking at the movie unfold. It's
23 different when you see things inside
24 yourself, you know, being able to have

Page 154

1 that intrapersonal insight. And I really
2 didn't understand. I knew there was an
3 anxiety issue. I knew there was a
4 problem with anxiety. You know, I knew I
5 suffered from depression.
6      Then, in 2003, I had to
7 check out this -- you know, if there was
8 any other issues. And that's why I
9 consulted St. John's. And it was under
10 the guidance of this individual that I'm
11 telling you initially that I was the
12 first time I was tested at St. John's.
13      Q.   And you don't remember his
14 name?
15      A.   I don't remember.
16      Q.   Or where he worked?
17      A.   I still have some of the
18 handouts he gave me about, you know,
19 cognitive behavioral therapy, some of the
20 materials he gave me, but I don't recall
21 his name. I could maybe look for it. I
22 don't know. But off the top of my head,
23 I don't remember his name.
24      Q.   So I would ask that you go

Page 155

1 back --
2      A.   I'll try to do that.
3      Q.   -- look for that.
4      A.   He may be listed on the
5 report. You could check the 2003 report
6 from St. John's. He may be there.
7      Q.   And was he a psychologist?
8      A.   He was, yeah, Ph.D.
9      Q.   And he was the first one who
10 recommended that you get tested?
11      A.   Tested. Yes.
12      Q.   And so this testing in 2003
13 at St. John's was while you were doing
14 your clerkships, same period of time?
15      A.   Must have been. Yes,
16 because I didn't graduate St.
17 Christopher's until 2004.
18      Q.   Now, the testing that you
19 had at St. John's, that was in
20 Queens?
21      A.   Mm-hmm.
22      Q.   Did that occur over a period
23 of days? Was that one day, two days?
24      A.   No. That was a period of

Page 156

1 time. That was a block of time.
2      Q.   A block, you mean over
3 different days?
4      A.   Yeah.
5      Q.   Take a look at Exhibit 3.
6 And you see there are numbers in the
7 lower right-hand corner. Okay. And it
8 starts at 0174.
9      A.   Correct.
10      Q.   So if you look at the pages
11 between from 174 to 191, is that the
12 report of the testing that you are
13 referring to at St. John's in 2003?
14      A.   Who's the reviewer, or the
15 clinician?
16      Q.   On page 189, the name
17 Subashini Jesurasa.
18      A.   Yes. That's correct.
19      Q.   And do you see anything in
20 those pages that has the name of the
21 referring psychologist?
22      A.   Maybe in her note. Referred
23 by his psychologist.
24      Q.   No name?

Page 157

1      A.   I don't believe so. I don't
2 think she listed it. I would have to go
3 back and see if I could find his name.
4      Q.   So you had this done in
5 2003. And your request for
6 accommodations to the USMLE was in 2005.
7 Why was there that gap in time?
8      A.   The first time I was
9 diagnosed with ADHD was from a doctor
10 from the Center of Emotional Care.
11      Q.   That's Dr. Hedberg?
12      A.   Dr. Hedberg. And this is
13 her letter here. And that's 2005. This
14 is the first time that ADHD was ever
15 introduced.
16      So your question is, why
17 didn't I request accommodations in 2003?
18      Q.   Right.
19      A.   I didn't really understand
20 this whole thing of accommodations. I
21 didn't know that if a person is depressed
22 and they suffer from major depression
23 that could actually be considered an
24 accommodation. I'm not sure if she

Richard Katz, M.D., M.H.A.

Page 158

1 discussed my anxiety issues here. She
2 makes recommendations about study skills.
3    Q.   Let me ask you this. Did
4 you take this report back to the
5 psychologist that you had seen?
6    A.   Yes, I did.
7    Q.   And did you discuss it with
8 the psychologist?
9    A.   Yes, we did.
10    Q.   And did you discuss whether
11 you --
12    A.   In fact -- let me interject
13 for one moment. The psychologist spoke
14 to the person who did the testing,
15 because I remember them having a
16 discussion. He told me he spoke to them.
17    Q.   And did you discuss with the
18 psychologist whether you could use this
19 information in this report to apply for
20 accommodations at USMLE?
21    A.   I don't recall. I don't
22 recall. I don't remember about the
23 transaction that took place between me
24 and that psychologist about this,

Page 159

1 applying for accommodations. I don't
2 really recall.
3    Q.   Wasn't that kind of the
4 point of getting the testing?
5    A.   Yeah, but I don't really
6 remember the recommendations that he gave
7 me. I see recommendations here from the
8 person that performed the exam, the
9 testing. But I don't really remember
10 what he told me in terms of applying for
11 accommodations.
12       I didn't really know that if
13 you suffer from depression that you can
14 even apply for accommodations. These are
15 things I didn't really know about. And I
16 don't remember having that discussion
17 with him. It wasn't until the second
18 report that I applied for the
19 accommodations, which was 2005, because
20 the diagnosis of ADHD opened my eyes to
21 something could be seriously wrong.
22    Q.   How did you get to Dr.
23 Hedberg in Virginia?
24    A.   A colleague, someone that I

Page 160

1 knew suggested that I see this doctor,
2 that it would be an evaluation that would
3 take place in her office. She would do a
4 full thorough evaluation and intake. And
5 she was very good at what she did. So it
6 was kind of a recommendation. And I was
7 kind of back and forth from Virginia.
8    Q.   Why? What was in Virginia?
9    A.   Does it matter what was in
10 Virginia? I mean, that's my personal
11 business.
12    Q.   Okay. So, somebody
13 recommended -- so 2003 you had this
14 testing that we looked at in Exhibit 3.
15 You took it back to that psychologist or
16 it went back to the psychologist. You
17 don't remember exactly the nature of the
18 discussions about accommodations with the
19 psychologist. But you didn't apply for
20 accommodations on the USMLE at that time.
21    A.   In 2003?
22    Q.   In 2003.
23    A.   No. I think I was still
24 data gathering to figure out what the

Page 161

1 hell was wrong with me.
2    Q.   So 2005, based on somebody's
3 recommendation that you knew in
4 New York --
5    A.   Yeah. Somebody that I knew,
6 an associate that I knew recommended to
7 go to the Center for Emotional Care and
8 get a full intake. And I was back and
9 forth from Virginia. And it was
10 convenient at the time.
11    Q.   So, how many times did you
12 meet with this Dr. Hedberg?
13    A.   I think two or three.
14    Q.   And how did she --
15    A.   With the DSM-IV criteria and
16 clinical evaluation.
17    Q.   Let me ask the question.
18       How did she conduct her
19 evaluation?
20    A.   With the DSM-IV.
21    Q.   Was it questions and
22 answers?
23    A.   It was questions. It was,
24 basically, a full intake of what has been

S.A. 250

Richard Katz, M.D., M.H.A.

Page 162

1  going on for the last couple of years and
2  where I was having issues and problems.
3  And she took a full comprehensive intake.
4      Q.   But the intake was oral
5  history, discussion between you and her?
6      A.   Yes.
7      Q.   As opposed to psychological
8  testing or something else?
9      A.   There is no psychological
10  test for ADHD. I mean, there is the TOVA
11  and CAARS. But, you know, a lot of
12  people don't really believe, so it's a
13  clinical diagnosis.
14      Q.   So after you received this
15  evaluation letter from Dr. Hedberg that
16  we see at Exhibit 3 page 192 --
17      A.   Yes.
18      Q.   -- did she recommend you get
19  further testing?
20      A.   She did.
21      Q.   And is that when you went
22  back to St. John's?
23      A.   That's correct.
24      Q.   And you had more testing in

Page 163

1  June of 2005?
2      A.   June -- this was May 2005.
3  Yes. And then we see the report from St.
4  John's here from 2005, July actually.
5  June is when they took the assessments.
6  And then they wrote the report on July
7  7th. Oh, no. I'm sorry. That's when
8  NBME received it, right? Disability
9  services received it in July. They
10  conducted their testing in June.
11      Q.   So the test report is pages
12  193. And I'm referring to these numbers
13  in the corner.
14      A.   Mm-hmm.
15      Q.   193 through 197 is the
16  letter. And there are several -- one,
17  two, three pages of test results. Is
18  that right? That's all part of the same
19  report?
20      A.   That looks right.
21      Q.   So through page 200.
22      A.   Yeah. Yes.
23      Q.   And all these materials that
24  are in Exhibit 3, and they all have this

Page 164

1  date stamp received July 7th, 2005, these
2  are all materials that you submitted in
3  support of your request for
4  accommodations to the NBME; is that
5  right?
6      A.   This is from -- they have
7  the same stamp on reports from childhood.
8  But the testing was also -- is when they
9  received July 7th.
10      Q.   So everything that's in
11  Exhibit 3 was part of what you submitted
12  to the NBME in support of your request
13  for accommodations; is that a fair
14  statement?
15      A.   I don't know yet.
16  Everything in Exhibit 4 is what I
17  submitted.
18      Q.   Exhibit 3.
19      A.   Exhibit 3?
20      Q.   Yes. You're in Exhibit 3.
21      A.   Oh, okay. Yeah. So
22  everything -- you are asking me
23  everything in this Exhibit 3 is
24  everything that I submitted to the

Page 165

1  ECFMG -- I mean to NBME, is that what you
2  are asking?
3      Q.   Yes.
4      A.   I believe there was a letter
5  from a friend of 20-plus years and my
6  fiancée at the time.
7      Q.   Right. So I was first
8  looking at -- Exhibit 3 has materials
9  that you submitted I'll say on the first
10  go-around, the first bunch of documents?
11      A.   Okay.
12      Q.   And then if you look at
13  Exhibit 4, do you remember getting that
14  letter from the NBME, "We will review
15  your documentation"?
16      A.   Yes.
17      Q.   And then if you look at
18  Exhibit 5, do you remember getting this
19  letter from Mr. Doane of the NBME about
20  an initial review of your documentation?
21      A.   (Witness reviewing
22  document.)
23      So my understanding is that
24  they wanted to know to include

Richard Katz, M.D., M.H.A.

Page 166

1 generalized anxiety and depression into
2 the application process. That's what
3 this letter is, basically, asking.
4    Q.   Fair to say that this letter
5 is asking you for additional information?
6    A.   Which was provided to them.
7    Q.   And then if you look at the
8 next exhibit, 6, is this the additional
9 information that you provided?
10    A.   (Witness reviewing
11 documents.)
12       I believe so.
13    Q.   Is there anything that you
14 submitted in 2005 or 2006 in support of
15 your request for accommodations that is
16 not included in these exhibits, either
17 Exhibit 3 or exhibit --
18    A.   It's possible. But as far
19 far as my recollection, this should
20 probably encompass most of it.
21    Q.   There's nothing that you can
22 recall that is not here?
23    A.   It's 10 years ago. It's
24 over 10 years. But as far as I can see,

Page 167

1 most of it -- there was a supplement by
2 Fred Holtz. I don't know if this is the
3 supplement.
4       Yeah. The anxiety and
5 depression supplement. He supplemented
6 the file. That's here. So I believe
7 that's it.
8       I should state that David
9 Kreditor asked the Office of Disabilities
10 Services to send him some information
11 that he can fill out or answer by
12 question form, but that was never sent to
13 him. Didn't feel that that was proper
14 protocol for the Department of
15 Disabilities Services.
16    Q.   In 2005 to 2006, what was
17 the disability that you were claiming to
18 the NBME? What you were trying to
19 getting accommodations for?
20    A.   ADHD, depression and general
21 anxiety.
22    Q.   And do you agree with your
23 doctor, Dr. Garloff, that the diagnosis
24 of ADHD was incorrect?

Page 168

1    A.   I believe that, and not just
2 on Dr. Garloff, the most recent
3 neuropsychiatric report that you haven't
4 seen yet, that's with the second amended
5 complaint, from the Aaron Center from Dr.
6 Hamidian that she corroborates that.
7    Q.   She corroborates what?
8    A.   That I don't have ADHD, but
9 I do have bipolar disorder depressed
10 type. I do have a generalized anxiety
11 disorder. And I do have specific phobia
12 associated with testing.
13    Q.   So Dr. Garloff and the more
14 recent doctors, you agree with their
15 statement that ADHD was incorrect?
16    A.   Why should I have to agree
17 with anyone? I mean --
18    Q.   You don't. I'm just asking.
19    A.   This is their clinical
20 impression.
21    Q.   Okay. If the diagnosis of
22 ADHD was incorrect, do you think the NBME
23 made a mistake when they denied your
24 accommodations for ADHD?

Page 169

1    A.   I didn't apply just for
2 ADHD. I applied for anxiety and
3 depression as well.
4    Q.   Was the NBME correct in
5 denying your accommodations for ADHD?
6    A.   I don't believe that that's
7 the case because that was the working
8 diagnosis by the clinicians at the time.
9 And I don't know if I have ADHD or not.
10       The two clinicians that
11 evaluated and performed batteries of
12 testing and clinical evaluation believe
13 it's probably more mood effective
14 disorder, like bipolar depressed type.
15 That's their contention. That's their
16 feeling. That's their clinical
17 impression.
18    Q.   All right. Let's go back do
19 some other questions.
20       You had this testing in
21 2003. And at that time, you were seeing
22 a psychologist whose name you can't
23 remember.
24    A.   I'll get it for you. I have

Page 170

1 to search my archives and see if I can
2 find it. I'll have to search and see if
3 I can find it. I don't recall his name.
4 No.
5     Q.  Who was the next mental
6 health provider that you saw?
7     A.  It was probably Dr. Kreditor
8 or Dr. Holtz. I don't remember who came
9 first. You can check your letters.
10     Q.  Feel free.
11     A.  You're talking about 2005
12 now.
13     Q.  I'm trying to take it step
14 by step and make sure that I get the full
15 picture of your mental health treatment.
16     A.  (Witness reviewing binder.)
17         I'm just trying to locate
18 the exhibits with the doctors' letters in
19 it. Do you know where that is?
20     Q.  Yes. Six.
21     A.  Exhibit 6?
22     Q.  Yes.
23     A.  They probably were around
24 the same time, Holtz and Kreditor.

Page 171

1         Am I in six here?
2     Q.  Yes.
3     A.  So Kreditor's letter is
4 dated 11/28/2005.
5         Holtz is dated -- is it
6 dated? I don't see a date here.
7     Q.  I don't think that is dated.
8 You're taking about the page that's
9 marked 149?
10     A.  Correct. I don't see that
11 he put a date on this, but it had to be
12 around the same time.
13     Q.  This next letter --
14     A.  Is it dated?
15     Q.  -- is dated January 14,
16 2006.
17     A.  Yeah. So they were
18 overlapping.
19     Q.  Okay. So, you described
20 seeing a psychologist in New York who
21 recommended testing and that was in 2003?
22     A.  Yes.
23     Q.  Between that psychologist
24 and Dr. Holtz and Dr. Kreditor, were

Page 172

1 there any others?
2     A.  In 2005 or 2006?
3     Q.  Or between 2003, when you
4 had testing, and 2005/6.
5     A.  No. There was the
6 psychologist that made the initial
7 request to St. John's. And this
8 psychologist, Holtz.
9     Q.  Right. And you saw Dr.
10 Hedberg who diagnosed you.
11     A.  Right.
12     Q.  So Holtz and Dr. Kreditor
13 were the next ones?
14     A.  I believe so, yes.
15     Q.  So where you in any kind of
16 treatment or counseling between say 2004
17 and -- in 2004?
18     A.  In 2004, no, because I
19 didn't have any insurance. I had
20 insurance in 2005. I couldn't afford it
21 at the time.
22     Q.  And following through with
23 mental health treatment, how long did you
24 continue with Dr. Holtz and Dr. Kreditor?

Page 173

1     A.  Up until probably 2007.
2     Q.  So you saw each of them for
3 a couple of years?
4     A.  I believe so.
5     Q.  And --
6     A.  No. Actually, I believe
7 that I continued with Dr. Holtz for a
8 longer period. I don't remember the
9 exact length of time for Dr. Kreditor,
10 how long I was seeing him for.
11     Q.  Were you receiving
12 medication during that period of time,
13 say 2004/5/6/7?
14     A.  From Dr. Kreditor, yes.
15     Q.  What kind?
16     A.  And from Dr. Hedberg.
17     Q.  What kind of medication were
18 you getting?
19     A.  Stimulants for ADHD.
20     Q.  Initially through Dr.
21 Hedberg?
22     A.  Yes.
23     Q.  And then Dr. Kreditor
24 continued that?

Page 174

1    A.   Yes. And he, also,
2  prescribed, I think, Wellbutrin to
3  address depression.
4    No, I'm sorry. I think he
5  prescribed Venlafaxine to address the
6  depression.
7    Q.   And how would you
8  characterize your mental status during
9  that period of time?
10    A.   Not good.
11    Q.   In what sense?
12    A.   I was going through some
13  personal issues at this time. It wasn't
14  a good time. And I'm not sure that was
15  the correct treatment for me.
16    THE WITNESS: Do you mind if
17    I get another bottle of water? My
18    mouth is very dry.
19    MR. SACKS: Let's take a
20    break.
21    - - -
22    (Whereupon, a luncheon
23    recess was taken.)
24    - - -

Page 175

1    (Whereupon, the requested
2    portion was read.)
3  BY MR. SACKS:
4    Q.   I want to go back to your
5  medical school time at St. Matthew's.
6  You spent two years. You did the basic
7  sciences. What was your grade point
8  average at St. Matthew's?
9    A.   It was like a pass/fail
10  system.
11    Q.   It was a pass/fail?
12    A.   Yeah. I passed all my
13  classes. There was also honors, PF 4-H.
14    Q.   Did you get any of those?
15    A.   Any honors?
16    Q.   Any honors.
17    A.   No.
18    Q.   Did you fail any classes?
19    A.   Once. Pathology, the first
20  semester -- second semester of pathology.
21    Q.   You --
22    A.   My dad had a heart attack
23  and it kind of affected very adversely.
24  I think I was getting depressed.

Page 176

1    This was the time, also,
2  that I was seeing -- we didn't discuss
3  Maine, did we? Maine, because I did St.
4  Joseph's College.
5    Q.   Okay. Let's come back right
6  back to that. But before I forget, let's
7  finish with St. Matthew's.
8    Did you have to repeat any
9  course?
10    A.   I did. The year my dad had
11  a heart attack, I think it was, I had to
12  repeat pathology, second semester of
13  pathology.
14    Q.   Any other courses during
15  your time there?
16    A.   Not at St. Matthew's.
17    Q.   And otherwise, the grading
18  was pass/fail?
19    A.   Yes.
20    Q.   By the way, from the time
21  that you finished your clerkships, which
22  you said were in New York, from that
23  point of time forward to today, have you
24  done any additional either course work or

Page 177

1  internships, unpaid internships, anything
2  to keep yourself fresh in medicine or in
3  clinical work?
4    A.   I read a lot, a lot of
5  research-oriented medical research type
6  things, especially the neurosciences.
7    Q.   So you read medical
8  journals?
9    A.   Yeah, I do, online.
10    Q.   Any unpaid internships at
11  any local hospitals, anything like that?
12    A.   No. I tried through Sanofi,
13  but they never responded. There aren't
14  many options in this area.
15    Q.   Okay.
16    A.   Sanofi has some applications
17  on file -- I could send those to you --
18  where I did -- they have postdoctoral
19  training there and things of that nature.
20  You know, Sanofi Pasteur. They're right
21  here in --
22    Q.   How do you spell Sanofi?
23    A.   S-A-N-O-F-I. Pasteur, like
24  Louis Pasteur. P-A-S-T-E-U-R. They're a

Richard Katz, M.D., M.H.A.

Page 178

1 French company. They're hard to -- it's
2 hard to get a job there. You have to
3 know someone. Unfortunately, I don't
4 know anyone.
5       But I tried. I keep trying.
6 I even wrote the CEO there, Mr. Braga,
7 but they have a no-solicitation policy.
8 You can't contact anyone.
9    Q.   So you mentioned school in
10 Maine.
11    A.   Yes.
12    Q.   When did you go there? What
13 school was it and when did you go there?
14    A.   So, St. Matthew's had this
15 arrangement with St. Joseph's, a college
16 in Maine, where you can do an M.D. with
17 the master's in health administration.
18       So, it was through that dual
19 program that, you know, we were able to
20 go -- the medical students in St.
21 Matthew's were able to go and finish
22 their basic sciences in Maine at a
23 satellite campus.
24    Q.   At a satellite campus of St.

Page 179

1 Matthew's?
2    A.   Yes, in Maine, while you
3 finish the MHA at the campus at St.
4 Joseph's. They were in close proximity
5 to each other.
6       MR. SACKS:  Off the record.
7          - - -
8       (Whereupon, a discussion
9 was held off the record.)
10          - - -
11 BY MR. SACKS:
12    Q.   So let me make sure I
13 understand that about St. Matthew's and
14 St. Joseph's.
15    A.   They had an arrangement.
16    Q.   Did you spend a full two
17 years at St. Matthew's in Belize or was
18 part of that time spent at St. Joseph's
19 in Maine?
20    A.   So, anatomy -- the first
21 semester of medical school is like
22 anatomy, biochemistry, some behavioral
23 courses. All that stuff was done in
24 Belize. When it came down --

Page 180

1    Q.   Excuse me. And you passed
2 all of those courses --
3    A.   Yes.
4    Q.   -- when you took them?
5    A.   Yes. The second year was in
6 Maine. So, to -- for the record, to make
7 everything nice and accurate, I spent two
8 years at St. Matthew's University, but
9 one year was in Belize and one year was
10 in the State of Maine, in the USA.
11    Q.   And --
12    A.   There were instructors from
13 Maine Medical Center that came to teach
14 us and were our professors. They were
15 hired through St. Matthew's. That's
16 where many of them came from.
17    Q.   You mean, many had been
18 students at St. Matthew's?
19    A.   No, no. They were
20 practicing physicians and professors
21 because I think it's a teaching hospital,
22 if I'm not mistaken, Maine Medical
23 Center, because we did take some courses
24 there as well.

Page 181

1    Q.   Did you ever have an
2 employment relationship with Maine
3 Medical Center where you worked there?
4    A.   No, never. We would just --
5 the students would use their conference
6 room like this. And the lecturers would
7 be physicians practicing at the --
8 teaching physicians from the Maine
9 Medical Center.
10    Q.   So your second year of
11 medical school at St. Matthew's was spent
12 in Maine?
13    A.   Right.
14    Q.   And was this at a campus of
15 St. Matthew's or was this at St. Joseph's
16 College?
17    A.   I would attend both. They
18 were two separate --
19    Q.   Unrelated?
20    A.   Unrelated entities within a
21 close proximity. But they were related.
22 They had a relationship.
23    Q.   Are they both still there to
24 your knowledge?

Richard Katz, M.D., M.H.A.

Page 182

1    A.   Oh, I don't know.
2    Q.   So St. Joseph's --
3    A.   Yes. St. Joseph's is still
4  there. That's like an old institution.
5  I don't know if they kept the Maine
6  program. I don't know if St. Matthew's
7  still does that.
8    Q.   In your second year of
9  medical school when you were still taking
10  basic science at St. Matthew's, although
11  in Maine; correct?
12    A.   That's correct.
13    Q.   You also took other courses
14  at St. Joseph's in Maine?
15    A.   For the master's in health
16  administration degree.
17    Q.   So St. Matthew's had an
18  actual physical campus in Maine?
19    A.   A satellite campus, yeah.
20  Like a small campus that was set up for
21  our medical school classes.
22    Q.   Was that like all in one
23  building?
24    A.   No. There was a couple of

Page 183

1  buildings, I think.
2    Q.   In the town of Standish,
3  Maine?
4    A.   Yes.
5    Q.   And is St. Joseph's in
6  Standish, Maine also?
7    A.   Yes.
8    Q.   What courses did you take in
9  your second year, the science curriculum
10  at St. Matthew's?
11    A.   That's when I failed, the
12  pathology, second year. We took -- for
13  the year I was in Maine, you mean?
14    Q.   Yes.
15    A.   Pathology 1 and 2.
16  Behavioral sciences 1 and 2.
17        What else?
18        There was also like a review
19  course for the USMLE. There was
20  practical clinical skills that was taught
21  both semesters. And I think that's it.
22    Q.   And --
23    A.   Oh, there was a research
24  class, too, I think. A journal class.

Page 184

1    Q.   And you passed path 1 but
2  failed path 2?
3    A.   Yeah. I was not well.
4    Q.   And you passed behavioral
5  science 1 and 2?
6    A.   Yes.
7    Q.   And you passed -- well, your
8  clinical skills?
9    A.   Yes.
10    Q.   And then there was a review
11  source for the USMLE. I assume that was
12  essentially for Step 1?
13    A.   Yes, I believe so. But it
14  was -- I think they had some kind of
15  arrangement with Kaplan or something with
16  the videos. We were kind of doing that
17  as a group.
18    Q.   And at the same time that
19  you were doing those science courses at
20  St. Matthew's in Standish, Maine, you
21  were also attending St. Joseph's to get a
22  master's degree in health administration?
23    A.   That's right.
24    Q.   And what courses did you

Page 185

1  have to take for that program?
2    A.   Oh, I can't even tell you.
3  I have no recollection of the individual
4  courses, but I'll tell you what they --
5  it's in the resume actually. I wrote it
6  in the resume. That was the program.
7    Q.   So here it says "St.
8  Joseph's" -- I'm looking at your resume,
9  what you've identified as your resume.
10        MR. SACKS: And you know
11        what, we'll mark this as 19. And
12        I'll send you a copy or we can
13        make a copy today.
14  BY MR. SACKS:
15    Q.   But it says here, "St.
16  Joseph's College, Maine, 2002 to 2004,
17  full-time student."
18    A.   Now, I was continuing
19  classes, long distance education even
20  though I wasn't there. I was still a
21  full-time student taking classes online
22  and stuff. And I had to send my papers
23  in -- I believe it was a capstone paper I
24  had to do. So I was still a student

S.A. 256

Page 186

1 there, even though we weren't physically
2 there. We were there for the first --
3 from the years I was in Maine, which I've
4 identified to you already. But then it
5 became my long distance education,
6 essentially online.
7     Q.   Okay. Let me see if I've
8 got that. So, your medical school
9 education went from 2000 to 2004?
10     A.   That's correct.
11     Q.   First year --
12     A.   Basic science.
13     Q.   You started at Ross, didn't
14 complete the semester.
15     A.   Yeah. I got sick there.
16 Right.
17     Q.   Then started at St.
18 Matthew's in Belize?
19     A.   That's right.
20     Q.   One year in Belize. Then
21 moved to their campus in Maine --
22     A.   Correct.
23     Q.   -- for your second year and
24 also started a master's in health

Page 187

1 administration --
2     A.   That's correct.
3     Q.   -- at St. Joseph's College.
4     A.   Right. And that's where the
5 exhibits from Elizabeth Wiesen, the
6 Ph.D., comes in. She was the counselor
7 at St. Joseph's. And I got -- I wasn't
8 doing well there. And that's why I
9 probably failed my second semester of
10 pathology.
11     Q.   And so, those were -- out of
12 the 2000 to 2004, two years roughly were
13 in basic science and then two more years
14 were when you were doing your clerkships
15 in New York?
16     A.   And at the same time, still
17 doing the St. Joseph's stuff.
18     Q.   And completing your
19 master's. So your master's didn't get
20 completed in that year you were in Maine.
21     A.   That's correct.
22     Q.   It got completed later.
23     A.   I think what I wrote there
24 was accurate. What are the dates I have

Page 188

1 there for 2000 -- full-time student.
2 Yeah. That's right.
3     Q.   Okay. You started to tell
4 me about --
5     A.   Elizabeth Wiesen.
6     Q.   Elizabeth Wiesen. How did
7 that come about? When --
8     A.   I wasn't doing well. I had
9 a lot of problems. Academically I was
10 struggling. And the --
11     Q.   In which --
12     A.   Both.
13     Q.   Basic science?
14     A.   And the St. Joseph's, the
15 master's stuff. It was just -- I needed
16 the caseload dropped somewhat because it
17 was too much for me. I was under too
18 much pressure and stress. And it just
19 took it's toll. Plus, my dad wasn't
20 feeling well. He had a heart attack. He
21 had a heart attack when I was still in
22 Belize, but they didn't tell me until I
23 got back.
24     Q.   So you saw Dr. Wiesen for

Page 189

1 what kind of counseling?
2     A.   Cognitive behavioral
3 therapy. She's a Ph.D.
4     Q.   Did you get medication
5 during that period of time, also?
6     A.   No. No. It was just all
7 talking therapy.
8     Q.   And --
9     A.   She was effective, though.
10     Q.   And Dr. Wiesen is at St.
11 Joseph's College; correct?
12     A.   She's still there, I
13 believe. Yeah. She was very effective.
14     Q.   And when you say that, what
15 does that mean? What do you --
16     A.   I thought she --
17     Q.   -- consider effective for
18 you?
19     A.   I thought she was very
20 thorough. She understood the issues.
21 She -- I worked hard with her to try to
22 develop better coping skills.
23     Q.   For what?
24     A.   For the difficulties I was

S.A. 257

Page 190

1 having, for my anxiety, my depression.
2 For the stuff I was contending with at
3 the time.
4     Q.   And this was, roughly, 2002?
5     A.   Yes.
6     Q.   And did she send you for any
7 testing of any kind?
8     A.   That -- she was all there
9 was really.  She was the counseling
10 center.  She was the Ph.D.  She was
11 qualified to do the therapy.  And she --
12 I think there was some suggestion
13 possibly, but it was -- I didn't want to
14 take medication at that time.
15     Q.   And you didn't get any
16 psychological testing at that time for
17 any diagnosis?
18     A.   No.  No, no.  But it was
19 definitely a very to tumultuous,
20 difficult time in my life.
21     Q.   Just personal issues, you
22 mean?
23     A.   A lot of things.
24     Q.   And what did she do for you

Page 191

1 other than the talking therapy?
2     A.   Can you be more specific?
3     Q.   Yes.  Did she facilitate any
4 accommodations in any academic programs?
5     A.   She did.  She tried to write
6 the people that were in charge of the
7 various programs, like the dean of the
8 medical school and Donna Walters.
9 There's a letter to her in there to see
10 about dropping a particular course that I
11 was finding very difficult.
12     Q.   In the master's program?
13     A.   Yes.  Yes.  She tried to see
14 if she could alleviate some of the burden
15 of the stress.
16     Q.   Did you come across that
17 material in this book today?
18     A.   I didn't.  I don't know if
19 you put it in here or not.
20          Oh, here it is.
21     Q.   Where is that?
22     A.   00085 in exhibit -- is that
23 13?
24          So you'll see two letters;

Page 192

1 one to Donna Walters and one to Dr.
2 Pringle.  Dr. Pringle was the dean.
3 Donna Walters of the medical school in
4 Maine.  And Donna Walters was the person
5 that was the program manager for the
6 master's students that were medical
7 students.
8     Q.   What you're looking at now,
9 which is in Exhibit 13, I will represent
10 to you that this is material that -- some
11 of it in this exhibit you filed in court
12 and others comes from the National Board
13 and has a date stamp of April 2014.
14     A.   What are you referring to?
15 I'm sorry.
16     Q.   Let's see.
17     A.   Yeah, but this has a date of
18 August 2001.
19     Q.   Yes.  So that's my question.
20 Dr. Wiesen, her letter, which is page
21 0085 at the bottom -- do you see?
22     A.   Yeah.
23     Q.   Her letter is dated August
24 of 2001.  And the date stamp for the

Page 193

1 disability office of the NBME is April of
2 2014.
3     A.   It could have --
4     Q.   Hang on one second.  Let me
5 ask you a question.
6     A.   Go ahead.
7     Q.   My question is, why didn't
8 you submit this material and
9 specifically these -- at least these two
10 pages, NBME Katz 0085 and 0086?  Why
11 didn't you submit those with your
12 materials in 2005?
13     A.   I don't recall.  I thought I
14 did.
15     Q.   So did she slow down the
16 pace of your master's program?
17     A.   The final determination was
18 mine.  And I attempted to just tough it
19 out, and that's what I did.  And the
20 grades may have reflected that, but I did
21 my best under the circumstances.
22     Q.   And you are talking during
23 the period of time in which you completed
24 your program online later?

Richard Katz, M.D., M.H.A.

Page 194

1    A.   I'm talking about the
2  recommendations that she made. I wound
3  up trying to tough it out, instead of
4  getting a grade that was acceptable. It
5  was a little unacceptable.
6    Q.   Was your master's program
7  pass/fail?
8    A.   You know, I don't recall.
9    Q.   The grades within each
10 course?
11   A.   I think it was A, B, C type
12 of thing.
13   Q.   Do you recall what your
14 grade point average was in that program?
15   A.   You had to maintain a B to
16 stay in it.
17   Q.   And did you?
18   A.   That particular class, I
19 didn't. I fell below. But I think they
20 made it up with another -- I think that
21 kind of worked itself out because there
22 may have been A from somewhere else. And
23 the A and the C kind of turned into a B,
24 but not that -- you know, from a previous

Page 195

1  semester, previous class.
2    Q.   So we clarified the time
3  that you spent during medical school and
4  slightly after that in Maine. St.
5  Matthew's had a satellite campus in Maine
6  and you attended that. And you also
7  attended St. Joseph's in Maine, which you
8  completed remotely.
9    A.   That's right. Some classes
10 were done at the campus while we were in
11 Maine. Obviously, we were there for that
12 reason. And then some classes were done
13 remotely.
14   Q.   And then after you finished
15 your couple of years of basic sciences
16 with St. Matthew's that's when you
17 transferred to St. Christopher's and
18 matriculated at St. Christopher's so that
19 you could do your clinical rotation in
20 New York?
21   A.   Correct. Well, yeah, in the
22 northeast. St. Matthew's had the
23 majority of their clinical rotations in
24 Chicago and Atlanta and placcs that were

Page 196

1  not convenient for me.
2    Q.   So, in your -- can we agree
3  that at the present time, you have a
4  proposed second amended complaint that's
5  pending with the court? And we're
6  waiting for the court to say, yes, this
7  is your second amended complaint or go
8  back and re-file it, something like that?
9    A.   You say that with -- like a
10 sense of humor to you.
11   Q.   Not at all. I'm just
12 asking.
13   A.   It sounds like --
14   Q.   I'm just asking for -- to
15 lay the ground work for a question I want
16 to ask you.
17         Can we agree that at the
18 present time you have a proposed second
19 amended complaint?
20   A.   Yes. We can agree on that.
21   Q.   And in your proposed second
22 amended complaint, which is included here
23 as Exhibit 18, you say -- take a look at
24 paragraph 5 on page 2.

Page 197

1    A.   (Witness complies with
2  request.)
3         Okay.
4    Q.   So the last sentence there
5  says, "Katz had submitted sufficient
6  documentation to demonstrate that he's a
7  person with a disability within the
8  meaning of the ADA and that he was
9  entitled to reasonable testing
10 accommodations to take his USMLE exams in
11 2005-2006."
12         And I want to ask you, in
13 light of what we talked about a few
14 minutes ago about Dr. Garloff and Dr.
15 Garloff's opinion that, in fact, ADHD was
16 an incorrect diagnosis, my question is,
17 what is it that you base your statement
18 on here that you submitted sufficient
19 documentation to demonstrate that you had
20 a disability and the NBME should have
21 given you accommodations?
22         What is it they should have
23 given you accommodations for?
24   A.   They had a very thorough

Richard Katz, M.D., M.H.A.

| Page 198 |
|---|

1 psychological educational battery done
2 from St. John's University. They had an
3 M.D./Ph.D. who clinically used the DSM
4 and clinical expertise. He is a
5 professor at, I think, at NYU, Dr.
6 Kreditor. They had Dr. Holtz who was a
7 specialist in ADHD. They had ample
8 amount of materials from caregivers to
9 justify this diagnosis.
10     Q.   Of ADHD?
11     A.   And depression and anxiety.
12     Q.   Well, I'm trying to separate
13 that. If it's make sense to you to
14 separate it. Should they have granted
15 you accommodations for ADHD in 2005/2006?
16     A.   I can't answer that. I
17 don't know. My opinion is that based on
18 the materials submitted to them, yes.
19     Q.   Even though now your
20 doctors --
21     A.   Well, we don't --
22     Q.   -- are saying it's an
23 incorrect diagnosis.
24     A.   We don't really know 100

| Page 199 |
|---|

1 percent. This is all people's opinion
2 based on the data of the testing.
3         I went and I got additional
4 cognitive testing done per Dr. Husain,
5 who is here in Stroudsburg, Arif Husain.
6 He suggested for clarification purposes,
7 it may be a very good idea to understand
8 exactly what the problems are because you
9 have been diagnosed with a lot of things
10 and a lot of them apply. You do have
11 anxiety. You do have depression. So he
12 wanted to discern.
13         Dr. Garloff probably read an
14 article that stated that it's unlikely
15 that a person can have ADHD and bipolar
16 disorder. But in the literature, it's
17 there. They can be comorbid disorders.
18         Who's right? Is the
19 literature right? Is Dr. Garloff right?
20 Is Dr. Husain right?
21         Is Dr. Hamidian correct in
22 the assessment? Is she right? I believe
23 so.
24         But that was the diagnosis

| Page 200 |
|---|

1 at the time based on their clinical
2 expertise. They were the experts.
3     Q.   I want to make sure I
4 understand. So in your proposed second
5 amended complaint, you are saying that
6 the NBME had enough information and they
7 had enough documentation to grant you
8 accommodations, they should have granted
9 you accommodations.
10     A.   Not only that, look at the
11 real look -- look at the big picture.
12 The big picture is that I suffer from
13 executive dysfunction. I have problems
14 planning, organizing, executing. And
15 executive dysfunction runs the gamut of
16 all of these disorders.
17         So if you really want to see
18 the big header, the big header, it
19 doesn't matter if it's ADHD or depression
20 or bipolar disorder. Because, you know
21 what happens, the big header is executive
22 dysfunction. And that's the real
23 problem. And that encompasses many
24 mental illnesses.

| Page 201 |
|---|

1     Q.   Your doctors, whose reports
2 you submitted in 2005/2006, didn't say he
3 has executive dysfunction and therefore
4 you should grant him accommodations.
5 They talked about ADHD and there was some
6 discussion about depression and anxiety.
7 Correct?
8     A.   That's correct. But this is
9 really -- if you want to rationalize it
10 and look at it academically, I believe
11 that that's the better explanation.
12     Q.   Is what you're referring to
13 as executive dysfunction?
14     A.   Yes.
15     Q.   And again, just to make sure
16 we're getting a clear answer to my
17 question, you believe there was
18 sufficient documentation in 2005/6 to
19 justify accommodations on the basis of
20 ADHD and depression and anxiety?
21     A.   They wanted additional
22 documentation for depression and anxiety,
23 but there was no money to pay for all of
24 these extra reports.

Richard Katz, M.D., M.H.A.

Page 202

1    Q.   I'm asking you about that
2  piece right now. I'm asking you about --
3    A.   I believe that there was
4  sufficient documentation that stated that
5  these -- as our caregivers to Richard
6  Katz, these are our recommendations. And
7  their recommendations was he needs extra
8  time on the exam. It's stated in black
9  and white right on the report.
10    Q.   So based on that, they
11  should have done it?
12    A.   Based on these people that I
13  consulted to tell me what was wrong with
14  me and why I was having so much
15  difficulty processing and retaining
16  information and why I was having so much
17  difficulty with the timing of the exam
18  and not finishing on time and not getting
19  a proper amount of time per question. I
20  felt rushed. I felt like I wasn't
21  processing correctly during the
22  examination.
23    Q.   Okay.
24    A.   That that would lead to

Page 203

1  carelessness, where you could have even
2  down the -- towards the end of the block,
3  you may have known -- I may have known
4  the questions. But because I was running
5  out of time, just put B, B, B, B. You
6  know, it's just things like that. It's
7  just processing-wise, it's a processing
8  speed problem. That's all part of the
9  executive dysfunction.
10    Do you want to all it ADHD?
11  Do you want to call it bipolar disorder?
12    Charles Wiener, the lawyer I
13  consulted, that's exactly what he said.
14  You know, you have the letter there from
15  Charles Wiener.
16    It doesn't matter what you
17  want to call it per se, but the problem
18  is that there is a processing speed
19  issue.
20    Q.   Okay. You just mentioned
21  some more doctors and I want to find out
22  who they are.
23    A.   So Dr. Garloff went to
24  Chicago. And Dr. Arif Husain is the new

Page 204

1  doctor that I'm seeing.
2    Q.   So he replaced Dr. Garloff?
3    A.   Correct.
4    Q.   Same office?
5    A.   Yes.
6    Q.   And how about Dr. Hamidian,
7  is that H-A-M --
8    A.   I-D-I-A-N. She's with the
9  Aaron Center. And she's out of Dixon
10  City, I think, in Scranton. They have a
11  whole contract with the Scranton School
12  District to test the kids that have
13  problems with learning academics. And
14  so, they seem like a very good center to
15  utilize for this type of thing.
16    Q.   And so, are you being
17  treated by Dr. Husain now?
18    A.   I am.
19    Q.   Is Dr. Husain an M.D. or a
20  D.O.?
21    A.   He is an M.D.
22    Q.   And Dr. Husain oversees your
23  medication?
24    A.   Yes.

Page 205

1    Q.   And you told us at the
2  beginning of this deposition what
3  medications you're taking.
4    A.   Yes.
5    Q.   And Dr. Hamidian, is that
6  somebody you went to only for testing?
7    A.   Yes.
8    Q.   And when was that testing?
9    A.   That testing was about 10 or
10  11 sessions, from like I think -- I want
11  to say -- it's recent.
12    Q.   2015?
13    A.   Yeah.
14    Q.   Okay.
15    A.   Yeah. October, November,
16  December, January, February -- yeah. I
17  think -- yeah. It completed in October,
18  I think. And it was ten weeks prior. So
19  it probably began, what, over the summer,
20  August.
21    Q.   And how are you paying for
22  these doctors?
23    A.   I have insurance.
24    Q.   And do you have insurance

S.A. 261

Richard Katz, M.D., M.H.A.

Page 206

1 through your wife?
2    A.   No. AmeriHealth Northeast.
3    Q.   So you pay for insurance?
4    A.   We have from the county,
5 from the state.
6    Q.   Is this part of Obamacare?
7    A.   I don't know.  I guess so.
8 I don't know very much about it.
9    Q.   What is the name of your
10 health insurer?
11    A.   AmeriHealth Northeast.
12    Q.   Where are they based?
13    A.   Somewhere in the northeast.
14 I don't think I have the card.  In
15 Pennsylvania somewhere.
16    Q.   And how long have you had
17 insurance with them?
18    A.   Since 2013 when I was
19 admitted to the hospital with nervous
20 breakdown.
21    Q.   Okay.  I want to ask you
22 about that.
23        What happened?  What
24 precipitated going to the hospital?

Page 207

1    A.   I think it was the make or
2 break aspect of the six attempt limit
3 rule.  I think it was all or nothing.
4 And I think that the pressure of studying
5 for the boards just took it's toll on me.
6        I was getting -- I wasn't
7 sleeping.  I was paranoid.  I wasn't
8 eating.  I was -- really looking back,
9 was delusional, I guess.  I think I just
10 got sick.
11    Q.   When did you start getting
12 sick?
13    A.   So March 9th is when I went
14 to the hospital.  I think I was beginning
15 to really decompensate several months
16 before that.
17    Q.   Were you seeing a doctor
18 leading up to that?
19    A.   Up to that point, I don't
20 think I had any insurance.  I didn't have
21 any money.
22    Q.   No medication at that point?
23    A.   No, because I had no money.
24 It just was a very dark time, a very

Page 208

1 difficult time.
2        My wife had just had -- the
3 year prior, in March of 2012, had a
4 miscarriage, even though we were not in a
5 position to have a child, but the
6 physiologic clock was ticking.  She's 44
7 years old.  And we're entering very
8 uncharted territory by waiting.  And we
9 were concerned about that.  And I think
10 all the stress carried over to her.  And
11 in 2012, she miscarried.
12        And then I was admitted to
13 the hospital in 2013, March.  When I got
14 out of the hospital, she says I have a
15 surprise for you, I'm pregnant.  And then
16 shortly after, she lost it for the second
17 time.  So my feeling is that she's been
18 through all this.
19        You know, I have been here
20 all day talking to about my own
21 individual stress and my ordeal and what
22 I have been through.  But let me tell
23 you, she came along for the ride and she
24 didn't sign up for this.  And she thought

Page 209

1 she was marrying a physician.  And she
2 didn't expect to be marrying someone that
3 is scrounging now just to get by.  And
4 that's the truth.
5    Q.   So the way you've described
6 it over a few months leading up to your
7 hospitalization, you had trouble
8 sleeping, you were paranoid, not eating,
9 had some -- looking back, you said you
10 were delusional.
11    A.   Yeah.
12    Q.   So was there a precipitating
13 event, like did things get worse and
14 worse and then you decided to go to the
15 hospital one day or did you --
16    A.   I remember my brother came
17 in from Jersey.  My wife gave me an
18 ultimatum.  I thought that the people
19 across the way were -- had CIA and FBI.
20 There were trucks that were unusual that
21 weren't usually there.
22        I thought that the house was
23 bugged.  I thought that my wife was
24 plotting against me and family was

Richard Katz, M.D., M.H.A.

Page 210

1 plotting. You know, just stupid things
2 you look back now and I can't believe I
3 actually was thinking these things.
4        You know, the medication
5 does help, but this was my mind set at
6 the time. And I think it was the make or
7 break aspect of that test that I began
8 getting very -- I just began
9 decompensating and unravelling.
10    Q.   So your wife gave you an
11 ultimatum. Your brother came to town.
12    A.   Yeah, yeah, took me to the
13 emergency room.
14    Q.   Did you voluntarily admit
15 yourself?
16    A.   I did because, you know, I
17 had a wife that was ready to leave and --
18    Q.   I meant as opposed to an
19 involuntary commitment.
20    A.   It was voluntary.
21    Q.   And you spent approximately
22 one week in the Pocono Medical Center, is
23 that --
24    A.   Correct.

Page 211

1    Q.   Is that where you met Dr.
2 Garloff?
3    A.   No. That was the aftercare
4 that they arranged upon the discharge of
5 the hospital admission.
6    Q.   Did they start you on
7 lithium in the hospital?
8    A.   Yes.
9    Q.   And in your mind, is it the
10 lithium that kind of took you down from
11 delusional --
12    A.   Breakdown?
13    Q.   Yes.
14    A.   Yeah. I think it helped. I
15 think it helped.
16    Q.   Now --
17    A.   I think it may have been
18 Depakote they were using in the hospital.
19 They may have switched to lithium. I'm
20 not certain about that.
21    Q.   Your current treatment, how
22 often do you see Dr. Garloff -- excuse
23 me, Dr. Husain?
24    A.   My counselor I see every

Page 212

1 three weeks. And Dr. Husain I see every
2 month or every three weeks if it's
3 possible.
4    Q.   So you see Husain once a
5 month?
6    A.   Yeah. Once every three to
7 four weeks.
8    Q.   When you say I see the
9 counselor --
10    A.   Yeah. Wanita Taylor.
11    Q.   Where is she?
12    A.   She's in the same building.
13    Q.   Is she --
14    A.   She's in town.
15    Q.   Is she part of the same
16 group?
17    A.   Yes.
18    Q.   Is this like the ReDCo or
19 something?
20    A.   Yes.
21    Q.   Same group as Garloff. What
22 is her qualifications?
23    A.   She's an MS.
24    Q.   Like a psychologist with a

Page 213

1 master's degree?
2    A.   I think so. Yeah.
3    Q.   And Dr. Hamidian, that was
4 just for the testing?
5    A.   Yes.
6    Q.   So your current treatment is
7 with Dr. Husain and Wanita Taylor.
8    A.   Yes.
9    Q.   I want to ask you some
10 questions about the six-attempt limit.
11 When you became aware of the six-attempt
12 limit? Do you know?
13    A.   I can't tell you an exact
14 date. I don't remember. I know it was
15 probably months -- I found it from their
16 bulletin online. So I don't know when
17 they put that out.
18    Q.   Take a look at Exhibit 11 in
19 the book.
20    A.   (Witness complies with
21 request.)
22    Q.   So there's two pages here.
23 They're announcements on two different
24 days, two different dates.

S.A. 263

Richard Katz, M.D., M.H.A.

Page 214

1    A.   Yeah.
2    Q.   The first one, the page
3  that's numbered NBME Katz 0218 has a --
4  it says posted August 25, 2011.
5    A.   Okay.
6    Q.   So is it -- I'm asking you,
7  does that refresh you about when you
8  first saw this and became aware of a
9  six-attempt limit?
10    A.   I don't recall. I really
11  don't recall.
12    Q.   Take a look at Exhibit 17.
13    A.   (Witness complies with
14  request.)
15    Q.   I think you have seen that
16  before; is that right?
17    A.   Yes.
18    Q.   So, Exhibit 17 on the page
19  that's marked NBME Katz 0213 lists from
20  the -- and this is a USMLE record. And
21  it lists the times that you have
22  registered for. It doesn't have the
23  actual examination dates, but it has the
24  dates -- your registration dates for the

Page 215

1  different USMLE step tests that you
2  registered for over the years.
3         And if you look at the
4  bottom, the very last entry shows a 2001
5  date for Step 1.
6    A.   Right.
7    Q.   Does that make sense to you?
8  Does that seem correct to you that you
9  first took the USMLE either in late 2001
10  or early 2002?
11    A.   Yes.
12    Q.   Okay. So moving toward the
13  top of the page, moving up this list, the
14  fourth entry that says, Step 1, and then
15  it has dates December 1, 2011 to February
16  29, 2012. And it shows a registration
17  date November 18, 2011. Do you see that?
18    A.   Mm-hmm.
19    Q.   And looking back at Exhibit
20  11 for a second, you see that at least as
21  early as August 25 of 2011 there was an
22  announcement that there was a six-attempt
23  limit being imposed.
24    A.   Yup.

Page 216

1    Q.   So is it fair to say that
2  when you registered for the USMLE Step 1
3  on November 18th, 2011 -- do you see
4  where I am?
5    A.   November 18th, 2011. Okay.
6    Q.   At that point, were you
7  aware of the six-attempt limit?
8    A.   November 18th, 2011, I don't
9  recall.
10    Q.   When you would register for
11  Step 1 or for a step of the USMLE, you
12  would see the USMLE bulletin online; is
13  that right?
14    A.   I believe -- yeah, I think I
15  was probably aware. Yeah.
16    Q.   So is it fair to say that
17  once the six-attempt limit was announced
18  by the USMLE, after that time you took
19  Step 1 three more times?
20    A.   The thing you have to
21  understand -- well, why don't you ask
22  your question first before I intervene.
23    Q.   That's my question. We
24  looked at this entry on the fourth line

Page 217

1  of Exhibit 17.
2    A.   Of the score of 179, we're
3  talking about.
4    Q.   Yes.
5    A.   Okay.
6    Q.   Score of 179. That that
7  time of taking Step 1 and then if you go
8  up two more lines, that there was -- you
9  took Step 1 sometime in 2012 and got a
10  185. And then you took Step 1 again, the
11  last time, and got a 182?
12    A.   Mm-hmm.
13    Q.   So those three times of
14  taking Step 1 were all after the
15  six-attempt limit was announced and you
16  became aware of it; is that fair?
17    A.   I don't know. What are you
18  getting at? What is the ultimate --
19    Q.   I'm not -- I'm trying to
20  establish a time line.
21    A.   Time line-wise, that's
22  accurate. Do you want me to respond to
23  that or --
24    Q.   Well, I want to ask you some

Page 218

1  more questions, but if you have something
2  else you want to say, why don't you go
3  right ahead.
4      A.  No.  Why don't you continue
5  with your questions.
6      Q.  In your proposed amended
7  complaint that we looked at earlier, you
8  talk right from the beginning of the
9  proposed amended complaint about an
10  administrative barrier.  Do you remember
11  that?
12      A.  Yes.
13      Q.  Is the administrative
14  barrier that you are talking about the
15  six-attempt limit?
16      A.  Yes.
17      Q.  And you're -- again, I'm
18  going to describe it generally.  And I'm
19  not trying to lead you to something if
20  you don't agree with me.
21          But in a general sense, you
22  say that the six-attempt limit
23  discriminates against you as a person
24  with a disability.

Page 219

1      A.  Correct.
2      Q.  Is that a fair
3  characterization?
4      A.  Correct.
5      Q.  So, I want to ask you a
6  question.  Let's say we're talking about
7  today.  And this is a hypothetical, not
8  about you.  This is more of a
9  hypothetical about how this situation
10  operates today.
11          If a medical student who's
12  in medical school today signs up for the
13  USMLE Step 1, and let's say that
14  individual believes that he has dyslexia,
15  for example, and he requests
16  accommodations from the NBME.  Okay, are
17  you with me?
18      A.  Mm-hmm.
19      Q.  And because he's always
20  gotten accommodations all through high
21  school and college, he gets
22  accommodations, and he goes to take the
23  USMLE and he asks for accommodations on
24  Step 1 first attempt because he has

Page 220

1  dyslexia and he presents documentation to
2  the NBME disability services area, okay,
3  do you agree with me that the NBME should
4  grant that -- assuming that the
5  documentation shows that he has dyslexia
6  and has been accommodated in college and
7  medical school that that individual
8  should also get accommodations taking the
9  USMLE?
10      A.  Sure.
11      Q.  And that individual who gets
12  accommodations on Step 1 of the USMLE
13  would then be subject to the six-attempt
14  limit; correct?
15      A.  I'm losing you.
16      Q.  So, an individual who asks
17  for accommodations on his first
18  registration for the USMLE because he has
19  dyslexia and he gets accommodations,
20  they're granted to him.  You understand
21  that that person would then have six
22  attempts to pass Step 1 with the
23  accommodations that he has been given?
24      A.  Why should he have any

Page 221

1  accommodation?  I mean, why should he
2  have any barrier in front of him?  Strike
3  the accommodation part.
4          Why should that person have
5  any attempt limit if he is struggling
6  with a disability?
7      Q.  Okay.  This is what I was
8  trying to understand in your theory.
9          So, an individual who has a
10  documented disability, like dyslexia,
11  asks for accommodations and is granted
12  accommodations under the present system,
13  the way it works, would have six attempts
14  to pass the USMLE Step 1 with
15  accommodations.  Okay?
16          Can you agree with me that's
17  the way it works?
18      A.  That is currently the
19  administrative way it works and there's a
20  problem there.
21      Q.  And for someone who signs up
22  for the USMLE for the first time and has
23  no disability at all and he's always
24  been, you know, had an easy time, breezes

Page 222

1 through medical school, signs up for the
2 USMLE, that person has six attempts to
3 pass Step 1; right? Correct?
4    A.    Yeah.
5    Q.    So, do you agree with me
6 that the person who has dyslexia, who's
7 been granted say double time for the --
8 to take each step is on an even playing
9 field with the person who doesn't have a
10 disability, so that they both then can
11 have six attempts and they're both
12 expected to pass?
13    A.    You're losing me somewhere.
14 I don't know the point you're trying to
15 make.
16    Q.    Well, let me ask you this
17 way. You said that you think that the
18 person who has dyslexia shouldn't be
19 subject to any limit on the number of
20 attempts.
21    A.    If he has a proven
22 documented disability.
23    Q.    Okay. That's what I'm
24 trying to understand.

Page 223

1         So you think that people
2 without disabilities, it's okay to apply
3 a six-attempt limit?
4    A.    Personally, I think it's --
5 I don't know what the motivation of the
6 USMLE organization is to implement this
7 rule. For the longest time, you could
8 take the exam as many times as you needed
9 until you passed.
10        I don't know what -- maybe
11 it would help me understand their point
12 of view as to why they implemented such a
13 policy.
14    Q.    Just so I understand your
15 thinking, if a -- either you think that
16 there shouldn't be a limit at all for
17 anybody or if there is a limit, you'd
18 rather see it apply to people without
19 disabilities than people with
20 disabilities?
21    A.    It's not me. It's a
22 precedent. Look at the Doe versus Samuel
23 Merritt University. The judge gave that
24 individual with an anxiety problem in a

Page 224

1 similar circumstance as a make or break
2 kind of scenario with her -- I think it
3 was podiatry student unlimited attempts
4 to pass her test. The judge granted
5 that.
6         So it's a legal precedent.
7 It's in the law. It's in the law
8 literature. It's not what I'm saying.
9 That's what is happening.
10    Q.    So, just for the record, I
11 disagree with your reading of that. I
12 don't think that that's accurate, but we
13 don't have to argue that today. That's
14 not relevant to or necessary for
15 discussion today.
16    A.    You're questioning my
17 interpretation of that?
18    Q.    Yeah. I think it's an
19 incorrect interpretation. But again, we
20 don't have to argue about who is right or
21 who's wrong. We don't have to try to
22 resolve that right now.
23        I'm asking about your views
24 about the six-attempt limit.

Page 225

1    A.    Yeah. I don't understand
2 the principle behind it. I believe that
3 people with documented disabilities have
4 their own difficulties in life and trying
5 to stay on that level ground as people
6 who don't have disabilities.
7         And I think it's a barrier
8 to those people that struggle on a daily
9 basis. I think it blocks them. I think
10 it doesn't consider them. I think it's
11 inconsiderate. And I don't think it
12 pertains to people that have legitimate
13 problems. And because they have
14 succeeded in a certain level of academic
15 success, they have succeed because they
16 have compensated on some level. They've
17 worked harder.
18        One student may study three
19 hours. That student with a disability
20 has to study nine to 12 hours. They have
21 done things to try to get that
22 information in their head because they
23 can't do so the way a regular medical
24 student can sit there and process the

S.A. 266

Richard Katz, M.D., M.H.A.

| Page 226 |
|---|

1  information. They have to figure out
2  strategies and ways to do that.
3       I make pictures because I
4  think in pictures.
5       Q.   What if --
6       A.   You know, everybody has
7  developed their own strategy about how to
8  get information retained, absorbed and
9  retained.
10      Q.   So it's not about -- in your
11 mind then, it's not about the type of
12 accommodation in terms of a timed exam.
13      Let's say they granted that
14 person with dyslexia unlimited time to
15 take the exam.
16      If they had unlimited time
17 to take the exam six times -- unlimited
18 to take the exam but a six-attempt limit,
19 you think that's still discriminates
20 against that person with a disability?
21      A.   If they could take the exam
22 so there's no timing on the individual
23 exams, you're saying.
24      Q.   I'm saying hypothetically.

| Page 227 |
|---|

1  I never heard of that, but I'm trying to
2  understand how far your belief about the
3  accommodations goes.
4       A.   I really can't respond to
5  hypotheticals. I don't know.
6       My own personal opinion is
7  that it is a barrier. It blocks people
8  with disabilities. There should be no
9  such policy in place for a person that
10 struggles on a daily basis.
11      Q.   Okay. Fair enough.
12      A.   You also want to mention the
13 activities of daily living and how
14 that -- that Mr. Doane talks about the --
15 affects your -- the term that they use --
16 affects your --
17      Q.   A major life activity?
18      A.   A major life activity. You
19 want to talk about a major life activity.
20 People with disabilities, they struggle
21 every day of their lives. Every day.
22      You know, there are days
23 that I can't even get out of bed. There
24 are days I can't even function. There

| Page 228 |
|---|

1  are days where I don't shave for six or
2  seven days. I can't get myself together.
3  If it wasn't for the medication, I don't
4  know what state I would be in.
5       Q.   But you do have medication
6  and it improves your functioning; right?
7       A.   Yeah. But the law also
8  discusses that. And that -- and because
9  you're taking a medication to address a
10 disability does not necessarily mean that
11 that that is the band aid and the fix
12 all, because it isn't. It helps, but
13 it's not everything.
14      Q.   So the appropriate
15 accommodation that you believe you should
16 get is no limit on number of attempts --
17      A.   Correct.
18      Q.   -- is that right?
19      A.   Correct.
20      Q.   In addition to more time on
21 each attempt?
22      A.   And a private room to take
23 the exam.
24      Q.   That's what you are asking

| Page 229 |
|---|

1  for?
2       A.   Yes.
3       MR. SACKS:  Let's take five
4  minutes.
5          -  -  -
6       (Whereupon, a brief recess
7  was taken.)
8          -  -  -
9  BY MR. SACKS:
10      Q.   So, Mr. Katz, we're just
11 returning from a break. And off the
12 record, we had a discussion about the
13 fact that you wanted to read and sign.
14      So, here is the way we'll do
15 it. You let me know if this is
16 acceptable to you.
17      The court reporter will
18 complete the transcript and will send it
19 to me with a copy to you for read and
20 sign purposes. You'll have whatever the
21 appropriate amount of time is. I think
22 it's 30 days under the rule, I think, to
23 read and sign and make your changes on an
24 errata sheet. And you will send a copy

S.A. 267

Richard Katz, M.D., M.H.A.

Page 230

1  of that errata sheet to me as well as to
2  the court reporter.
3      A.  Okay.
4      Q.  What is the current status
5  of your communications with the State
6  Medical Board?
7      A.  Nil.  Nothing.
8      Q.  When was the last time you
9  had some communications with the State
10  Medical Board?
11      A.  It's when Charles Wiener
12  wrote the letter to them.  It was
13  probably shortly prior to starting this
14  lawsuit.
15      Q.  So, since this lawsuit has
16  gotten underway, you haven't had any
17  further communication with --
18      A.  Their last communication
19  with me was that they thought that if we
20  are successful in our appeal, that the
21  NBME will accommodate.  And if they
22  don't, then I should get back in touch
23  with him.
24      Q.  And what is the status of

Page 231

1  your communications with the Department
2  of Justice?
3      A.  I just spoke to Nabina Sinha
4  about three days ago.
5          Actually, no.  What is
6  today?  I think Friday of last week.
7      Q.  And what is your
8  understanding of what, if anything, the
9  Department of Justice is doing?
10      A.  I don't know.  They are
11  giving me briefs that they're doing their
12  investigation, but they are not very
13  specific.
14      Q.  When you say they're giving
15  me briefs, what do you mean?
16      A.  That we're -- they're,
17  essentially, working on it, but they
18  don't give me details.
19      Q.  Is that just orally that
20  they have said that?
21      A.  Most of my communications
22  thus far with them have been oral through
23  telephone.  Yes.
24      Q.  And the individual with whom

Page 232

1  the communicating is?
2      A.  Nabina Sinha and Danielle
3  Keefer.
4      Q.  Nabina, N-A-B-I --
5      A.  She's the trial attorney.
6      Q.  N-A-B-I-N-A?
7      A.  N-A-B-I-N-H-A [sic].  S-I,
8  N, like Nancy, H like Henry, and A like
9  apple.
10          And then Danielle Keefer,
11  K-E-E-F-E-R.  She's the paralegal of
12  Nabina Sinha.
13      Q.  So your understanding is,
14  it's an ongoing investigation?
15      A.  Correct.
16      Q.  But you don't have any more
17  specifics?
18      A.  I don't.  I'm sorry.
19      Q.  They haven't given you
20  details?
21      A.  No.
22      Q.  Earlier you mentioned -- you
23  said something to the effect that the big
24  picture -- you used the term the big

Page 233

1  picture is that you have executive
2  dysfunction.  Did I get that right?
3      A.  Mm-hmm.
4      Q.  And in that, am I correct
5  that you're describing the same
6  constellation of symptoms that you have
7  had throughout your --
8      A.  Yes.
9      Q.  So, the symptoms that you
10  have, you've had continuously for going
11  back 15 years give or take?
12      A.  It states it in the exhibit
13  when I wrote my own statement to the NBME
14  back in 2005/2006.  A lot of that
15  information is in there.
16      Q.  So at that time and
17  continuing forward, it's always been,
18  more or less, the same?
19      A.  The executive dysfunction?
20      Q.  Yes.
21      A.  Yeah, I would say it's --
22  yeah.  Pretty much.
23          There's certain ways I think
24  a person can try to deal with it.  Like,

Richard Katz, M.D., M.H.A.

Page 234

1  for instance, I have a basket that I put
2  my keys and my cell phone in and stuff
3  like that to kind of -- in the same
4  basket every day so I know where it is,
5  because I have a tendency of losing
6  things and forgetting where I put them.
7      Q.   Okay. I'm looking now at
8  what you sent to us yesterday by e-mail,
9  which was your response to the
10  defendants' request for documents. And I
11  just want to make sure that I'm clear on
12  your responses.
13          With respect to experts, at
14  one point, approximately a month ago,
15  give or take, you supplied a fee
16  schedule.
17      A.   Yes.
18      Q.   In fact, you filed it with
19  something with the Court.
20      A.   Yes.
21      Q.   And it was a doctor named
22  Suruli [ph], I think?
23      A.   Yes.
24      Q.   Are you in touch with that

Page 235

1  doctor about testifying in your case?
2      A.   We've had a discussion.
3      Q.   And is that all dependent
4  on --
5      A.   This is work product. I
6  don't know if this is really something we
7  should be discussing.
8      Q.   Well, I think it's a fair
9  question given your a pro se plaintiff.
10      A.   Okay.
11      Q.   So, is your -- hold on one
12  second.
13          Is your thought that you
14  would be able to hire her if there's some
15  sort of a ruling by the Court that
16  provides for payment somehow?
17      A.   Yes.
18      Q.   And so you haven't gotten
19  into the substance of the case or
20  anything like that with her yet. Is that
21  a fair statement?
22      A.   She has the preamble. She
23  has the basic preamble, the short
24  abbreviated synopsis of the case.

Page 236

1      Q.   And in terms of nonexpert
2  witnesses, is there anyone that you are
3  planning to have testify on your behalf
4  other than yourself?
5          If the case goes to trial,
6  is there any other person who would
7  testify for you other than you and other
8  than --
9      A.   Likely Dr. Hamidian.
10      Q.   So, you would have Dr.
11  Hamidian testify?
12      A.   Possibly. Yeah.
13          She wrote the last report,
14  so she's responsible for last psychiatric
15  report. That's with the second amended
16  complaint at this time.
17      Q.   What medical reports do you
18  have in your possession that have not
19  been filed as an exhibit with the Court?
20          Do you have medical reports
21  relating to the disabilities that you
22  claim to have that you have not filed
23  with the Court?
24      A.   I think we better wait for

Page 237

1  the motion to be ruled upon before I
2  answer that question.
3      Q.   So --
4      A.   I'm not comfortable
5  answering that.
6      Q.   So you're uncomfortable
7  saying whether you have additional
8  medical --
9      A.   No, don't put words in my
10  mouth.
11      Q.   I'm asking. I'm not trying
12  to put words in your mouth.
13      A.   I'm just saying I think we
14  should wait for the Judge's ruling on
15  that matter. That's just my own feeling
16  about it.
17          This is a problem and issue
18  that is currently in the case that we
19  have. This issue needs to be ruled upon
20  by the Judge and then we can take it from
21  there.
22      Q.   So, again, just so we're
23  clear, I'm not asking for you to disclose
24  the contents of anything right now

Page 238

1 because you have objected to that with
2 the Court.
3        My question is, do you have
4 materials in your possession from medical
5 providers that relate to your
6 disabilities? Whether you think they're
7 helpful or not helpful is a different
8 question.
9        I'm asking, do you have
10 materials in your possession that you
11 have not produced to us because of your
12 objections?
13     A.  The only documents that I
14 will tell you about is what is currently
15 accompanying the second amended complaint
16 as exhibits that you don't have yet. So
17 we have to wait for the Judge to rule on
18 the second amended complaint for those
19 accompanying exhibits to be released.
20 They're attached as exhibits.
21     Q.  Now I'm confused. So I'm
22 going to ask you more.
23        Is there something you have
24 filed with the Court that I have not

Page 239

1 seen?
2     A.  The only thing that has been
3 filed with the Court is the second
4 amended complaint, at least what I'm
5 referring to as the second amended
6 complaint with which you have.
7     Q.  I have the second amended
8 complaint.
9     A.  And the materials that have
10 been attached under seal that accompany
11 it.
12     Q.  And so, those documents you
13 have not sent to me, is that what you are
14 saying?
15     A.  I sent it to the Judge's
16 chambers.
17     Q.  Okay. I was not clear on
18 that fact before just now that there are
19 documents that you have filed in court.
20 I understand that they're under seal.
21        Under seal tends to mean
22 it's not open to the public, but it
23 doesn't mean that it's not open to the
24 opponents of -- to your opponents in the

Page 240

1 case.
2     A.  I believe I did send you the
3 documents that were three letters that
4 were written that you should have from
5 three medical doctors.
6     Q.  Okay.
7     A.  Do you have those?
8     Q.  I'm not sure if we're
9 talking about the same things now. So
10 I'm not sure and I don't have those in
11 front of me.
12     A.  I'll make sure you get them.
13     Q.  So, is that what you said
14 you have filed under seal that you didn't
15 think I had or is there additional
16 material that you have filed under seal
17 with the Court that you are not willing
18 to send to me now?
19     A.  No. You can have now. You
20 have it now. I have no problem. But I
21 don't know what the procedure is. I gave
22 it to the Judge's chambers and I don't
23 know what they do with it.
24     Q.  So, we might as well leave

Page 241

1 this on the record and let's see if I can
2 explain a little bit.
3        And I have not done this all
4 day of trying to explain things, but I
5 think this is an important point.
6        My understanding of filing
7 under seal is about confidentiality for
8 you in the lawsuit from the outside
9 world.
10     A.  Okay.
11     Q.  So that the outside world
12 shouldn't be able to go on the docket and
13 electronically click on something and
14 find something that is highly
15 confidential and shouldn't be open for
16 the public.
17     A.  Okay.
18     Q.  But again, my understanding
19 is that if you want to file something
20 under seal, you still have to send it to
21 us.
22     A.  All right.
23     Q.  That's my understanding.
24     A.  No, I agree. But the Clerk

Page 242

1 of Courts said that they would be issuing
2 all this to you upon the Judge making the
3 ruling on the second amended complaint.
4     Q.   Well, that's something I
5 never heard before.
6     A.   So I need to check that
7 point, too. I'm not sure about that.
8     Q.   Okay. That's fine. We can
9 leave that alone for now. That's fine.
10     A.   They said they would be the
11 ones to take care of it. So I don't
12 know.
13     Q.   So in the request for
14 documents, for example, at Number 7, I
15 asked you for all diagnostic reports,
16 medical reports, physicians reports or
17 other records or abstracts that relate
18 in any way to your alleged disability or
19 to your claim for damages.
20         And you responded. You
21 objected. And objected two paragraphs of
22 objections.
23         And then you said, "Based on
24 the determination of the Court and

Page 243

1 without waiving, plaintiff will produce
2 relevant non-privileged documents that
3 are responsive to this request on a
4 rolling basis as they become available."
5     A.   Some things I don't have.
6     Q.   Okay. So, again, I'm asking
7 for the things that you do have.
8     A.   Okay.
9     Q.   And subject to the Court
10 ruling, you'll produce them.
11     A.   Sure.
12     Q.   Understood?
13     A.   Yup.
14     Q.   I asked you about documents,
15 all your correspondence with the
16 Department of Justice and their
17 correspondence with you, any documents.
18         And you said, here it is.
19 And is that everything that you had?
20     A.   Yeah. Most of the
21 communications have been telephone.
22     Q.   I asked you in request
23 Number 14 for all documents relating
24 or -- referring or relating to damages

Page 244

1 you are claiming in this action.
2         And you said, "Some
3 up-to-date special/economic damages have
4 been submitted to the Court accompanying
5 the second amended complaint currently
6 awaiting ruling."
7     A.   Goes back to --
8     Q.   That's the same --
9     A.   Yeah. All the hospital and
10 medical bill damages have been assessed
11 to date from last week. I believe it was
12 up until -- March 2013 up until last
13 week, I believe it was.
14     Q.   And is that material
15 submitted to the Court under seal?
16     A.   Yes.
17     Q.   Okay.
18     A.   Now, I don't know what the
19 rule is.
20     Q.   No. That's fair. If
21 there's some --
22     A.   I have to check that.
23     Q.   -- confusion or
24 misunderstanding, that's fine.

Page 245

1     A.   So I certainly don't mean to
2 hold it from you.
3     Q.   If I'm entitled to it, I'll
4 get it.
5     A.   Yes.
6     Q.   And then you said something
7 to the effect that -- well, exactly, not
8 to the effect. You said, "Plaintiff will
9 produce relevant non-privileged documents
10 that are responsive to this request on a
11 rolling basis as they become available."
12         Does that just mean that
13 you'll keep supplying --
14     A.   Future --
15     Q.   -- things you don't have
16 now?
17     A.   Yeah. Also, I did it from
18 March of 2013 up until last week. So I
19 don't know about any --
20     Q.   Okay. I asked for your
21 federal income tax returns. And you made
22 an objection and said, "Subject to and
23 without waiving the objection, plaintiff
24 will produce relevant non-privileged

Richard Katz, M.D., M.H.A.

Page 246

1 documents that are responsive to this
2 request on a rolling basis as they become
3 available."
4        A.   Okay.  So I was just
5 questioning why you want my income tax.
6 What does that do for you?
7        Q.   Income taxes and W-2s are a
8 source of information about employers.
9        A.   Okay.
10       Q.   So I have asked you today
11 about your employers.  And you have given
12 me information.  And having the federal
13 income tax returns and the W-2s is a way
14 of crosschecking these things.
15       A.   Now, for me to take each of
16 those income taxes and to photocopy them,
17 some of them I don't even have anymore
18 because we moved so much.
19            Can I just give you the face
20 sheet where the accountant did the
21 analysis comparison from my 2009/2010?
22 Can I give you just a breakdown?
23       Q.   Are you talking about the
24 cost involved in making those copies?  Is

Page 247

1 that the difficulty?
2        A.   No, I just think it's --
3        Q.   Because you can do it but
4 scanning.
5        A.   I was going to try to scan
6 them, but I'm talking about a box full of
7 materials.  You are asking from as far
8 back as 2006; right?
9        Q.   Right?
10       A.   That's a lot of scanning.
11 Can I just give you the face sheets?  The
12 accountant does a breakdown of all the
13 deductions and everything and then he
14 does a comparison from 2009 to 2010 50
15 2011.
16       Q.   Let me ask you a question.
17 Have you filed federal income tax every
18 year?
19       A.   Not for the past -- not
20 since 2011, I believe.
21       Q.   So you haven't filed since
22 2011 --
23       A.   No.  There's no income.
24       Q.   -- because there's no

Page 248

1 income.
2        A.   Right.
3        Q.   Or no employment?
4        A.   Correct.
5        Q.   So, 2006 to 2011 was when
6 you had employment income.  Is that why
7 you had income taxes?
8        A.   Yes.
9        Q.   I think that you told me
10 that your last employment was 2008.
11       A.   Well, don't forget, I'm
12 married.  So we filed jointly on a few
13 years.  Do you know what I mean?
14       Q.   I see.
15       A.   So I don't know how you want
16 to tweeze that out.
17       Q.   Yes.  I'd like to see --
18       A.   I'll send you my wife's W-2s
19 and whatever.  I send you the W-2s and I
20 can send you the breakdowns of the way
21 the accountant did from year to year with
22 the deductions and everything.
23       Q.   And does that show --
24       A.   Shows everything.

Page 249

1        Q.   Okay.
2        A.   But it's an abbreviated
3 version.
4        Q.   Why don't we start with
5 that.  And if I feel like we need --
6        A.   That's fine.
7        Q.   -- more, we'll readdress the
8 issue.
9        A.   That's fine.
10       Q.   And again, in Number 16 I
11 asked about documents relating to all
12 jobs you have held since 2006, including
13 W-2 forms.  So the W-2 forms would be
14 included with those --
15       A.   Yeah.
16       Q.   -- income tax returns and
17 other information that identify the
18 employers as well?
19       A.   Sure.  Sure.
20            So, essentially, you want
21 the taxes and the work searches.  Is that
22 what we --
23       Q.   Well, earlier -- and I'll
24 get to that in a second because I don't

Page 250

1 think I got there yet in my request.
2       In Number 17, I asked for
3 evaluations, performance reviews and
4 other written feedback you have received
5 at every job since 2006, both paid and
6 unpaid.
7    A.   I don't really have
8 anything.
9    Q.   So if the answer is -- you
10 said, "I will produce on a rolling
11 basis."
12    A.   I could have something, but
13 I don't think there's anybody evaluating
14 me.
15    Q.   If the answer is none,
16 that's fine.
17    A.   Okay.
18    Q.   But if you have anything,
19 I'm asking for you --
20    A.   I'll double-check that
21 point.
22    Q.   The next one is what we were
23 talking about earlier.  "If you are not
24 currently employed, provide copies of all

Page 251

1 job applications and related
2 correspondence that document your
3 attempts to locate employment since your
4 last job."
5    A.   Okay.  I'll send you that
6 and I'll send you the taxes.
7    Q.   That's it.  Let me
8 double-check my notes.
9    A.   You have the Pennsylvania
10 Commonwealth file that I sent you for the
11 local congressman.
12    Q.   Yes.
13    A.   You have all that.
14    Q.   That's complete, also?
15    A.   Pretty much.  I didn't see
16 anything else in my e-mail archives.
17       MR. SACKS:  I'm just going
18 to double-check my notes.  We
19 might be done.  Give me one
20 second.
21       Okay.
22       THE WITNESS:  That's it?
23       MR. SACKS:  All done.  Thank
24 you.

Page 252

1          - - -
2       (Whereupon, Exhibit 19 was
3 marked for identification.)
4          - - -
5       (Whereupon, the deposition
6 concluded at 3:01 p.m.)
7          - - -

Page 253

1 C E R T I F I C A T E
2
3       I HEREBY CERTIFY that the
  witness was duly sworn by me and that the
  deposition is a true record of the
4 testimony given by the witness.
5
6
7
8
9 Margaret Peoples, RPR
  Dated: February 9, 2016
10
11
12
13
14
15
16
17
18
19       (The foregoing certification
20 of this transcript does not apply to any
21 reproduction of the same by any means,
22 unless under the direct control and/or
23 supervision of the certifying reporter.)
24

Richard Katz, M.D., M.H.A.

| Page 254 |
|---|

1   INSTRUCTIONS TO WITNESS
2       Please read your deposition over
3   carefully and make any necessary changes.
4   You should assign a reason in the
5   appropriate column on the errata sheet
6   for any change made.
7       After making any change which has
8   been noted on the following errata sheet,
9   along with the reason for any change,
10  sign your name to the errata sheet and
11  date it.
12      You are signing it subject to the
13  changes you have made in the errata
14  sheet, which will be attached to the
15  deposition.  You must sign in the space
16  provided.
17      Return the original errata sheet
18  to the deposing attorney within thirty
19  (30) days of receipt of the transcript by
20  you.
21
22
23
24

| Page 256 |
|---|

1   ACKNOWLEDGMENT OF DEPONENT
2
3       I,_____, do
4   hereby certify that I have read the
5   foregoing pages,_____and that the
6   same is a correct transcription of the
7   answers given by me to the questions
8   therein propounded, except for the
9   corrections or changes in form or
10  substance, if any, noted in the attached
11  Errata Sheet.
12  _____
13  DATE
14
15  Subscribed and sworn to before me this
16  _____day of_____,
17  20_____.
18  My commission expires:_____
19
20  _____
21
22  Notary Public
23
24

| Page 255 |
|---|

1       - - - - - - - -
2       E R R A T A
3       - - - - - - - -
4   PAGE    LINE    CHANGE
5   _____  _____  _____
6   _____  _____  _____
7   _____  _____  _____
8   _____  _____  _____
9   _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24  _____  _____  _____

Richard Katz, M.D., M.H.A.

Page 255

|  | | | |
|---|---|---|---|
| 1 | | | |
| 2 | | E R R A T A | |
| 3 | | | |
| 4 | PAGE | LINE | CHANGE |
| 5 | 72 | 23 | got a C with exam accommodations. |
| 6 | 142 | 9 | I never applied for accommodations on MCAT |
| 7 | 143 | 10 | this form was not regarded at the time to be all |
| 8 | | | encompassing of all accommodations received. |
| 9 | 145 | 21 | Yeah but if you read ............. |
| 10 | 148 | 2 | Registration instead of accommodations |
| 11 | 148 | 5 | Registration instead of accommodations |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

Richard Katz, M.D., M.H.A.

Page 256

1              ACKNOWLEDGMENT OF DEPONENT

2

3        I, ___Richard Katz_____, do

4    hereby certify that I have read the

5    foregoing pages, _1-256_____and that the

6    same is a correct transcription of the

7    answers given by me to the questions

8    therein propounded, except for the

9    corrections or changes in form or

10   substance, if any, noted in the attached

11   Errata Sheet.

12   _____

13   DATE   3-28-16

14

15   Subscribed and sworn to before me this

16   28th day of March_____,

17   20 16 .

18   My commission expires: 7-1-16____

19

20   Deborah A Rath

21

22   Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
DEBORAH A. RATH, Notary Public
Mount Pocono Boro., Monroe County
My Commission Expires July 1, 2016

23

24

# EXHIBIT 24

Application for Admissions                    mailbox://C%7C/Program%20Files/Netscape/Nu...UAA07475@ambergri.webstor.com&number=1341

MODE OF ADMISSION:              New: checkedTransfer:

TAKEN MCAT:                     Yes: No:

MCAT DATE TAKEN:

MCAT SCORE:

# COMPLETED HOURS:

COMPLETED HOURS QT. OR SEM:Quarter:Semester:checked

OVERALL GPA:                    3.4

OVERALL SCIENCE GPA:

COMPLETED PREREQUISITES:        Inorganic Chem: checked
                                Organic Chem: checked
                                Biology: checked
                                Physics: checked
                                Language Arts: checked
                                Psy/Soc: checked
                                Algebra: checked


COLLEGES PREVIOUSLY ATTENDED:           New School For Social Research/ NY NY /BFA

State University of New York College at Old Westbury/ New York, NY/ Pre- MED /POST-BACH

DEGREE RECEIVED:        Yes: No:

PREVIOUS MEDICAL SCHOOL:

HOURS ENROLLED:

APPLYING FOR FINANCIAL AID:     Yes: checkedNo:

HAS ANY FAMILY RECEIVED MD DEGREE:      Father:
                                        Mother:
                                        Sibling:
                                        Other:

PAYMENT OPTIONS:                Check: checked
                                Money Order:
                                Credit Card:

CREDIT CARD TYPE:       Visa:Mastercard:

NAME ON CARD:

CC EXPIRATION:

CC NUMBER:

SEND A CATALOG
DO NOT SEND CATALOG

12/21/99 8:38 AM

StMatt 002

CONFIDENTIAL

12/21/00  12:35 FAX 718 280 7750     KINKO'S COPIES QUEENS                    ☒008/025

# Richard D. Katz

90-50 Union Tpke. 18H
Glendale, New York 11385
(718) 441-5064

### Education

Parsons School of Design; New York, N.Y.

August 1988-May 1992                    Bachelor of Fine Arts

SUNY College at Old Westbury,
Westbury, N.Y.
August 1994-May 1997                    Post Graduate Medical Prerequisites

### Health Care Experience
April 1998-present

Elmhurst Hospital Center. Elmhurst, NY.
Department of Psychiatry/Nursing.
**Psychiatric Care Associate (Case Worker)**
Perform therapeutic and related health service activities
for an age specific psychiatric population. Interact
with patients in daily living activities ensuring a properly
maintained physical, social and clinical environment.
Apply casework approaches including home visits to
evaluate patient needs, assist with patient referrals and
and work with families on related social, economic and health
problems. Establish and maintain therapeutic relationships
with assigned patients while assisting with the maintenance
of the therapeutic milieu. Communicate patients progress to
team members by written and verbal reports. Participate in
interdisciplinary treatment planning meetings. Lead and
assist with milieu groups.   Participate in planning and im-
plementing an orientation program for new patients. Gather
information for intake, social histories, referrals and related
purposes which would augment the understanding of
cases. Plan and implement therapeutic activities.
Encourage client involvement in various individual and
group activities as part of planned treatment programs.

May 1991-April 1998

Elmhurst Hospital Center. Elmhurst. NY
Department of Emergency Medicine.
**Clerical Associate III**
*Registration functions:*
Interviewed patients and family members to obtain billing
and demographic information; opened and closed Emergency
Department visits; booked clinical referrals, processed
Managed Care information for authorization; acted as liaison
between medical staff and family members to facilitate
patient care.

received
DEC 21 1999

StMatt 035

**CONFIDENTIAL**

**S.A. 279**

**Richard D. Katz**
(continued)

*Nursing Station functions:*
Prepared patient specimens for transmittal to laboratories
for testing. Responsible for receiving reports of abnormal
test results and panic values from the technician in the
lab. Responsibilities also included: paging Trauma
and Cardiac teams, as well as medical consultants,
and support personnel; coordinated transportation
for patients being discharged or transfers to other
facilities for specialty services, (e.g.. a burn patient being
transferred to Cornell Burn Unit.)

**Community, and Advocacy Activities**
1996-1997

Elmhurst Hospital Center
Department of Adolescent and Pediatric
Psychiatry/Mental Hygiene clinic:
Art Activities/Therapist
Volunteered approximately one evening a week for one
year in the Child and Adolescent Psychiatric units and
outpatient clinic in the After School Program. The
purpose of the program is to develop supportive
relationships and assist patients in building academic and
daily living skills. Using art as modality, I was responsible
for supervising group art projects. There was a focus on
process and expression as opposed to end product. This
group effort often led to innovative, original pieces of art.
The method seemed extremely effective in boosting the
patients' self esteem as the entire group often expressed a
sense of accomplishment.

**Honors, Awards, Activities**

Undergraduate:

Excellence in Academic Achievement
Dean's List  1989, 90, 91, 92
Artwork selected and displayed in Parsons Gallery

Postbaccalaureate:

Deans list: Science Prerequisites SUNY College
at Old Westbury 1996-1997

StMatt 036

CONFIDENTIAL

12/21/99  12:34 FAX 718 286 7750    KINKO'S COPIES QUEENS    ☑008/025

Richard D. Katz
(continued)

Professional experience:

Art Director/Creator
**Crisis Management Fair**

The purpose of the Crisis Management Fair was to educate
clinical staff in the management of crisis situations with
emphasis on a least restrictive approach.
July 16, 1998

Published illustrator
Travel Agent's Corporate Travel Professional
June 29, 1992/July 27, 1992
Commissioned to do 3-dimensional mixed media collages for
Articles entitled: "Finding- and Eliminating- Loss Business"
"An Educated Traveler Is Your Best Customer"

Guest Lecturer
Parsons School of Design
Presented art work and lectured on the medium of collage
in relation to color, composition and creation of
new visual reality.
November- 1993

StMatt 037

CONFIDENTIAL

# EXHIBIT 25

St Christophers College of Medicine Application                                                Page 1 of 1

St. Christopher's College of
Medicine
Office of the Registrar
P. O. Box 1199
Melville, NY 11747
1-888-728-0100
Fax 1-877-229-1420

St. C.



It is imperative that this is typed or written in small, clear block letters.

Family Name _KATZ_____ First name _RICHARD_____ Middle name _DENIS_____

Soc. Sec/NMS No _____ Date of Birth _____ Citizenship _U.S.A_____

Street address _90-50 Union Tpke. 1811_ City, State & Zip code _Glendale__, _N.Y._ _11385_

Telephone No. _(718) 849-2955_ E-mail Address _Cat 2900 @ Holmel.Gov_ Male/Female _Male_

Spouse name_____ Address _____ Telephone _____

Emergency contact name/relationship _Kathleen Katz / Mother_ Address _RD # 3 Box 306 E Stroud R_ Telephone _(570) 476-8842_

Father's name _EDWIN KATZ_ Address _RD # 3 Box 306, E Stroud R_ Telephone/Profession _(570) 476-8842 / Balwin Mg_

Mother's name _KATHLEEN KATZ_ Address _____ Telephone/Profession _(570) 476-8842 / Salesperson_

High School/Secondary _H.S. of Art & Design_ Address _NYC__, _NY_ Diploma/Major _H.S. Diploma_

College _Parsons School of Design_ Address _NYC_, _NY_ Major/Degree dates _B.F.A / ILLUSTRATION_

College _SUNY College at Old Westbury_ Address _Old Westbury, NY_ Major/Degree dates _Pol.Sci / Pre-Med_

Advanced Degree _____ License held _____ Admission date requested _____

Medical School attended _St. Matthew Sch. Med_ Dates _01/99 — present_ Reason for leaving _As per St. Chris Student Recomendation_

Advanced standing basis _____ Preclinical terms completed _____ Clinical rotations completed _____

Employment & Experience (use separate paper if necessary) _See CV_

Have you a health problem of any kind? _No_ Are you currently under the care of a physician? _No_

Have you ever been convicted of a crime or felony? _No_

If yes, please explain _____

I understand that St. Christopher's College of Medicine reserves the right to accept or deny any applicant.

I hereby state all information here is true and that (I) / (_RICHARD KATZ_) am/is responsible for paying all my fees. I will conform to all the terms and conditions pertinent to being a student/graduate at this school. Any student providing St. Christopher's College of Medicine with any incorrect or misleading information, will be denied admission, be dismissed, or any degree nullified at any future time.

Please enclose the following along with your completed application: four recent passport-style photographs, two letters of recommendation, a brief autobiography and personal essay on medical career expectations typed or printed, a Curriculum Vitae, official transcripts from undergraduate and/or graduate colleges, official MCAT scores if taken and a non-refundable application fee of $100.00.

Signature _____ Date _10/26/01_
                        This application will not be processed without the $100.00 application fee.

St Christopher's 001

CONFIDENTIAL

S.A. 283

90-50 UNION TPKE. SUITE 18H • GLENDALE, NY 11385
PHONE (718) 849-2455 • E-MAIL CAT2400@MSN.COM

# RICHARD KATZ

## EDUCATION

1999 – present  St. Matthew's University School of Medicine [Belize, CA]
*M.D. Candidate*
1999 – present  ST. Joseph's College of Maine. [Standish, Me.]
*MHCAS Candidate*
Aug. 1994 – May 1997  SUNY College at Old Westbury [Westbury, N.Y.]
*Post Graduate Medical Prerequisites*
Aug. 1988- May 1992  Parsons School of Design [New York, N.Y.]
*Bachelor of Fine Arts*

## PROFESSIONAL EXPERIENCE

1998-1999  Elmhurst Hospital Center. [Elmhurst, N.Y.]
Department of Psychiatry/Nursing
*Psychiatric Care Associate (Case Worker)*
Performed therapeutic and related health service activities for an age specific psychiatric population. Interacted with patients in daily living activities ensuring a properly maintained physical, social and clinical environment. Applied casework approaches including home visits to evaluate patient needs, assisted with patient referrals and worked with families on related social, economic and health problems. Developed and Piloted group therapy protocols tailored to this specific population. Established and maintained therapeutic relationships with assigned patients while assisting with the maintenance of the therapeutic milieu. Communicated patient progress to the interdisciplinary treatment team by way of written and verbal reports. Participated in planning and implementing an orientation program for new patients. Gathered information for intake, social histories, referrals that would augment the understanding of cases. Encouraged patient involvement in various individual and group activities as part of planned treatment programs.

1991-1998  Elmhurst Hospital Center. [Elmhurst, N.Y.]
Department of Emergency Medicine
*Clerical Associate Level III*
*Registration Functions:*
Interviewed patients and family members to obtain billing and demographic information; opened and closed emergency department visits; booked clinical referrals, processed Managed Care information for authorization.

*Nursing Station Functions:*
Prepared patient specimens for transmittal to laboratories for testing. Responsible for receiving reports of abnormal test results from technician in lab.

St Christopher's 002

CONFIDENTIAL

# EXHIBIT 26

Applicant Status Program (ASP)

| Applicant | Registration | Search | CAPS | ERAS | OASIS | Viper | CIBIS INFO | Call Log |

Name: Katz, Richard Denis                           DOB:                    USMLE ID:  06314751

## AVTS Report
ETS Number:                          Test Date:                    Form Entry Date:

Processing Status:                                    Fee Status:

Applicant Status:                               Score Accepted:

Letter Status:                               Letter Send Date:

### Exam History - All Exams

| Cert? | Date | Exam Type | Result | Score 2 | Score 3 | Report Date | Update Date | IB | TA | Void? |
|---|---|---|---|---|---|---|---|---|---|---|
| | 11/12/2013 | STEP1 | FAIL | | 182 | 12/04/2013 | 12/04/2013 | No | No | No |
| | 01/31/2013 | STEP2CS | FAIL | | | 04/24/2013 | 04/24/2013 | No | No | No |
| | 11/02/2012 | STEP1 | FAIL | 74 | 185 | 11/21/2012 | 11/21/2012 | No | No | No |
| | 02/29/2012 | STEP1 | FAIL | 73 | 179 | 03/21/2012 | 03/21/2012 | No | No | No |
| | 08/05/2011 | STEP2CS | FAIL | | | 10/12/2011 | 10/12/2011 | No | No | No |
| | 11/17/2010 | STEP2 | FAIL | 44 | 140 | 12/08/2010 | 12/08/2010 | No | No | No |
| | 10/21/2010 | STEP1 | FAIL | 50 | 145 | 11/10/2010 | 11/10/2010 | No | No | No |
| | 03/02/2007 | STEP2CS | FAIL | | | 04/25/2007 | 04/25/2007 | No | No | No |
| | 09/29/2006 | STEP2 | FAIL | 59 | 141 | 10/25/2006 | 10/25/2006 | No | No | No |
| | 04/29/2005 | STEP1 | FAIL | 71 | 174 | 05/25/2005 | 05/25/2005 | No | No | No |
| | 03/31/2005 | STEP2 | FAIL | 66 | 160 | 04/27/2005 | 04/27/2005 | No | No | No |
| | 12/20/2004 | STEP1 | FAIL | 72 | 176 | 01/19/2005 | 01/19/2005 | No | No | No |
| | 09/26/2003 | STEP1 | FAIL | 63 | 152 | 10/22/2003 | 10/22/2003 | No | No | No |
| | 10/25/2002 | STEP1 | FAIL | 56 | 135 | 11/20/2002 | 11/20/2002 | No | No | No |
| | 03/27/2002 | STEP1 | FAIL | 55 | 133 | 04/17/2002 | 04/17/2002 | No | No | No |

® Registered in the U.S. Patent and Trademark Office.
Copyright © 2003 Educational Commission for Foreign Medical Graduates. All rights reserved.

ECFMG-000016

http://asp.ecfmg.org/ExamHistory.aspx                    **CONFIDENTIAL**    6/6/2016

# EXHIBIT 27

## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

Richard Katz

Plaintiff

**FILED**
**WILKES BARRE**

MAY 0 3 2016

Per _MS_

Case No.: **3:15-cv-01187**

**SECOND AMENDED COMPLAINT:**
DISCRIMINATION PURSUANT TO TITLE III
OF ADA, BREACH OF CONTRACT,
MISLEADING CONDUCT, NEGLIGENT OR
INTENTIONAL INFLICTION OF EMOTIONAL
DISTRESS, IMPAIRMENT OF ECONOMIC
OPPORTUNITY, FRAUDULENT
MISREPRESENTATION, PRELIMINARY
INJUNCTION, DISCRIMINATION PURSUANT
TO § 504 OF THE REHABILITATION ACT OF
1973

v.

NATIONAL BOARD OF MEDICAL EXAMINERS (NBME)
3750 Market Street
Philadelphia, PA 19104

and

FEDERATION OF STATE MEDICAL BOARDS (FSMB)
400 Fuller Wiser Road, Suite 300
Euless, Texas 76039-3855

Defendants

## PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT

### INTRODUCTION AND GENERAL STATEMENT OF THE CASE

COMES NOW plaintiff Richard Katz, appearing pro se respectfully requests this Honorable Court to grant leave, thereby permitting filing of a Second Amended Complaint, states as follows:

1. Richard Katz resides in East Stroudsburg, Pennsylvania he graduated Medical School in 2004 and holds a Medical Degree.

1

2. This is a disability access and discrimination complaint alleging that there is an administrative barrier and discriminatory policies in place at the National Board of Medical Examiners (hereinafter NBME) and the Federation of State Medical Boards (hereinafter FSMB). NBME and FSMB own and sponsor the United States Medical Licensing Examination® ("USMLE"), a standardized examination that is used in evaluating applicants for medical licensure in the United States and its territories. The USMLE Organization's primary place of business is located in Philadelphia, PA. Richard Katz is an individual with a disability. This barrier denies full and equal access to in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 and § 504 OF THE REHABILITATION ACT OF 1973, [AS AMENDED, 29 U.S.C. § 794].    **Section 504 of the Rehabilitation Act specifically prohibits discrimination against individuals with disabilities in programs receiving federal funds. *NBME and FSMB are both recipients of federal funds.***

3. In 2011 the USMLE Organization announced that they will place an attempt limit to the number of times examinees can take to pass a USMLE Step Exam. *The previous policy allowed examinees to take the exam as many times as they needed until passing.* In creating this so-called "Six Attempt Limit Rule" the NBME/FSMB made NO concession in their policy development for people with documented disabilities. This is an access violation that does NOT comply with accessibility regulations under Title III of the ADA and § 504 of The Rehabilitation Act Of 1973. This is in violation to the specifications promulgated by the Department of Justice (the "DOJ Standards") who have been investigating Katz's claim since November 28, 2014 (Please see EXHIBIT 6 for Senator Toomey's update).

4. NBME and FSMB are subject to the requirements of Section 309 of the ADA of 1990, 42 U.S.C. § 12189, and the implementing regulations, 28 C.F.R. § 36.309. Private entities that administer examinations related to professional licensing must offer examinations in a place and manner accessible to persons with disabilities. Katz sent an appeal to NBME Disability Services on April 1st 2014, requesting that they modify their "Six Attempt Limit Rule " as a reasonable accommodation under the ADA (Doe v. Samuel Merritt University, 921 F. Supp. 2d. 958 (N.D. Cal. 2013) Preliminary Injunction granted allowing student with a disability to take a podiatric licensing examination unlimited times as an accommodation to University's policy providing for a three exam limit.). The defendants denied this request.

5. A second dispute exists in this case, Katz alleges that he was discriminated by NBME Disability Services in 2005 through 2006. Katz requested exam accommodations and extended exam time for his USMLE exams during this period. NBME Disability Services found that the supporting documentation submitted by Katz did not demonstrate that he was currently substantially limited in a major life activity as compared to most people, so as to be disabled within the meaning of the ADA. Katz had submitted sufficient documentation to demonstrate that he is a person with a disability within the meaning of the ADA, and that he was entitled to reasonable testing accommodations to take his USMLE Exams in 2005-2006.

6. Katz filed his original Complaint in this Court on June 18, 2015. He amended his complaint on August 12, 2015.

7. NBME/FSMB Answer was submitted to this Court on August 28, 2015.

8. Katz *traversed* NBME/FSMB's Answer on September 8, 2015.

2

## JURISDICTION AND VENUE

9.  This Court has subject matter jurisdiction under 28 U.S.C. sections 1331 and 1343.

10. This action is commenced pursuant to 2201 and 2202.

11. Plaintiff seeks declaratory relief pursuant to 28 U.S.C. Section 2201 and 2202. Plaintiff claims for injunctive relief are authorized by 28 U.S.C. Section 2283 and Rule 65 of the Federal Rules of Civil Procedure.

## PARTIES

12. Plaintiff Richard Katz is a citizen of the State of Pennsylvania, United States of America.

13. NBME is a private, non-profit organization. Its principal place of business is located in Philadelphia, Pennsylvania. It is registered as a Professional Society and/or Association by Guidestar database of Non-profit organizations. http://www.guidestar.org

14. NBME and the FSMB together own and sponsor the United States Medical Licensing Examination ("USMLE"), an examination that is a prerequisite for medical licensing in the United States and its territories. NBME administers the USMLE. The USMLE's primary location is in Philadelphia, Pennsylvania.

15. FSMB is a private non-profit organization that is incorporated under the laws of Nebraska but located in Euless, Texas. FSMB is registered as a Research Institute and/or Public Policy Analysis Organization by Guidestar database of Non-profit organizations. http://www.guidestar.org

## FIRST, SECOND AND THIRD
## CAUSES OF ACTION

### [DISCRIMINATION PURSUANT TO TITLE III OF ADA]
### [BREACH OF CONTRACT]
### [MISLEADING CONDUCT]

3

## [DISCRIMINATION PURSUANT TO TITLE III OF ADA]

16. Pursuant to 28 C.F.R. § 36.309, private entities that administer licensing examinations are required to provide reasonable modifications to the examination and appropriate auxiliary aids and services (i.e., testing accommodations) for persons with disabilities. The purpose of testing accommodations is to ensure, in a reasonable manner, that the "examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual or speaking skills (except where those skills are the factors that the examination purports to measure)." 28 C.F.R. § 36.309(b)(1)(i). "Required modifications to an examination may include changes in the length of time permitted for completion of the examination." 28 C.F.R. § 36.309(b)(2). Private entities who administer licensing examinations also now have a duty to provide exam accommodations and to modify existing rules on the number of times a disabled examinee may take a qualifying professional examination (Doe v. Samuel Merritt University, 921 F. Supp. 2d. 958 (N.D. Cal. 2013)).

---

Judicial and Regulatory Year in Review 3 Page 6  https://www.mesacc.edu/.../disability.../Judicial%20Year%20in%20Review.
Docx Summer Reading List, Post-Secondary Disability, Judicial and Regulatory Year in Review.

17. Katz submitted sufficient documentation to demonstrate that he is a person with a disability within the meaning of the ADA, and that he was entitled to reasonable testing accommodations to take his USMLE exams in 2005-2006. Catherine Farmer., Psy.D. a Reviewer for the NBME in 2006 (now the NBME Compliance Officer for Disability Services) was the sole evaluator of Katz's file. **Ms. Farmer spent a total of *only four hours* reviewing a compilation of Katz's psychoeducational reports, evaluations, and assessments from two psychiatrists and two clinical psychologists that personally examined him on numerous occasions (see defendants' Exhibit 4 pg. 0070).** The Compliance Officer at the time J. Abram Doane (no longer employed by NBME) stated in the NBME denial letter to Katz dated March 13, 2006:

"We consulted EXPER**TS** in the field of Learning Disability and Mental Disorders to assist us in reviewing the documentation."

In actuality, there were no "EXPER**TS**" just one individual Psy.D. by the name Catherine Farmer.

(Please see defendant's Exhibit 4 page 0077 and plaintiff's Complaint Document 1-2 Filed 06/17/15 Page 17 of 29)

18. Ms. Farmer recommended that Katz's application be denied for accommodations in 2006 despite ever meeting or evaluating him. She states in her letter addressed to Mr. Doane dated February 2, 2006:

"As you know, I have not met or examined Mr. Katz. My recommendation is based upon my review of the request and supporting documentation submitted by and behalf of Mr. Katz."

(Please see defendant's Exhibit 4 page 0071)

4

19. The Defendant's determination and denial of accommodations was discriminatory then and in light of the 2008 ADAAA the defendants cannot continue their denial. Pursuant to the ADAAA, Katz would be entitled to the accommodations of extended exam time on the USMLE.

20. Pursuant to the ADAAA and its regulatory guidance, NBME/FSMB are mandated to give considerable deference to Katz's evaluators and their recommendations to provide accommodations. The guidelines to the regulations promulgated by the ADA, provide that testing entities should accept without further inquiry, "documentation provided by a qualified professional who has made an individualized assessment of an applicant, that supports the need for modifications, accommodations or aid requested." (See 28 C.F.R. § 36, App A, at 795). The guidance further explains that **"reports from experts who have personal familiarity with candidates should take precedence over those from, for example reviewers from testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment."**

21. Prior to the ADAAA the NBME and other similar testing entities had a penchant for denying accommodations for students in higher education on the basis that they were not diagnosed at an earlier age or that they performed well academically. In passing the ADAAA, Congress targeted these testing entities noting in the Congressional Record: 2 Cong Rec 8296 (Sept 17, 2008).

22. Katz submitted an Appeal and additional documentation to NBME Disability Services on April 1st 2014 in support of his request for accommodations on the USMLE Step 1, Step 2 CS, CK and Step 3 documenting accommodations he received in undergraduate school, graduate school and medical school. Katz also submitted early childhood medical documentation from The New York Hospital dated 04/22/1981 validating that he had suffered from neurological problems (seizure disorder) as a child (See Document 1-2 Filed 06/17/15 Page 19 of 29).

23. In Rush v. NBME, a second-year medical student with reading and visual processing skills impairments requested and was denied extended time on USMLE Step 1. The court found that the student was substantially limited in his ability to read and process information compared to most people. The court also ruled that the student would suffer an irreparable injury if the requested injunction for additional time was denied. Plaintiff was a medical student with a learning disability who requested and was denied double time in which to take the U.S. Medical Licensing Exam. The court found that Rush was an individual with a disability because he was substantially limited in the major life activities of reading and learning compared to most people. **THE COURT, CRITICAL OF THE BOARD'S (NBME) EXPERTS, granted an injunction requiring the NBME to provide Rush with the accommodations of double time for the exam, stating that without such accommodations the exam would test his disability and not his mastery of the subject matter.**

https://www.ahead.org/node/238

## [BREACH OF CONTRACT]

24. Katz alleges that NBME/FSMB breached "its duty of good faith and fair dealing by wrongfully failing to assist him with his disability in 2005-2006 and again in 2014". He also alleges that NBME/FSMB violated its contract with him by failing to provide testing accommodations in 2006 and in 2014. Katz is disabled as defined by the ADA and Rehabilitation Act. He is entitled to accommodations even though the contract covenants of good faith and fair dealing, as well as third party beneficiaries, are defined *1282 by state, and not federal, law. *See Corneveaux v. CUNA Mut. Ins. Group,* 76 F.3d 1498, 1506 (10th Cir.1996).

"[A] federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." *Carnegie-Mellon Univ. v. Cohill,* 484 U.S.343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

## [MISLEADING CONDUCT]

25. Obstructing justice under federal and state law is generally defined as interfering with the workings of the judicial system, law enforcement, or *regulatory agencies.*

In Shannon the Court of Appeals held:

**"neither must the target be scheduled to testify at the time of the offense nor must he or she actually give testimony at a later time. It is only necessary that there is a *possibility* that the target of the defendant's activities be called on to testify in an official proceeding."**

(Citing the Congressional Record – Senate S272 Jan. 15, 1999)

26. Katz alleges that material fact was concealed by defendants, as there were NO EXPER̲T̲S̲ in the field of Learning Disability and Mental Disorders that assisted defendants in reviewing his documentation in 2005-2006. **The determination that was made by defendants in 2006 should therefore be rendered null and void.** Katz sent a notarized request to NBME Disability Services on January 27, 2014 requesting his documentation from 2005-2006. On February 4th, 2014 Catherine Farmer replied by mail stating:

*"The NBME does not copy or return the comments of an examinee's disability file or send copies to examinees or third parties."*

(See Document 1-5 Filed 06/17/15 Page 1-2)

6

27. The constitutionality of ownership and control of patient records; reports or copies of records of disclosure of information may warrant further scrutiny by this Court. **This information was not made available to Katz until receiving Exhibits 4 and 5 from defendant's dated August 28, 2015.**

28. Katz contacted NBME Disability services on April 20th 2014 by email to appeal the April 17, 2014 denial of his first appeal and to address a Catch-22 situation presented by the defendants. The defendants were requesting a *'formal request'* for exam accommodations on April 8, 2014. It was explained to defendants that a formal request would not be possible to submit as long as he was locked out from registering for USMLE Step I because of the 'Six Attempt limit Rule' imposed by the defendants. The notion Katz was addressing was you cannot submit a formal request for an exam that you obviously barred from registering for. Hence a Catch-22 situation. Katz regarded this as a form of psychological manipulation and bureaucratic entanglement. The defendants never responded to Katz's second appeal. (See Document 1-4 Filed 06/17/15 Pgs. 2-4).

29. There was only one individual Psy.D.* by the name of Catherine Farmer who reviewed Katz's file and it only took her *four hours of review to create years of difficulties and hardships for him.* Ms. Farmer likely had some internal affiliation to NBME/FSMB in 2006 as she is now the Compliance Officer of NBME Disability Services. Ms. Farmer's denial of accommodations in 2006 went against the recommendation of Katz's caregivers that included two clinical psychologists and two psychiatrists (one of whom is an MD/PhD). NBME/FSMB interfered with accessibility regulations under the ADA.

Note*

In the United States, both the Psy.D. and Ph.D. are the only two doctorate degrees that are eligible to sit for the Examination for Professional Practice of Psychology (EPPP). This is the national licensing exam and successful completion is required in order to obtain a license to practice psychology.

Schaffer and colleagues (2012) found that students trained in Ph.D. programs passed the EPPP at higher rates (82%) than students trained in Psy.D. programs (69%).

Schaffer, Jack B.; Rodolfa, Emil; Owen, Jesse; Lipkins, Robert; Webb, Carol; Horn, Jacqueline (February 2012). "The Examination for Professional Practice in Psychology: New data-practical implications". Training and Education in Professional Psychology 6 (1): 1–7. Doi:10.1037/a0026823.

Citing
Statutory Law

*18 U.S.C. § 1515(a)(3) (2010) (Title 18—Chapter 73: Obstruction of Justice)*
(a) As used in sections 1512 and 1513 of this title [18 U.S.C. §§ 1512 and 1513] and in this section—

(3) the term "misleading conduct" means –
(A) knowingly making false statement;
(B) intentionally omitting information from a statement and thereby causing a portion of such statement to be misleading, or intentionally concealing a material fact, and thereby creating a false, forged, altered, or otherwise

7

lacking in authenticity;
(C) with intent to mislead, knowingly submitting or inviting reliance on a writing or recording that is false, forged, altered, or otherwise lacking in authenticity;
(D) with intent to mislead, knowingly submitting or inviting reliance on sample, specimen, map, photograph, boundary mark, or other object that is misleading in a material respect; or
(E) knowingly using a trick, scheme, or device with intent to mislead;

30. Mr. Doane's LinkedIn Profile (Please see Exhibit 7), states he was:

"Manager of Disability/ADA Compliance for NBME from July 2003 through July 2006."

He then became a *Consultant* for NBME Office of General Counsel on July 2006 until ultimately leaving the NBME organization in July 2008.

31. Mr. Doane states in the Education section of his profile that he has a:

- **"Ph.D. (ABD)** in *Communication Sciences and Disorders/Learning Disabilities* from Northwestern University from 1996-2012."

- ABD stands for **"All But Dissertation."** "All But Dissertation" (ABD) is a mostly unofficial term identifying a stage in the process of obtaining a research doctorate in the United States. At this stage, the student has completed the preparatory coursework, qualifying examinations, comprehensive examinations, and *may have* defended his or her dissertation proposal.

- **To complete the degree, the student must carry out the proposed research and write the dissertation that defines a Ph.D. or equivalent research doctorate. "All but dissertation" attrition ranges from 43% to 51% depending on the field.**

32. Mr. Doane's states in his LinkedIn profile that his role at NBME was:

- "Reviewed documentation and reports in support of student requests for services, and was; **Decision-maker for accommodations for NBME testing programs and state medical licensing boards.**"

- Richard Katz applied to NBME Disability Services for exam accommodations in 2005 until receiving a denial by Mr. Doane on March 13, 2006.

33. Mr. Doane states in his profile that he was: "Manager of Disability Services/ADA Compliance Officer at (NBME) from July 2003 through July 2006." This was within the time period that Katz applied to NBME Disability Services for exam accommodations (2005-2006). Mr. Doane was not a Ph.D. during this period.

8

34. Richard Katz respectfully brings to the Courts attention, that Mr. Doane:

- did not have a Ph.D. at the time Katz applied for exam accommodations in 2005-2006;

- was *not qualified* to make any determination on Katz's disability application in 2005-2006;

- was not qualified to disagree with Katz's caregivers (Ph.D.'s, M.D.'s etc.) in 2005-2006.

35. It must be questioned whether Mr. Doane transferred from his role as Compliance Officer of Disability Services because the liability threshold was high. Did NBME realize that Mr. Doane did not have the credentials to hold such a position and was in fact a liability because of his Ph.D./ABD status? It would seem logical that the position would call for a full-fledged Ph.D. candidate.

36. Mr. Doane was the only transparent NBME Representative signing off on disability determinations. By remaining with the NBME organization as a Consultant in 2006 he would lose his transparency and be out of public view (Please See EXHIBIT 8).

Schuman, Rebecca (1 August 2014). "ABD Company - What's worse than getting a Ph.D. in today's job market? Not finishing one.". Slate. Retrieved 17 October 2014.

Sowell, Robert (31 March 2008). "Ph. D. Completion and Attrition: Analysis of Baseline Data" (PDF). Council of Graduate Schools. Retrieved 17 October 2014.

The Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL) 73 P.

S. §§ 201-1 –201-9.2

The "Catchall" Provision

37. The Act's twenty-first unfair trade practice definition, its "catchall," is "any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."

38. Before the 1996 amendments, the catchall provision addressed only "fraudulent conduct," requiring a plaintiff to prove the elements of common law fraud, including proof that a

9

misrepresentation was made intentionally or with reckless disregard of its truth. Rodriguez v.
Mellon Bank, N.A., 218 B.R. 764 (Bankr. E.D. Pa. 1998).

39. However the 1996 amendments expanded the catchall provision to include a wider variety
of unsavory conduct within the reach of the UTPCPL

40. In Fazio, the Superior Court reviews a series of cases, mostly in the federal courts, that recently
held that proof of common law fraud was NOT required and concludes:

"Notwithstanding prior case law on the catchall provision, our review of decisions from the
Commonwealth Court, the federal courts interpreting Pennsylvania law, as well as the statutory
language of the post-amendment catchall provision leads us to conclude the court's jury
instruction regarding 'misleading' conduct accurately set forth the standard of liability under the
amended catchall provision."

41. The courts that have actually examined the issue closely have concluded, rightfully, that the
legislative change is intended to broaden that catchall so that common law fraud is not required.
Grimm v. Washington Mutual Bank, 2008 U.S. Dist. LEXIS 55628, 2008 WL 2858377 (W.D.
Pa. July 22, 2008), Hansford v. Bank of America, 2008 WL 4078460, 2008 U.S. Dist. LEXIS
65502 (E.D. Pa. Aug. 22, 2008); Wilson v. Parisi, 549 F.Supp.2d 637 (M.D. Pa. 2008).

http://www.pittsburghlegalbacktalk.com/archives/7336/#sthash.GlBfYf3T.dpuf

10

## FOURTH CAUSE OF ACTION

## [NEGLIGENT OR INTENTIONAL INFLICTION
## OF EMOTIONAL DISTRESS]

42. Richard Katz has been subjected to intense mental anguish as a result of NBME/FSMB's failure to provide reasonable accommodations in 2005-2006 and again in 2014. This has resulted in repeated studying, multiple attempts at the USMLE exams and subsequent failures all subverting his self-esteem and sense of self-worth not to mention crippling him financially. This took a toll on his mental resources and ultimately his overall health. The 'Make or Break' nature of the 'Six Attempt Limit Rule' was *"the straw that broke the camel's back."* Katz ran out of mental resources and had a nervous breakdown in March of 2013. This resulted in a week long in-patient hospitalization at Pocono Medical Center Behavioral Health Unit.

43. Katz has endured persistent and recurring severe abdominal pain due to emotional distress ultimately a repercussion of the defendant's behavior. He was admitted to the Pocono Medical Center Emergency Room on August 20th 2015. The nature of this ailment is currently being evaluated by a Gastroenterologist requiring further testing.

44. Katz has experienced frequent exacerbations of his asthma during the past two years. The experience of an acute negative event increases the risk of a subsequent asthma attack by nearly 2-fold. The long-term stress has also induced frequent headaches, high blood sugar approaching a pre-diabetic state, skin conditions for which he sees a Dermatologist monthly since 2013, depression, anxiety and sleep disturbance (Please see EXHIBIT 9 Under Seal).

## FIFTH CAUSE OF ACTION

## [IMPAIRMENT OF ECONOMIC OPPORTUNITY]

45. A defendant is liable for damages if it can be proven that their negligence was both the cause-in-fact and the proximate cause of the consequent harm. In most negligence cases the "but for" test provides a bright line rule for determining whether the defendant's actions were the cause-in-fact of the plaintiff's loss. The plaintiff must successfully argue that but for the act of negligence he would not have suffered the subsequent economic loss.

http://academic.udayton.edu/Lawecon/Readings/Paper%20-%20Loss%20of%20chance%20for%20LB%20Class.pdf

46. Richard Katz's medical career has been in a state of perpetual limbo since graduating Medical School in 2004. If NBME/FSMB granted Katz's accommodation request in 2006 only two years would have been lost instead of a decade. By not granting the accommodation Katz sorely needed for success he was subjected to a decade of studying and struggling to apply methods in order to compensate for his disability. This proved to be futile as his resourcefulness could do nothing to

11

compensate for the clock. NBME/FSMB refused to grant Katz additional time on his USMLE exams in 2006 and again in 2014.

47. Frederick Romberg a Yale Medical Student with dyslexia (now an Anesthesiology Resident at the University of Utah) only waited a year for the DOJ to settle with NBME for his disability DJ# 20216-181. On February 23, 2011, NBME entered into a settlement agreement with DOJ resolving a complaint by Romberg who was refused the accommodations he requested because of his disability. **The Board agreed to provide reasonable testing accommodations to people with disabilities when taking the U.S. Medical Licensing Examination and agreed to grant the complainant the accommodations he needed -- double the standard testing time and a separate testing area to take the test.**

http://massivearticles.com/news/Frederick-Romberg.html

48. "In the past, demands for unnecessary or redundant documentation, burdensome and expensive repeated professional evaluations, or irrelevant evaluative testing unrelated to the ability to demonstrate one's knowledge or skills on an examination prevented individuals with appropriately documented disabilities from pursuing their chosen professions." said Thomas E. Perez, assistant attorney general for DOJ's Civil Rights Division. "By entering into this agreement, NBME is doing its part to ensure that people with a reading disability like Mr. Romberg will have the opportunity to take the USMLE with the reasonable testing accommodations they need to demonstrate their knowledge and ability

http://healthleadersmedia.com/page-1/PHY-262976/DOJ-NBME-Reach-Settlement-in-ADA-Complaint

49. Under the agreement, the NBME was to:

Only request documentation about (a) the existence of a physical or mental impairment; (b) whether the applicant's impairment substantially limits one or more major life activities within the meaning of the ADA; and (c) whether and how the impairment limits the applicant's ability to take the USMLE under standard conditions;

http://massivearticles.com/news/Frederick-Romberg.html

50. "Too many people like Frederick have seen their hard work disregarded and their career paths disrupted," according to the Director of the Yale Center for Dyslexia & Creativity Sally Shaywitz. Mrs. Shaywitz was influential in helping Romberg receive accommodations he needed. She stated:

"What testing agencies have tended to do is ask for a whole panoply of information and testing that wasn't relevant for determining who had a disability. At the very least, the settlement acknowledges that it's important to give careful consideration to the medical history of the specific individual who's being evaluated."

http://massivearticles.com/news/Frederick-Romberg.html

12

51. This agreement was signed February of 2011 and was over in February of 2013. Katz sent an appeal to the USMLE Organization in April of 2014 and was *denied* accommodations by the USMLE Secretariat's Office (see Document 1-2 Filed 06/17/15 Page 1 of 29 and Document 1-4 Filed 06/17/15 Page 1 of 5).

52. Katz exhausted all Administrative remedies in resolving this matter with NBME/FSMB prior to filing this lawsuit. As stated in Amy Bueno's (Office of the USMLE Secretariat) letter dated April 17, 2014:

"According to the *USMLE Bulletin of Information*, the only exception to this policy identified by the USMLE Composite Committee (the governing body of the USMLE program) involves state medical boards. The policy includes a provision to allow examinees who have six or more attempts at a Step or component to have an additional attempt if so requested by a state medical board that is fully informed of the individual's prior examination history."

Document 1-4 Filed 06/17/15 Page 1 of 5

53. With the help of Representative David Parker's Office of District 115 Katz inquired about the above provision on March of 2015 and the matter was placed on the May 2015 Agenda of the Pennsylvania State Board of Medicine. The conclusion is stated in the Counsel for the State of PA Board of Medicine's letter dated June 4, 2015:

"The Board determined that the request to waive the six-attempt limit is premature. If you are successful in your appeal, the Board anticipates that the NBME will grant reasonable accommodations and authorize your client (Katz) to re-test. If for some reason the NBME will provide accommodations but will not allow re-testing without authorization from the Board to waive the six-attempt limit, please correspond with us again and the matter will be presented to the Board for action."

Document 1-7 Filed 06/17/15 Page 4 of 5

## SIXTH CAUSE OF ACTION

### [FRAUDULENT MISREPRESENTATION]

54. A plaintiff can recover against a defendant on the grounds of fraudulent misrepresentation if (1) a representation was made; (2) that was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth; (4) that it was made with the intention that the plaintiff rely on it; (5) that the plaintiff did rely on it; and (6) that the plaintiff suffered damages as a result.

**1. The defendant must have made a representation as to a past or existing material fact.**
*Affirmative.* Mr. Doane in his March 13, 2006 letter made a *false representation* stating that Katz's documentation was given to "experts in the field of Learning Disability and Mental Disorders to assist NBME Disability Services in reviewing the documentation"

13

2. The representation must have been false. *Affirmative.* It was based on review of the defendant's exhibit 4.

3. The defendant must have known that the representation was false when made or must have made the representation recklessly without knowing whether it was true or false. *Affirmative.*
Mr. Doane would have had knowledge as to who the Reviewers were in 2006 because he would of received a statement from each Reviewer evaluating Katz's file.

4. The defendant must have made the representation with an intent to defraud the plaintiff, that is, he she must have made the representation for the purpose of inducing the plaintiff to rely upon it and to act or to refrain from acting in reliance thereon. *Affirmative.* Mr. Doane intentionally affected Katz's transaction with NBME by employing a *false statement.*

5. The plaintiff must have been unaware of the falsity of the representation; must have acted in reliance upon the truth of the representation and must have been justified in relying upon the representation. *Affirmative.* The defendants required excessive documentation in 2005-2006 that was not financially feasible. Katz felt that he submitted sufficient documentation to justify his disability under the guidelines of the ADA. This was the same complaint in the Romberg case that prompted NBME to enter into agreement with DOJ, 'the requirement of excessive documentation to substantiate disability claims.'

6. And, finally, as a result of the reliance upon the truth of the representation, the plaintiff must have sustained damage. *Affirmative.* Katz was obviously harmed by the final transaction as described above in the FOURTH and FIFTH CAUSES OF ACTION.

http://www.west.net/~smith/deceit.ht

## SEVENTH CAUSE OF ACTION

### [PRELIMINARY INJUNCTION]

55. To obtain a preliminary injunction, the moving party must demonstrate:

(1) A substantial likelihood of success on the merits;
(2) A substantial threat of irreparable injury if the injunction is not granted;
(3) The threatened injury to the movant outweighs the damage to the opposing party; and
(4) Granting the injunction would not be adverse to the public interest. Four Seasons Hotels & Resorts v. Consorcio Barr, 320 F.3d 1205, 1210 (11th Cir, 2003).

56. First, Katz has a substantial likelihood of success on the merits.

Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of

14

disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). To succeed on his ADA claim, Katz would need to prove that:

(1) He is disabled,
(2) NBME/FSMB is a private entity which owns, leases or operates a place of public accommodation;
(3) NBME/FSMB failed to make reasonable modifications in its policies, practices, or procedures to accommodate Katz's disability without fundamentally altering the nature of the public accommodation. See 42 U.S.C. § 12182(a);

57. Under the ADA, the term "disability" means, with respect to an individual, "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; [5](B) a record of such an impairment; or (C) being regarded as having such an impairment" as described in 42 U.S.C. § 12102(3). 42 U.S.C. § 12102(1).

Katz satisfies criteria for A, B, and C as stated above.

58. Katz satisfies:

(1) Criteria one above. Katz has impairment of a major life activity substantially limiting him, he has difficulty thinking, concentrating, and reading. He had the same difficulties back in 2005-2006 when he applied for exam accommodation to NBME Disability Services. He suffers from bipolar disorder. Bipolar disorder often appears in the late teens or early adult years. At least half of all cases start before age 25. Some people have their first symptoms during childhood, while others may develop symptoms late in life.

---

Kessler RC, Berglund P, Demler O, Jin R, Merikangas KR, Walters EE. Lifetime prevalence and age-ofonset distributions of DSM-IV disorders in the National Comorbidity Survey Replication. Arch Gen Psychiatry. 2005 Jun;62(6):593–602

(2) Criteria two as stated above does not appear to be in dispute in this case.

(3) Katz satisfies Criteria three as stated above. He provided sufficient documentation to NBME in 2005-2006 to demonstrate that he is a person with a disability. A telephone conversation with Nabina Sinha Trial Attorney for the DOJ on July 23rd 2015 at 10:30 AM stated; based on the Department's review of his documentation from 2005-2006 and current, that he "is covered under the ADA." Mr. Doane Compliance Officer for Disability Services in 2005-2006 made a false statement as Katz's documentation in 2005-2006 was never evaluated by EXPERTS in the fields of Learning Disability and Mental Disorders. Also, "The Six Attempt Limit Rule" is a violation to individuals with documented disabilities under the ADA based on the following precedent Doe v. Samuel Merritt University, 921 F. Supp. 2d. 958 (N.D. Cal. 2013).

59. Second, Katz has shown that he faces a substantial threat of irreparable injury because granting such an injunction would allow Katz to take the USMLE while his knowledge of the subject matter remains relatively fresh. His last attempt on USMLE Step I was November 12, 2013 he failed by six points, the attempt before last was November 2, 2012 he failed by three points (see Document 1-6 filed

15

06/17/15 Pgs. 1-2/7). The fact that Katz is on the cusp of passing without accommodations speaks volumes of what he is likely to achieve if his disability was accounted for and the playing field levelled. It is quite feasible that Katz could achieve very high scores on the USMLE exams due to the fact that he has reached near passing scores while carrying the burden of his disability. *Lastly, if Katz is not granted future attempts at the USMLE exams with accommodations he will be in financial ruin because of the failure to meet the commitment of his medical educational loans.*

60. Third, the threat of harm to Katz outweighs the damage to the opposing party. Katz's request for extended exam time for the USMLE Exams is a reasonable accommodation under the ADA. His request to modify the 'Six Attempt Limit Rule' is a reasonable accommodation and does not substantially compromise USMLE standards.

61. Fourth, preliminary injunction would not harm the public interest especially in light of the DOJ's involvement and investigation into this case.

62. Because Richard Katz has carried the burden on all four elements the balance of equities tips in his favor. He respectfully requests this Honorable Court to grant Motion for Preliminary Injunction adopting his arguments.

## EIGHTH CAUSE OF ACTION

### [DISCRIMINATION PURSUANT TO § 504 OF THE REHABILITATION ACT OF 1973]

63. Section 504 of the Rehabilitation Act specifically prohibits discrimination against individuals with disabilities in programs receiving federal funds. Both NBME and FSMB are recipients of Federal Funds. Section 504 covers individuals who have physical or mental impairments that are substantially limited by one or more major life activities, have a record of such impairments, or are regarded as having such impairments. Richard Katz satisfies all three criteria due to his disability (bipolar disorder).

64. NBME/FSMB violated Katz's rights under § 504 by refusing to accommodate his disability, and by barring him from registering for USMLE Step I because of their 'Six Attempt Limit Rule.'

§ 504 of the Rehabilitation Act provides:

"No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."
Section 504, 29 U.S.C.§794

16

65. Katz exhausted all administrative remedies prior to filing this suit, he clearly asked defendants to accommodate his disabilities in his April 1st 2014 Appeal (see Documents 1-2 Pages 1-29). He needed extra time during his medical licensing exams because his disability prevented him from processing all of the exam questions in the time permitted under regular exam conditions. This request was denied on April 17, 2014 by the office of the USMLE Secretariat (Document 1-4 Page 1). Katz responded with a second Appeal of the April 17, 2014 denial on April 20, 2014 to NBME Disability Services regarding the injustice of 'The Six Attempt Limit Rule' for people with disabilities. Compliance Officer for NBME Disability Services Catherine Farmer never responded to Katz's second Appeal (see Documents 1-4 Pages 2-4).

66. The Rehabilitation Act requires defendants to grant Katz's requests to waive 'The Six Attempt Limit Rule' and to provide double time and a separate testing area for him to take his examinations. It also requires defendants to provide Katz additional time (double time) for his USMLE Step 2 CS exam Patient Encounter and double time for writing his Patient Note. (See EXHIBIT 10 Proof of Federal Funding)

67. Remedies for violations of § 504 of the Rehabilitation Act include declaratory judgments, injunctions (including preliminary injunctions and temporary restraining orders, where appropriate), costs, and attorney fees at market rates. Money damages may also be available[1].

---

[1] See, e.g., Ferguson v. City of Phoenix, 157 F.3d 668, 674 (9th Cir. 1998).

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff respectively prays that this Honorable Court enter judgment granting plaintiff:

## ON ALL CAUSES OF ACTION:

68. For general and special damages according to proof;

69. For attorneys' fees and costs incurred;

70. For an adequate and sufficient sum to indemnify Plaintiff from any and all losses or liabilities, attorneys' fees, experts' fees, or any other damages arising from Defendants' actions;

71. A declaration that the acts and omissions described herein violated plaintiffs' right under the Constitution and laws of the United States of America.

72. A preliminary and permanent injunction ordering defendants to overturn Six Attempt Limit Rule and allow plaintiff to register for USMLE Step 1, Step 2 (CK and CS) and Step 3 with Exam accommodations (double exam time) on all USMLE exams under the ADA ADAAA and Rehabilitation Act, as well as a separate room in which to complete the exams.

73. Plaintiff requests from this Court that all of his previous attempts on USMLE Step 1, Step 2 CS and CK be wiped clean from the record. These attempts occurred without any form of exam accommodations, during regular exam conditions, and as a result the playing field was not levelled based on plaintiffs' disability pursuant to Title III of the ADA.

74. Compensatory damages against defendants, jointly and severely based on what this Honorable Court finds fair and equitable based on DOJ guidelines.

75. Punitive damages against Defendants severely based on what this Honorable Court finds fair and equitable based on DOJ guidelines.

76. A jury Trial on all issues triable by Jury

77. Plaintiff's Costs for registering for all USMLE Steps without the proper exam accommodations needed for his disability since February 1st 2006 totaling $8,660.00.

78. Any additional relief this court deems, just, proper, and equitable.

Respectfully submitted,

Richard Katz
3364 Parker Lane
East Stroudsburg, PA
18301
pro se

/s/ Richard Katz
Richard Katz

18

S.A.  305

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Second Amended Complaint has been served upon:

Michael Sacks
Hamburg & Golden, P.C.
1601 Market Street Suite 3310
Philadelphia PA 19103-1443


Date: November 13, 2015


/s/ Richard Katz
Richard Katz

19

PRESS FIRMLY TO SEAL

U.S.
EAST STROUDSBURG, PA
8301
NOV 13  15
AMOUNT

$5.75

1005     18501     R2304N118528-02

Richard Katz
3364 Parker Lane
East Stroudsburg, PA
18301

ECEIVED
CRANTON

NOV 1 7 2015

DEPUTY CLERK

TO:

The Middle District of Pennsylvania
William J. Nealon Federal Bldg. & US
Courthouse

ATT: CLERK OF COURT
US DISTRICT COURT
PO Box 1148

235 N. Washington Avenue
Scranton, PA 18501-1148

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

UNITED STATES
POSTAL SERVICE.

The packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® this

1 SCV 1187

FILED
SCRANTON

NOV **1 7** 2015

PER _____ ~~A̶m̶o̶~~
DEPUTY CLERK

# EXHIBIT 6

PATRICK J. TOOMEY
PENNSYLVANIA

COMMITTEES:
FINANCE
BANKING, HOUSING, AND
URBAN AFFAIRS
BUDGET

# United States Senate

WASHINGTON, DC 20510

October 26, 2015

Richard Katz
3364 Parker Ln
East Stroudsburg, PA, 18301-8737

Dear Mr. Katz,

Thank you for contacting my office regarding your inquiry with the Department of Justice. I contacted the appropriate officials and received the enclosed response.

According to the response, you have been in contact with officials at the Department of Justice. I suggest that you continue to work directly with them to find a resolution to your inquiry. If you find yourself having issues hearing back from the Department of Justice, please contact my office and we will be happy to assist you.

If you have any questions, please contact my Constituent Advocate Magdalena Jagla. Magdalena can be reached by phone at (610) 434-1444, by email at Magdalena_Jagla@toomey.senate.gov, by fax at (610) 434-1844 or by mailing address at 1150 S. Cedar Crest Blvd., Suite 101, Allentown, PA 18103.

Sincerely,

Pat Toomey
U.S. Senator

U.S. Department of Justice          OCT 22 2015

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

OCT 14 2015

The Honorable Patrick Toomey
United States Senate
1150 S. Cedar Crest Blvd
Suite 101
Allentown, PA  18103

Dear Senator Toomey:

This responds to your email to the Office of Legal Affairs dated June 29, 2015, regarding your constituent, Mr. Richard Katz. We apologize for our delay in responding to your email. Mr. Katz is a person with a disability and he alleges that a private testing entity, the National Board of Medical Examiners (NBME), violated the Americans with Disabilities Act (ADA) when it refused to grant him his requested testing accommodations for the United States Medical Licensing Examination (USMLE). You previously contacted the Department of Justice (the Department) regarding this matter and you now request an update.

The Disability Rights Section of the Civil Rights Division enforces the ADA. Title III of the ADA protects individuals with disabilities from discrimination by private testing entities, such as NBME. Specifically, the ADA implementing regulations require that private testing entities administer examinations to people with disabilities "so as to best ensure that...the examination results accurately reflect the individual's aptitude or achievement level...rather than reflecting the individual's [disability]". 28 C.F.R. § 36.309. More information on the ADA is available on the Department's ADA Home Page at http://www.ada.gov.

Since this office's last communication with you (attached), Section staff have opened an investigation of Mr. Katz's complaint. Staff have collected additional information from him and are currently monitoring the progress of Mr. Katz's private lawsuit against NBME. As a result, Mr. Katz is in regular contact with Section staff.

The Honorable Patrick Toomey
Page Two

We hope this information is helpful to you. Please do not hesitate to contact the
Department if we can be of assistance in this or any other matter.

Sincerely,

# EXHIBIT 7

Misleading Conduct
Katz v. NBME/FSMB
Case No. 3:15-cv-01187

# EXHIBIT 7



## Abram Doane

Coordinator, Office for Academic Success at Salus University

Greater Philadelphia Area | Higher Education

Previous    J.A. Doane Consulting / Student Support Services, National Board of Medical Examiners, Temple University

Education    Washington University in St. Louis School of Law

**Send Abram InMail** ▾

**263**
connections

https://www.linkedin.com/in/jsdoane    Contact Info

**Background**

 **Summary**

Check back....I'm updating...

Specialties: Coaching adults with ADD, their partners, and families. Trained in adult ADD, LD and related challenges. Experienced with the effects of ADD in post-secondary education, medical and law schools and certification/licensure, as well as law and medical practice. Experienced teacher and speaker. Trained mediator.

Psychoeducational assessment, disability services consultation, and advocate for individuals with disabilities.

 **Experience**

### Coordinator, Office for Academic Success



Salus University

August 2015 – Present (3 months) | Elkins Park, PA

ADA and Rehab Act compliance, accessibility services; advocacy, universal design promotion

### Coach, Disability Services Consultant, Advocate, Mediator

J.A. Doane Consulting / Student Support Services

August 2007 – August 2015 (8 years 1 month) | United States

Enlightened professional support for young adults and adults with ADD/ADHD, their partners and families. Providing individual and group coaching, conversation facilitation. Psychoeducational assessment, advocacy for individuals with disabilities and conflict mediation. Services offered in-person, via phone, and online.

### Consultant, Office of the General Counsel



National Board of Medical Examiners

July 2006 – July 2008 (2 years 1 month) | Greater Philadelphia Area

Consultant for general counsel regarding ADA compliance and disability-related matters

### Adjunct Faculty, Institute on Disabilities



Temple University

September 2006 – June 2008 (1 year 10 months) | Greater Philadelphia Area

### Manager, Disability Services/ADA Compliance Officer



National Board of Medical Examiners

July 2003 – July 2006 (3 years 1 month) | Greater Philadelphia Area

• Reviewed documentation and reports in support of student requests for services. Decision-maker for accommodations for NBME testing programs and state medical licensing boards. Developed and implemented non-standard computer-based and clinical skills examinations

• Reorganized unit to improve professionalism and efficiency. Designed and implemented information processing confidential system in collaboration with technical staff. Trained staff in use

• Supervised professionals, support staff, and external consultants. Formulated policies and procedures, annual budget and best practices. Managed escalated, highly sensitive, and high profile cases in conjunction with general counsel and contracted law firms. Advised senior management regarding ADA compliance

• Represented NBME at professional conferences. Presented seminars at national, state, and local events.

# EXHIBIT 8

Misleading Conduct                Katz v. NBME/FSMB                        Case No. 3:15-cv-01187

## COMPLIANCE OFFICER







Misleading Conduct                    Katz v. NBME/FSMB                         Case No. **3:15-cv-01187**

## MISLEADING CONDUCT

## Example:

Any of the above Disability Applicants depicted in the above illustration can be potential *TARGETS* of the Compliance Officer.

"Neither must the target be scheduled to testify at the time of the offense nor must he or she actually give testimony at a later time. It is only necessary that there is a possibility that the target of the defendant's activities be called on to testify in an official proceeding."

-The Court of Appeals.

If a defendant lies to a Target hoping the Target will believe his story, this is misleading conduct.

Any act interfering with administration of justice constitutes obstruction. *No official proceeding needs to be pending.* This law applies to all businesses.

For instance, let's say that the Compliance Officer in a written denial letter to the Disability Applicant states that his/her records have been reviewed by "EXPERTS" in the fields of learning disabilities and mental disorders and do not qualify for exam accommodations because his/her disability does not substantially limit them in a *major life activity*. If the disability candidates' file is never reviewed by such experts does this constitute misleading conduct?

The Compliance Officer misleads the Disability Applicant expecting that he/she will believe his story as true and move on without the much needed accommodation that he/she required for success. The Compliance Officer knows that the Disability Applicant will likely never get to see his/her reviews by the "Experts" in the field of Learning Disorders and Mental Disabilities that were supposedly consulted, as this is not available and never made available to the Applicant. This is unless his/her case happens to appear in front of a Court of law and these reports are obtained. In essence the Disability Applicant falls victim to the falsification of a record and as a result never obtains the justice that he/she required or deserved for success and individual career goals are never achieved.

Obstruction of Justice is a broad concept that extends to any effort to prevent the execution of lawful process or the administration of justice in either criminal or *civil matters.*

In the November 2011 United States Government Accountability Office (GAO) Report to Congressional Requesters entitled: **HIGHER EDUCATION AND DISABILITY** Improved

Case: 17-1329    Document: 003112711114    Page: 157    Date Filed: 08/25/2017

Case 3:15-cv-01187-RDM-JFS   Document 125-4   Filed 07/08/16   Page 32 of 40
Case 3:15-cv-0118    DM-JFS   Document 107   Filed 05/0.   3   Page 31 of 41

Misleading Conduct                    Katz v. NBME/FSMB                    Case No. 3:15-cv-01187

**Federal Enforcement Needed to Better Protect Students' Rights to Testing Accommodations GAO states:**

"Since we found testing companies believe their practices are already in compliance with the new regulatory requirements, it is unclear whether these changes will better protect the rights of students with disabilities. **In order to ensure individuals with disabilities have equal opportunity to pursue their education and career goals, it is imperative for Justice (DOJ) to establish a credible enforcement presence to detect, correct, and prevent violations.**"

This report goes on to say:

"Given the critical role that standardized tests play in making decisions on higher education admissions, licensure, and job placement, federal laws require that individuals with disabilities are able to access these tests in a manner that allows them to accurately demonstrate their skill level. **Test takers and disability advocates continue to raise questions about whether testing companies are complying with the law in making their determinations.**"

---

*References:*

1. http://www.armstrongteasdale.com/ClientAlerts/GoodLivingUnderTheNewObstructionOfJusticeLaw-may04.pdf

2. http://www.nytimes.com/1999/01/16/us/the-trial-of-the-president-applying-witness-tampering-in-civil-cases.html

3. http://www.wholechildeducation.org/blog/self-selecting-real-world-learning-communities

4. http://www.gao.gov/assets/590/587367.pdf

5. 329 U.S.C. § 794.

6. 442 U.S.C. § 12189. Section 309 is found in Title III of the ADA.

# EXHIBIT 10

## PROOF OF
## FEDERAL FUNDING

EXHIBIT PROOF OF FEDERAL FUNDING

Katz v. NBME/FSMB

Case No. 3:15-cv-01187


## Proof of Federal Funding NBME:


www.usaspending.gov/Pages/AdvancedSearch.aspx?k=national%20board%20of%20medic
al%20examiners



| Recipient | Award ID | Award Amount | Award Date | Award Type | Awarding Agency | Funding Agency | Role |
|---|---|---|---|---|---|---|---|
| AKION RESOURCE MANAGEMENT INCORPORATED | DTFA240T00A013 | $0 | 09/11/2000 | Contracts | Department of Transportation | Department of Transportation | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | MI9424015EA531 | $72,378 | 09/26/2013 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | W9124041EA043 | $10,120 | 12/26/2013 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000310AV518 | $8,310 | 11/25/2004 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000310AV172 | $15,860 | 04/03/2009 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000310AV317 | $79,410 | 07/16/2013 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000310AV202 | $7,240 | 11/03/2000 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | VAF1F1P0000 | $195,000 | 11/23/2010 | Contracts | Department of Veterans Affairs | Department of Veterans Affairs | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000310AV312 | $0 | 04/25/2011 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000310AV202 | $37,554 | 09/03/2013 | Contracts | Department of Veterans Affairs | Department of Veterans Affairs | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | VAF1F1P0008 | $0 | 10/04/2011 | Contracts | Department of Veterans Affairs | Department of Veterans Affairs | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000310AV572 | $3,911 | 09/09/2011 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000310AV313 | $9,000 | 04/25/2011 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000310AV256 | $7,990 | 01/20/2011 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000311AV543 | $7,440 | 12/26/2010 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000310AV517 | $3,330 | 03/24/2011 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000310AV202 | $7,490 | 04/07/2010 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000311AV324 | $7,440 | 04/07/2010 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000310AV425 | $8,200 | 03/28/2006 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000310AV119 | $95,330 | 03/29/2006 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000310AV042 | $8,700 | 11/03/2000 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000310AV518 | $8,700 | 11/29/2004 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000310AV518 | $15,440 | 02/11/2000 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | MI9404103AV454 | $71,102 | 03/11/2012 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | MI9404103AV437 | $9,700 | 01/24/2011 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | RE99912310AV216 | $10,530 | 04/29/2010 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000311AV253 | $4,700 | 12/25/2011 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000311AV243 | $18,320 | 12/13/2010 | Contracts | Department of Defense | Department of Defense | Prime |
| NATIONAL BOARD OF MEDICAL EXAMINERS INC | HL000311AV342 | $21,000 | 12/16/2010 | Contracts | Department of Defense | Department of Defense | Prime |

EXHIBIT PROOF OF FEDERAL FUNDING                                    Katz v. NBME/FSMB

Case No. 3:15-cv-01187

**www.usaspending.gov/transparency/Pages/RecipientProfile.aspx?DUNSNumber=06184032
8&FiscalYear=2015**

EXHIBIT PROOF OF FEDERAL FUNDING                                    Katz v. NBME/FSMB

Case No. 3:15-cv-01187



EXHIBIT PROOF OF FEDERAL FUNDING                          Katz v. NBME/FSMB

Case No. 3:15-cv-01187

PRIME AWARD DATA

PRIME AWARDS BY SPENDING TYPE



■ Contracts

Text View of Prime Awards By Spending Type

PRIME'S SUB-AWARDEES

No Data Found

TOP PRODUCTS OR SERVICES

| | | |
|---|---|---|
| 1. Education Services | | $19,250 |
| 2. Personnel Testing | | $4,756 |
| 3. Other Education and Training Services | | $0 |
| | Text View and More Details on Top Products/Services | |

AWARDING AGENCIES

| | | |
|---|---|---|
| 1. Department of Defense | | $24,006 |
| 2. Department of Veterans Affairs | | $0 |
| | Text View and More Details on Awarding Agencies | |

TOP PROGRAMS

No Data Found

AWARDS BY STATES



| | | |
|---|---|---|
| 1. Pennsylvania | | $19,250 |
| 2. Maryland | | $4,756 |
| | Text View and More Details on Awards by States | |

EXHIBIT PROOF OF FEDERAL FUNDING                    Katz v. NBME/FSMB

Case No. 3:15-cv-01187

## Proof of Federal Funding FSMB:

www.usaspending.gov/Pages/AdvancedSearch.aspx?k=Federation%20of%20State%20Medical%20Boards



EXHIBIT PROOF OF FEDERAL FUNDING                    Katz v. NBME/FSMB

Case No. 3:15-cv-01187

www.usaspending.gov/transparency/Pages/RecipientProfile.aspx?DUNSNumber=051010890&FiscalYear=2015

PRESS FIRMLY TO SEAL

U.S.
EAST STROUDSBURG, PA
18301
NOV 19   15
AMOUNT
**$5.75**
R2304N118526-02

1006      18501

Richard Katz
3364 Parker Lane
East Stroudsburg, PA
18301

ECEIVED
CRANTON

NOV 1 7 2015

DEPUTY CLERK

**TO:**

The Middle District of Pennsylvania
William J. Nealon Federal Bldg. & US
Courthouse

ATT: CLERK OF COURT
US DISTRICT COURT
PO Box 1148

235 N. Washington Avenue
Scranton, PA 18501-1148

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® this

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

**UNITED STATES
POSTAL SERVICE.**

**S.A. 326**